IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION

A & E AUTO BODY, INC.,
AMERICAN PAINT & BODY, INC.,
AUTO & COACH WORKS OF CENTRAL FL
INC.,
AUTO BODY CONCEPTS, INC.,
COLLISION CONCEPTS OF DELRAY, LLC,
ELITE EURO CARS COLLISION SERVICES,
INC.,
EXPRESS PAINT & BODY,
GUNDER'S AUTO CENTER, INC.,
JUSTICE COLLISION, LLC,
LONG WHOLESALE CONSULTANTS,
MARSHALLS BODY MASTERS,
OLD DIXIE PAINT AND BODY LLC,
ORLANDO AUTO BODY, INC.,
QUALITY COLLISION REPAIR, INC.,
REGAL PONTIAC, INC.,
SPS BUSINESS INVESTMENTS, INC.,
STEWART AGENCY INC. d/b/a EARL
STEWART TOYOTA OF NORTH PALM
BEACH ,
STEWART AUTO REPAIR, INC.,
STEWART COLLISION GROUP, LLC, d/b/a
BERNIE'S BODY SHOP,

PLAINTIFFS

VS.                                              CAUSE NO.  6:14-CV-310-ORL-31TBS
                                                          _____

21ST CENTURY CENTENNIAL INSURANCE COMPANY,
d/b/a FARMERS INSURANCE GROUP,
21st CENTURY NORTH AMERICAN INSURANCE COMPANY,
ACCEPTANCE INDEMNITY INSURANCE COMPANY,
ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY,
ALLSTATE INSURANCE COMPANY,
BRISTOL WEST INSURANCE COMPANY,
DIRECT GENERAL INSURANCE COMPANY,

-1-

ENCOMPASS INDEMNITY COMPANY,
ESURANCE PROPERTY & CASUALTY INSURANCE
COMPANY, a/k/a ESURANCE INSURANCE COMPANY,
FIRST ACCEPTANCE INSURANCE COMPANY, INC.,
FLORIDA FARM BUREAU GENERAL INSURANCE
COMPANY, d/b/a FLORIDA FARM BUREAU
INSURANCE COMPANIES,
FOREMOST INSURANCE COMPANY,
GEICO GENERAL INSURANCE COMPANY,
HARTFORD ACCIDENT AND INDEMNITY COMPANY,
HARTFORD UNDERWRITERS INSURANCE COMPANY,
HORACE MANN INSURANCE COMPANY,
INFINITY AUTO INSURANCE COMPANY,
LIBERTY MUTUAL INSURANCE COMPANY,
MERCURY INSURANCE COMPANY OF FLORIDA,
MGA INSURANCE COMPANY, INC., d/b/a
GAINSCO AUTO INSURANCE,
NATIONAL GENERAL INSURANCE ONLINE, INC.,
NATIONWIDE INSURANCE COMPANY OF FLORIDA,
NATIONWIDE MUTUAL INSURANCE COMPANY,
OCEAN HARBOR CASUALTY INSURANCE COMPANY,
OLD REPUBLIC INSURANCE COMPANY,
OLD REPUBLIC INSURANCE COMPANY, d/b/a
GALLAGHER BASSETT SERVICES, INC.,
PROGRESSIVE CASUALTY INSURANCE COMPANY,
SAFECO INSURANCE COMPANY OF AMERICA,
SECURITY NATIONAL INSURANCE COMPANY, d/b/a
FARMERS INSURANCE GROUP,
SENTRY INSURANCE A MUTUAL COMPANY,
STATE AUTOMOBILE MUTUAL INSURANCE
COMPANY,
STATE FARM MUTUAL AUTOMOBILE INSURANCE
COMPANY,
THE CINCINNATI INSURANCE COMPANY,
THE TRAVELERS INDEMNITY COMPANY,
USAA CASUALTY INSURANCE COMPANY, d/b/a
UNITED SERVICES AUTOMOBILE ASSOCIATION,
USAA CASUALTY INSURANCE COMPANY,
WESTFIELD INSURANCE COMPANY,

-2-

WINDHAVEN INSURANCE COMPANY,
ZURICH AMERICAN INSURANCE COMPANY,

### DEFENDANTS.

### COMPLAINT &

### DEMAND FOR JURY TRIAL

COME NOW, the above-captioned Plaintiffs, pursuant to the Federal Rules of Civil Procedure and the Local Rules of the U.S. Dist. Ct. for the Mid. Dist. of Fla., and file this, their Complaint & Demand for Jury Trial against the above-captioned Defendants, and in support thereof, state the following:

### PARTIES

1.      Plaintiff A & E Auto Body, Inc, is a Florida corporation licensed to do business and is doing business at 12002 Highway 17 North, Eagle Lake, Florida 33839.

2.      Plaintiff American Paint & Body, Inc, is a Florida corporation registered to do business and is doing business at 2210 Garden Street, Titusville, Florida 32796.

3.      Plaintiff Auto & Coach Works of Central FL, Inc, is a Florida corporation registered to do business and is doing business at 3650 Havendale Blvd. N.W., Winter Haven, Florida 33881.

4.      Plaintiff Auto Body Concepts, Inc, is a Florida corporation registered to do business and is doing business at 1927 NW 40th Court, Pompano Beach, Florida 33064.

5.      Plaintiff Collision Concepts of Delray, LLC, is a Florida limited liability corporation registered to do business and is doing business at 1875 SW 4th Avenue, C-1, Delray Beach, Florida 33444.

6.      Plaintiff Elite Euro Cars Collision Services, Inc, is a Florida corporation licensed to do business and is doing business at 15740 County Line Road, Spring Hill, Florida 34610.

7.      Plaintiff Express Paint & Body, Inc, is a Florida corporation licensed to do business and is doing business at 706 N. Wabash Avenue, Lakeland, Florida 33815.

8.      Plaintiff Gunder's Auto Center, Inc, is a Florida corporation licensed to do business and is doing business at 930 Griffin Road, Lakeland, Florida 33805.

9.      Plaintiff Justice Collision, LLC, is a Florida limited liability corporation licensed to do business and is doing business at 1190 Wendy Court, Spring Hill, Florida 34607.

10.     Plaintiff Long Wholesale Consultants, is a Florida sole proprietor licensed to do business and is doing business at 827 Saint Michel Drive, Rockledge, Florida 32955.

11.     Plaintiff Marshalls Body Masters is a Florida sole proprietor licensed to do business and is doing business at 1825 Canova Street SE, Palm Bay, Florida 32909.

12.     Plaintiff Old Dixie Paint and Body, LLC, is a Florida limited liability corporation licensed to do business and is doing business at 983 12th Street, Suite D, Vero Beach, Florida 32960.

13.     Plaintiff Orlando Auto Body, Inc, is a Florida corporation licensed to do business and is doing business at 7052 Old Cheney Highway, Orlando, Florida 32807.

14.     Plaintiff Quality Collision Repair, Inc, is a Florida corporation, licensed to do business and at 989 Kings Post Road, Rockledge, Florida 32955.

-4-

15.    Plaintiff Regal Pontiac, Inc, is a Florida corporation licensed to do business and is doing business at 925 US Highway 98 South, Lakeland, Florida 33805.

16.    Plaintiff SPS Business Investments, Inc, is a Florida corporation licensed to do business and is doing business at 4453 Todd Street, Lake Worth, Florida 33461.

17.    Plaintiff Stewart Agency, Inc, is a Florida corporation licensed to do business as Earl Stewart Toyota of North Palm Beach and is doing business at 1215 Federal Highway, Lake Park, Florida 33403.

18.    Plaintiff Stewart Auto Repair, Inc, is a Florida corporation licensed to do business and is doing business at 1990 42nd Street N.W., Winter Haven, Florida 33881.

19.    Plaintiff Stewart Collision Group, LLC, is a Florida limited liability corporation licensed to do business as Bernie's Body Shop and is doing business at 1829 E. Gary Road, Lakeland, Florida 33801.

20.    At all times material hereto, 21st CENTURY CENTENNIAL INSURANCE COMPANY, d/b/a FARMERS INSURANCE GROUP, was and is a Florida Corporation authorized and doing business in Florida.

21.    At all times material hereto, 21ST CENTURY NORTH AMERICAN INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

22.    At all times material hereto, ACCEPTANCE INDEMNITY INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

23.    At all times material hereto, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

24.     At all times material hereto, ALLSTATE INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

25.     At all times material hereto, BRISTOL WEST INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

26.     At all times material hereto, DIRECT GENERAL INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

27.     At all times material hereto, ENCOMPASS INDEMNITY COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

28.     At all times material hereto, ESURANCE PROPERTY & CASUALTY INSURANCE, a/k/a ESURANCE INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

29.     At all times material hereto, FIRST ACCEPTANCE INSURANCE COMPANY, INC., was and is a Florida Corporation authorized and doing business in Florida.

30.     At all times material hereto, FLORIDA FARM BUREAU GENERAL INSURANCE COMPANY, d/b/a FLORIDA FARM BUREAU INSURANCE COMPANIES, was and is a Florida Corporation authorized and doing business in Florida.

31.     At all times material hereto, FOREMOST INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

32.     At all times material hereto, GEICO GENERAL INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

33.     At all times material hereto, HARTFORD ACCIDENT AND INDEMNITY COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

34.     At all times material hereto, HARTFORD UNDERWRITERS INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

35.     At all times material hereto, HORACE MANN INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

36.     At all times material hereto, INFINITY AUTO INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

37.     At all times material hereto, LIBERTY MUTUAL INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

38.     At all times material hereto, MENDOTA INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

39.     At all times material hereto, MERCURY INSURANCE COMPANY OF FLORIDA, was and is a Florida Corporation authorized and doing business in Florida.

40.     At all times material hereto, MGA INSURANCE COMPANY, INC., d/b/a GAINSCO AUTO INSURANCE, was and is a Florida Corporation authorized and doing business in Florida.

41.     At all times material hereto, NATIONAL GENERAL INSURANCE ONLINE, INC., was and is a Florida Corporation authorized and doing business in Florida.

42.     At all times material hereto, NATIONWIDE INSURANCE COMPANY OF FLORIDA, was and is a Florida Corporation authorized and doing business in Florida.

43.     At all times material hereto, NATIONAL MUTUAL INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

44.     At all times material hereto, OCEAN HARBOR CASUALTY INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

45.     At all times material hereto, OLD REPUBLIC INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

46.     At all times material hereto, OLD REPUBLIC INSURANCE COMPANY, d/b/a GALLAGHER BASSETT SERVICES, INC., was and is a Florida Corporation authorized and doing business in Florida.

47.     At all times material hereto, PROGRESSIVE CASUALTY INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

48.     At all times material hereto, SAFECO INSURANCE COMPANY OF AMERICA, was and is a Florida Corporation authorized and doing business in Florida.

49.     At all times material hereto, SECURITY NATIONAL INSURANCE COMPANY, d/b/a FARMERS INSURANCE GROUP, was and is a Florida Corporation authorized and doing business in Florida.

50.     At all times material hereto, SENTRY INSURANCE A MUTUAL COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

51.     At all times material hereto, STATE AUTOMOBILE MUTUAL INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

52.     At all times material hereto, STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

53.     At all times material hereto, THE CINCINNATI INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

54.     At all times material hereto, THE TRAVELERS INDEMNITY COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

55.     At all times material hereto, USAA CASUALTY INSURANCE COMPANY, d/b/a UNITED SERVICES AUTOMOBILE ASSOCIATION, was and is a Florida Corporation authorized and doing business in Florida.

56.     At all times material hereto, USAA CASUALTY INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

57.     At all times material hereto, WESTFIELD INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

58.     At all times material hereto, WINDHAVEN INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

59.     At all times material hereto, ZURICH AMERICAN INSURANCE COMPANY, was and is a Florida Corporation authorized and doing business in Florida.

## JURISDICTION AND VENUE

60.     Original jurisdiction and venues exists in this Court pursuant to 28 U.S.C. § 1332, as the parties are wholly diverse from each other and the amount in controversy exceeds $75,000.00., and 28 U.S.C. § 1391(b)(2), as it is the judicial district in which a substantial part of the events or omissions giving rise to the claim(s) occurred.

## FACTS

61.    Each individual Plaintiff is in the business of recovery and/or repair of motor vehicles involved in collisions.

62.    Each individual Defendant is an insurer providing automobile policies to consumers throughout the state of Florida.

63.    Each individual Plaintiff has done business at various times over the course of years with the Defendants' policyholders and claimants by providing to these policyholders and claimants motor vehicle collision repair service. Each Defendant is individually responsible for payment for those repairs for their respective policyholders and claimants.

64.    Over the course of several years, the Defendants have engaged in an ongoing, concerted and intentional course of action and conduct with State Farm acting as the spearhead to improperly and illegally control and depress automobile damage repair costs to the detriment of the Plaintiffs and the substantial profit of the Defendants.

65.    One of the methods by which the Defendants exert control over Plaintiffs' businesses is by way of entering program agreements with the individual Plaintiffs. Although each Defendant's program agreements have unique titles, such agreements are known generally and generically within the collision repair industry as direct repair program agreements ("DRPs").

66.    DRPs were originally presented to the Plaintiffs as a mutually beneficial opportunity. In exchange for providing certain concessions of price, priority and similar matters, the individual Defendants would list the body shop as a preferred provider.

67.    However, the concessions demanded by the individual Defendants in exchange for remaining on the direct repair program were not balanced by the purported benefits. The

Defendants, particularly State Farm, have utilized these agreements to exert control over the Plaintiffs' businesses in a variety of manners, well beyond that of an ordinary business agreement.

68.    Defendants, particularly State Farm, have engaged in an ongoing pattern and practice of coercion and implied threats to the pecuniary health of the individual Plaintiff businesses in order to force compliance with unreasonable and onerous concessions. Failure to comply results in either removal from the program (s) combined with improper "steering" of customers away from the Plaintiffs' businesses, simply punishment to decrease the number of customers utilizing the Plaintiffs' services, and/or increasing ongoing and improper refusals to pay for certain repair procedures and/or charges without valid or reasonable justification.

69.    The vast majority of the Plaintiffs' business is generated by customers for whom the Defendants are responsible to pay repair costs.  The insurance-paying customers account for between seventy and ninety-five percent of each shop's revenue.   Overall, courts have acknowledged the significant role played by insurance companies in funding automobile collision repairs, as well as the ability and market power to exert substantial influence and control over where consumers will take a wrecked car for repairs.  See, e.g., *Allstate Ins. Co. v. Abbott*, 2006 U.S. Dist. LEXIS 9342 (N.D. Tex. 2006)(aff'd, *Allstate Ins. Co. v. Abbott*, 2007 U.S. App. LEXIS 18336 (5th Cir. 2007).

70.    As a general proposition, each DRP contains a general statement that the body shop will charge the respective insurance company no more for any particular repair than is the going rate in the market area.

-11-

71.     In order to establish the "market rate," State Farm utilizes what it terms "surveys." From State Farm's perspective, the geographical boundaries of the market area to be "surveyed" to establish the "market rate" are wholly within the control and direction of State Farm.

72.     Under the terms of its DRP, State Farm is not required to disclose any of the methods by which it establishes either the market area, the market rate, nor any other factual bases for its determination of the "market rate." The agreement contains no provisions for independent and neutral verification of the data utilized, nor any oversight not directly within the control and direction of State Farm.   The shops are simply required to blindly accept State Farm's pronouncements regarding these matters.

73.     Previously this "survey" was conducted by sending written documents to the individual shops.  The owner or designated representative of the shop would fill out the survey and return it to State Farm. In recent years, this process has been transferred to an electronic forum, State Farm's Business to Business portal, whereby the shops go online to complete the "survey."

74.     State Farm does not perform a survey in the traditional sense, where information is obtained and results produced, establishing a baseline of all the shops' information.  With respect to labor rates, as an example, State Farm's methodology does not represent what the majority of shops in a given area charge, quite the contrary.  State Farm's methodology lists the shops in a given market (as determined by State Farm) with the highest rates submitted at the top of the list and descending to the least expensive hourly rates at the bottom.

75.    State Farm then lists how many technicians a shop employs or the number of work bays available, whichever is lesser.  Those are then totaled and State Farm employs it's "half plus one" method.  If, for example, a State-Farm-determined market area has a total of fifty (50) technicians or work bays, State Farm's "half plus one" math equals twenty six (26).  With that number, starting at the bottom of the shop list, State Farm counts each shops technicians until the "half plus one" number is reached, twenty six in this example, and whatever that shop's rate happens to be is declared the market rate.

76.    There could, arguably, be some validity to this method, if it accounted for the variance in shop size, skill of technicians and other quality variables, which it does not.  However, the greatest problem with this method is that State Farm can and does alter the labor rates input by the shops, decreasing those arbitrarily deemed too high–or higher than State Farm wishes to pay.

77.    By altering the rates entered, particularly those of the larger shops, those with the most technicians and/or work bays, State Farm manipulates the results to achieve a wholly artificial "market rate."  The results are therefore not that of an actual survey reflecting the designated market area but created from whole cloth by State Farm.

78.    Furthermore, State Farm attempts to prohibit the shops from discussing with each other the information each has entered into the survey, and improperly threat that any discussion may constitute illegal price fixing.  State Farm selects the geographical boundaries of the "survey," and State Farm takes the position that it retains the right to alter the "survey" results and does so.  All without disclosure or oversight.

79.     Another electronic page on State Farm's business portal is known as the Dashboard/Scorecard.

80.     The Dashboard has substantive impact on several levels.  It serves as the record of an individual shop's survey responses.  It also provides a "report card" and rating of the individual shop based primarily upon three criteria: quality, efficiency and competitiveness.

81.     Within the quality criterion, the shop's reported customer satisfaction, customer complaints, and quality issues identified by an audit are scored.

82.     The efficiency criterion evaluates repair cycle time, number of days a vehicle is in the shop, utilizing information input by the shops on the car's drop-off and pickup dates.

83.     The competitiveness criterion analyzes the average estimate for each State Farm repair, the cost of parts, whether a vehicle is repaired or replacement parts are utilized, the number of hours required to complete repair and similar matters.

84.     In rating an individual shop, a total score of 1000 is possible. However, State Farm is under no obligation to disclose the weight or total number of points possible given to each factor included in reaching the score, particularly those factors included under the competitiveness criterion. In fact, State Farm has refused to disclose its method of determining competitiveness even to its own team leaders.

85.     Due to this opacity, State Farm maintains complete and unsupervised authority to determine an individual shop's rating. It is therefore possible for a shop to have no customer complaints, high customer satisfaction, no issues identified on an audit, complete compliance with all repair cycle time and efficiency requirements and yet still have a low rating.  It is also possible for a shop to have multiple customer complaints, poor customer satisfaction, numerous

issues identified on audit and complete failure to meet efficiency expectations and yet have a very high rating.

86.    The Dashboard rating is very important as a shop's rating determines its position on the list of preferred providers. When a customer logs on to the State Farm web site seeking a repair shop, those shops with the highest ratings are displayed first. A shop with a low rating will be at the bottom of the list, often pages and pages down, making it difficult for a potential customer to find it. If a customer calls State Farm, the representative provides the preferred shops beginning with those holding the highest rating.


## Suppression of Labor Rates

87.    Among the questions asked by the "survey" is the individual shop's hourly labor rate. This information is supposed to be provided by the shop and to accurately reflect that shop's labor rate to allow State Farm to reach a "market rate." The actual method of determining a "market rate" is described above.

88.    If the labor rate information received is unilaterally deemed unacceptable by State Farm, a State Farm representative will contact the shop and demand the labor rate be lowered to an amount State Farm wishes to pay.

89.    If the body shop advises a labor rate increase is required, State Farm representatives will inform the body shop they are the only shop in the area who has raised its rates, therefore the higher rate does not conform with the "market rate" and is thus a violation of the direct repair program agreement.

-15-

90.    At various points in time, State Farm has utilized this method of depressing labor rates, telling each shop they are the only one to demand a higher labor rate when, in fact, multiple shops have attempted to raise their labor rates and advised State Farm of such.

91.    Should a shop persist in its efforts to raise its labor rate, State Farm will take one or more of several "corrective" measures: it will go into the individual shop's survey responses and alter the labor rate listed without the knowledge or consent of the shop and use this lowered rate to justify its determination of the "market rate." It will threaten to remove the shop from the direct repair program to coerce compliance.   It will remove the shop from the direct repair program.

92.    The net effect of this tactic is to allow State Farm to manipulate the "market rate" and artificially suppress the labor rate for the relevant geographic area, an area which, again, is defined solely by State Farm and is not subject to either neutral verification or even disclosure.

93.    The remaining Defendants, intentionally and by agreement and/or conscious parallel behavior, specifically advised the Plaintiffs they will pay no more than State Farm pays for labor.  These Defendants have not conducted any surveys of their own in which the Plaintiffs have participated to determine market rates.  These Defendants have agreed to join forces with State Farm, the dominant market holder, and each other to coerce the Plaintiffs into accepting the artificially created less-than-market labor rates through intimidation and threats to the Plaintiff's financial ability to remain operating.

## Suppression of Repair and Material Costs

94.     Through various methods, the Defendants have, independently and in concert, instituted numerous methods of coercing the Plaintiffs into accepting less than actual and/or market costs for materials and supplies expended in completing repairs.

95.     Some of these methods include but are not limited to: refusal to compensate the shops for replacement parts when repair is possible though strongly not recommended based upon the shop's professional opinion; utilizing used and/or recycled parts rather than new parts, even when new parts are available and a new part would be the best and highest quality repair to the vehicle; requiring discounts and/or concessions be provided, even when doing so requires the shop to operate at a loss; de facto compulsory utilization of parts procurement programs.

96.     In addition to the above, the Defendants have repeatedly and intentionally failed to abide by industry standards for auto repairs. Three leading collision repair estimating databases are in ordinary usage within the auto body collision repair industry:

a)     ADP;
b)     CCC; and
c)     Mitchell.

97.     These databases provide software and average costs associated with particularized types of repairs to create estimates. The estimates generated by these databases include the ordinary and customary repairs, repair time (labor) and materials necessary to return a vehicle to its pre-accident condition. These databases and the estimates they generate are accepted within the industry as reliable starting points, subject to the shop's expert opinions and the necessarily present variability between the "best-case scenario"[1] presented by the procedure databases and the actual needs of a particular repair.

---

[1] The database procedure pages set forth the anticipated repairs, repair times and materials for repair of an undamaged vehicle using original manufacturer equipment which are specifically designed to fit that particular

98.     Over the course of years, the Defendants have admitted the accepted position of the estimating databases within the industry, but have nonetheless engaged in a course of conduct of refusing to make full payment for procedures and materials. In many instances the Defendants will refuse to allow the body shop to perform required procedures and processes, thereby requiring the Plaintiffs to either perform less-than-quality work or suffer a financial loss.

99.     There exists numerous procedures and processes, for which the Defendants refuse to pay and/or pay in full.

100.    At the same time, Defendants selectively rely upon and assert the definitive nature of these databases when doing so is to their respective financial advantage. For example, when a particular repair requires twenty hours of labor to complete but the database estimate notes fifteen hours of labor is standard for that type of repair, Defendant will cite the database estimate and pay for only fifteen hours of labor time.

101.    With respect to materials, while it is inarguable that materials must be expended to repair automobile collisions, the Defendants simply refuse to pay for them, asserting materials are part of the cost of doing business.  This is the Defendants' position even when the authoritative databases specifically state that such materials are not included in the repair procedure pages.

102.    The only partial exception to this practice is paint.  While paint costs are factored into the amount the Defendants will pay, it is calculated via a formula which compensates the shops for only half the actual cost on average.  The Defendants' method of calculating paint payment does not take into account the type of paint needed/used, the requirement that paint be

vehicle. Wrecked cars are obviously not undamaged and original manufacturer parts are not always used, particularly with repairs for which State Farm and the other Defendants are responsible for payment, which can substantially affect repair procedures required, repair times and necessary materials.

-18-

mixed to match the existing color of the vehicle, the actual amount of paint required to complete the job, the type of vehicle involved or any other factor.  Defendants pay only based upon arbitrary caps, self-established and unrelated to actual costs to the Plaintiffs.

103.    This continued refusal and/or failure to compensate Plaintiffs for ordinary and customary repairs and materials costs places Plaintiffs in the untenable position of either performing incomplete and/or substandard repairs and thus breaching their obligation to automobile owners to return vehicles to pre-accident condition, or performing labor and expending materials without proper compensation and thereby jeopardizing continuing viability of the business enterprise.

104.    ( - By way of emphasis, it was these very concerns that prompted, *inter alia*, a meeting between many Mississippi automobile collision repair shop owners, along with Tim Bartlett, State Farm Estimatix team leader, John Findley, Estimatix section manager, Steve Simkins, State Farm counsel for Mississippi and Alabama, and members of the Mississippi Department of Insurance in April, 2013. At this meeting, the members of the automobile collision repair industry expressed their dissatisfaction and concerns with the very practice of refusing to compensate fully and fairly for repairs that were performed and State Farm's inconsistent application of the database estimating software, i.e., utilizing database estimates only when it is in State Farm's financial best interests to do so.

105.    State Farm representative Tim Bartlett acknowledged (before witnesses) that repairs and subsequent payment for those repairs should be consistent with the estimates prepared through the database software. Mr. Bartlett assured those present, and the Department of Insurance representative that it would begin abiding by those database estimates and stated it

would raise the matter at its insurance industry meetings, held locally approximately once a month.

106.   Also at that meeting, Mr. Simpkins asked if insurance representative might be permitted to attend the meetings of the Mississippi automobile collision society. The auto body representative present for the meeting, John Mosley, invited State Farm to attend those Association meetings if State Farm would permit members of the auto body Association to attend the insurance meetings. Mr. Simkins refused.

107.   Despite the assurances given the body shop representatives and the Department of Insurance at this meeting, State Farm has failed to perform as promised. State Farm, and the other Defendants in collusion with State Farm, have continued to refuse to make payment and/or full payment for necessary and proper repairs, labor and materials. - )

108.   Defendant State Farm also imposes restrictions upon the Plaintiffs' ability to obtain and utilize quality replacement parts and materials.  As part of its DRP agreement, State Farm asserts it has the unilateral authority to enter into separate agreements with manufacturers, distributors or suppliers of automotive parts, supplies or materials.

109.   Despite the fact that the shops have no involvement in the negotiation of those separate agreements, they are de facto required to abide by the pricing agreements reached, even if they do not make purchases with those vendors.  Although presented as an option to participate, the optional language is rendered nugatory by additional language which requires the shops to accept as payment only that amount for which the parts and/or materials could have been obtained through those agreements.  Participation or lack thereof is therefore completely meaningless and the optional language is illusory.

-20-

110.    Moreover, shops are required to "stack" this purportedly optional usage of separate agreements with other discounts required elsewhere within the agreement.  Thus, the limitation on payment, refusal to compensate for nearly all materials and the compelled discounts end in a shop operating at or near a loss for each repair.

111.    Though led by State Farm as the dominant market share holder, all Defendants have agreed to and/or consciously parallel the compensation ceilings established by State Farm solely for their own profit.

### Steering

112.    The Defendants regularly and routinely engage in "steering" in order to punish noncompliant shops. Defendants will "steer" insureds and/or claimants to favored, compliant shops through misrepresentation, insinuation, casting aspersions upon the business integrity and quality of disfavored repair centers, and other improper methods and means.

113.    Examples of this practice include advising that a particular chosen shop is not on the preferred provider list, advising that quality issues have arisen with that particular shop, that complaints have been received about that particular shop from other consumers, that the shop charges more than any other shop in the area and these additional costs will have to be paid by the consumer, that repairs at the disfavored shop will take much longer than at other, preferred shops and the consumer will be responsible for rental car fees beyond a certain date, and that the Defendant cannot guarantee the work of that shop as it can at other shops.

114.    These statements have been made about certain Plaintiffs without any attempt to ascertain the truth thereof. Not only that, some of the ills recited which implicitly criticize the shops are wholly attributable to the insurer itself.  For instance, the statement that repairs will

-21-

take longer at a disfavored shop–consumers are not told that the delay in beginning repairs is due to the insurer's decision to delay sending an appraiser to evaluate the damage, a decision completely and wholly within the control of the Defendants. Asserting the shops charges more is often not a function of what the shop actually charges but the Defendants' refusal to pay, also a factor wholly and completely within the control of the respective Defendant. Yet both are conveyed to the public as problems with the shop.

115.   The most egregious of these statements, that the Defendant cannot guarantee the work of the shop, is particularly misleading as none of the Defendants offer a guarantee for repair work. Instead, the Defendants require the body shops to provide a limited lifetime guarantee on work performed. In the event additional work is required, the body shop is required to do so without any additional payment, or to indemnify the insurer for costs if work is performed at another shop.

116.   Thus, while it may be a facially truthful statement that an insurer cannot guarantee the work of a particular shop, the clearly understood inference is that it can and will guarantee the work of another, favored shop, which is simply not true.

### Intentional Nature of Defendants' Wrongful Conduct

117.   In 1963, a consent decree was entered in *United States vs. Association of Casualty and Surety Companies*, et al, Docket No. 3106, upon complaint filed in the Southern District of New York. The allegations of that complaint included violations of Sections 1 and 3 of the Sherman Act, also known as the Sherman Antitrust Act. A copy of this Decree is attached hereto as Exhibit "4."

118.    Specific actions supporting those allegations included: (1) requiring repair rather than replacement of damaged parts; (2) replacing damaged parts with used rather than new parts; (3) obtaining discounts on new replacement parts; (4) establishing strict labor time allowances; (5) suppressing the hourly labor rate; (6) channeling auto repairs to those repair shops which would abide by the insurer estimates and boycotting those which refused.  The complaint further alleged a conspiracy and combination in unreasonable restraint of trade and commerce for these practices.

119.    The Consent Decree order provided the following relief: (1) enjoined the defendants from placing into effect any plan, program or practice which has the purpose or effect of (a) directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any independent or dealer franchised automotive repair shop with respect to the repair of damage to automobile vehicles; (2) exercising any control over the activities of any appraiser of damages to automotive vehicles; (3) fixing, establishing, maintaining or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automotive vehicles or for replacement parts or labor in connection therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

120.    Whether or not any current Defendant is legally bound by this Decree, the actions described in the present cause fall squarely within those prohibited by the Decree.  The Decree has been "on the books" for fifty years and is well-known within the insurance industry.

121.    Being known, it can only be said that Defendants were fully aware their actions, plans, programs, and combinations and/or conspiracy to effectuate the same have been willful, intentional and conducted with complete and reckless disregard for the rights of the Plaintiffs.

## COUNT ONE:  QUANTUM MERUIT

122.    Plaintiffs incorporate and restate by reference herein all allegations set forth above.

123.    Quantum meruit rests upon the equitable principle that a party is not allowed to enrich itself at the expense of another. More specifically, the law implies a promise to pay a reasonable amount for the labor and materials furnished, even absent a specific contract therefore.

124.    Plaintiffs have performed valuable services and expended material resources with the reasonable expectation of payment\compensation for those services and materials. This is their business. Performing said services and expending material resources benefitted Defendants and Defendant's insured/claimants for whom Defendants are required to provide payment for repairs.

125.    It was and has always been foreseeable the Plaintiffs were not performing labor or providing services and materials without expectation of full payment. However, Defendants have simply taken the position that payment may not be made unless they choose to provide it, regardless of any other factor or consideration and have thus enriched themselves at the expense of Plaintiffs.

-24-

126.   Plaintiffs are equitably entitled to receive payment for the materials and services rendered.

## COUNT TWO:   UNJUST ENRICHMENT

127.   Plaintiffs incorporate and restate by reference herein all allegations set forth above.

128.   A quasi-contract, or constructive contract, is based on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. In this respect, the terms "unjust enrichment" and "restitution" are modern designations for the doctrine of "quasi-contracts" and the basis for an action for unjust enrichment lies in a promise, which is implied in law, that one will pay to the person entitled thereto which in equity and good conscience is his.

129.   It is an obligation created by law, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money under circumstances that in equity and good conscience ought not be retained and which in justice and fairness belongs to another.

130.   In the present case, Defendants' insureds and claimants entrusted the Plaintiffs with the full and complete repair of their vehicles, the cost of which it is incumbent upon the Defendants to pay. Statute requires the Defendant pay for the proper and fair repair of those vehicles. An obligation was thus created to provide payment to Plaintiffs for their work and expended materials.

131.   By failing to make payment and\or full payment for the necessary and reasonable costs of repair, Defendants have obtained or retained money which, in equity and good conscience, rightfully belongs to the Plaintiffs.

### COUNT THREE:   QUASI-ESTOPPEL

132.   Plaintiffs incorporate and restate by reference herein all allegations set forth above.

133.   Quasi-estoppel is an equitable principle. This long-standing doctrine is applied to preclude contradictory positions by preventing a person from asserting to another's disadvantage, a right inconsistent with the position previously taken.

134.   The Defendants have relied upon and asserted the validity\authority of the databases, supra, when it has been to their respective advantage. Indeed, State Farm has admitted the baseline applicability of the various databases and given every indication to Plaintiffs as well as representatives of the Mississippi Department of Insurance that it would comply with the minimum requirements of the databases in the future. Despite this, State Farm and the other Defendants have refused to compensate and\or fully compensate Plaintiffs for materials expended and work performed, including labor and labor rates, upon reliance of these very same guides, claiming they are unnecessary to complete the work at hand.

135.   Defendants' inconsistent and contradictory application of, or refusal to abide by, the guidelines of the industry databases has created an atmosphere of doubt, uncertainty and distrust, all to the severe detriment of Plaintiffs while, at the same time, seeking to obtain every improper advantage for Defendants themselves.

136.   Plaintiffs therefore seek to have the Defendants estopped from denying the applicability and reasonableness of the baseline procedures and costs set forth in the industry databases henceforth and make full payment for the necessary reasonable costs of repairs made for the benefit of Defendants' insureds and claimants.

### COUNT FOUR:   TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

137.   Plaintiffs incorporate and restate by reference herein all allegations set forth above.

138.   Tortious interference with business relations occurs when a defendant engages in a wrongful act with intent to interfere and injure the business of another.

139.   The Defendants have repeatedly engaged in malicious actions and a course of conduct designed to interfere with and injure the Plaintiffs' business relations and prospective business relations, which otherwise constitute improper methods and means on the part of the Defendants. The Defendants have repeatedly steered and attempted to steer customers away from the Plaintiffs' respective businesses through their repeated campaign of misrepresentation of facts, failure to verify facts damaging or tending to cause damage to the Plaintiffs business reputations before conveying the same to members of the public, implications of, *inter alia*, poor quality work, poor quality efficiency, poor business ethics and practices, and unreliability.

140.   The purpose of these actions was twofold: to punish the Plaintiffs who complained about or refused to submit to the various oppressive and unilateral price ceilings the Defendants were enforcing upon them, and to direct potential customers of the Plaintiffs to other vendors who would comply with the maximum price ceilings unilaterally imposed by the Defendants.  Such actions on the part of the Defendants clearly constitute improper methods and

means as part of the Defendants intentional and unjustified interference with the business relationships and prospective business relationships of the Plaintiffs, of which relationships the Defendants are fully and very well aware when they commit their wrongful acts with the use of these clearly improper methods and means as set forth above.

141.   The Plaintiffs have been damaged by these malicious and intentional actions on the part of the Defendants. Plaintiffs are therefore entitled to compensation for these damages.

## COUNT FIVE:  CONVERSION

142.   Plaintiffs incorporate and restate by reference herein all allegations set forth above.

143.   Plaintiffs have performed necessary work and expended appropriate labor and materials in and of specific amounts for which Defendants have refused to deliver payment and\or full payment, even after demand for same.

144.   Defendants' actions constitute a conversion of Plaintiffs' monies.

145.   Defendants are therefore wrongfully in possession of monies which should have been expended to pay repair bills of their policyholders and claimants and which rightfully belongs to Plaintiffs as a result Plaintiffs performing necessary reasonable and customary repairs to vehicles.

## COUNT SIX: VIOLATIONS OF THE SHERMAN ACT–PRICE-FIXING

146.   Plaintiffs incorporate and restate by reference herein all allegations set forth above.

147.    The Sherman Act prohibits contracts, combinations or conspiracies in restraint of trade. 15 U.S.C. §1. Such agreements are illegal if (1) their purpose or effect is to create an unreasonable restraint of trade, or (2) they constitute a per se violation of the statute.

148.    Through parallel actions, and\or explicit agreement, the Defendants have formed and engaged in a vertical conspiracy or combination to impose maximum price limits upon the Plaintiffs for their products and services.

149.    The United States Supreme Court has noted that agreements to fix maximum prices, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment. *Kiefer-Stewart Co.* Vs. *Joseph E. Seagram and Sons, Inc.*, 340 U.S. 211 (1951).

150.    The Defendants and co–conspirators have engaged in combination and conspiracy in unreasonable restraint of trade and commerce in the automobile damage repair industry.

151.    The aforesaid combination and/or conspiracy has consisted of a continuing agreement in concert of action among the Defendants and co-conspirators to control and suppress automobile damage repair costs, automobile material repair costs through coercion and intimidation of these shops.

152.    Evidence of this conspiracy or combination include, but is not limited to, admission before witnesses that members of the insurance industry meet regularly to discuss such matters in and amongst themselves but refuse to allow members of the auto collision repair industry to attend those meetings, explicit statements by Defendants that they will conform to State Farm's unilaterally imposed payment structure, admitting the baseline application of the

industry database but failing to conform to that minimum standard, followed by the uniformity of action by all Defendants.

153.    The aforesaid offenses have had, among others, the effect of eliminating competition within the automobile damage repair industry, elimination of some shops from a substantial segment of the automobile damage repair industry for refusing or attempting to refuse the Defendants' arbitrary price ceilings, and subjecting repair shops to collective control and supervision of prices by the Defendants and co-conspirators.

154.    Neither the Plaintiffs, nor other members of the auto collision repair industry, are able to engage in competitive business practices as the Defendants have effectively and explicitly determined what their business practices will be.

155.    The Defendants actions individually and certainly collectively have violated federal law and directly caused the Plaintiffs to incur substantial damages. Defendants are continuing and will continue said offenses unless the relief herein prayed for is granted.

## COUNT SEVEN: VIOLATION OF THE SHERMAN ACT–BOYCOTT

156.    Plaintiffs incorporate and restate by reference herein all allegations set forth above.

157.    The United States Supreme Court has repeatedly held that boycotts constitute a violation of the Sherman Act, 15 U. S. C. §1. "Boycott" has been defined within the antitrust law context as "pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target." *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978).

158.    The Defendants have engaged, and continue to engage, in boycott and boycotting activity through their repeated actions of steering customers away from the Plaintiffs through allegations and intimations of poor quality work, of poor efficiency in performing work, of questionable business practices, of overcharging, impugning integrity, and similar actions so as to withhold and\or enlist others to withhold patronage from the Plaintiffs.

159.    This boycott was specifically designed to pressure, intimidate, and/ or coerce the Plaintiffs into complying with the maximum-price limitations unilaterally conceived by Defendant State Farm and agreed to collusively by the other Defendants.

160.    It is irrelevant for purposes of the Sherman antitrust boycott activity that the Plaintiffs and Defendants are not direct competitors within the same industry. The United States Supreme Court has directly addressed this issue in *St. Paul Fire and Marine Insurance Company*, supra, stating, "[B]oycotters and the ultimate target need not be in a competitive relationship with each other." 438 U.S. at 543.

161.    The enlistment of third parties as a means of compelling capitulation by the boycotted group has long been viewed as conduct supporting a finding of unlawful boycott. *Id*.

162.    In the present matter, the Defendants have engaged in not only a boycott, but have regularly, routinely and purposefully enlisted the aid of unwitting third parties in carrying out their boycott through their intentional acts of steering those customers away from the Plaintiffs.

163.    Defendants' boycott was created and carried out with the sole purpose and intent of financially coercing and threatening the Plaintiffs into complying with the Defendants price caps.

164.    The Defendants actions are violation of federal law and have directly caused the

Plaintiffs to incur substantial damages. Defendants are continuing and will continue said offenses

unless the relief requested herein is granted.

## PRAYER FOR RELIEF

165.    Plaintiffs incorporate and restate by reference herein all allegations set forth
above.

166.    As a result of the Defendants' actions, Plaintiffs have been substantially harmed

and will continue to suffer unless the relief requested herein is granted.  The Plaintiffs therefore

pray for the following relief:

A.    Compensatory damages for all non-payment and underpayment for work
completed on behalf of the Defendants' insureds and claimants as determined by a
jury.

B.    Compensation for the lost revenue through artificial suppression of labor rates as
determined by a jury.

C.    Damages sufficient to compensate Plaintiffs for lost business opportunities as
determined by a jury.

D.    Treble damages, reasonable attorneys' fees and costs  for violations of the
Sherman Act, as required under 15 U.S.C. § 15.

E.    Injunctive relief prohibiting the Defendants from further engaging in any of the
following:

(1)    Placing into effect any plan, program or practice which has the purpose or
effect of:

(a)    directing, advising or otherwise suggesting that any person
or firm do business or refuse to do business with any
Plaintiff automotive repair shop with respect to the repair
of damage to automobiles.

(b)    fixing, establishing or otherwise controlling the prices to be
charged by independent or dealer franchised automotive
repair shops for the repair of damage to automobiles or for
replacement parts or labor in connection therewith whether

-32-

by coercion, boycott or intimidation, or by the use of flat rate or parts manuals or otherwise.

(2)     Placing into effect any plan, program or practice which explicitly requires or has the purpose or effect of requiring Plaintiffs to participate in any parts procurement program.

(3)     Providing untruthful and/or unverified information to customers or third persons regarding the quality, cost, efficiency or reputation of any Plaintiff ("steering").

(4)     Prohibiting Defendant State Farm from altering or amending any Plaintiff response to its market labor rate "survey" without the express written permission of the affected Plaintiff.

F.     Punitive and/or exemplary damages sufficient to punish Defendants for their intentional acts and deter each Defendant and similar entities from pursuing this improper conduct in the future.

G.     Pre- and post-judgment interest.

H.     Any additional relief the Court deems just and appropriate.


## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demands a judgment against Defendants in an amount sufficient to fully compensate Plaintiffs for damages incurred as a result of Defendants' conduct with appropriate pre- and post-judgment interest, equitable relief as set forth above, punitive damages, attorneys' fees, expenses, costs and any other relief the Court deems the Plaintiffs entitled.

Respectfully submitted, this the _21st_ day of _February_ 2014.

**GEOHAGAN, P.A.**

A. Brent Geohagan, Esq.
Florida Bar Number 071927
Trial Counsel for the Plaintiffs
Geohagan, P.A.
3001 Bartow Road
Lakeland, Florida 33803
Telephone: (863) 665-6930
Fax:  (863) 665-6935
E-mail:  abrent@geohaganlaw.com and
wavery@geohaganlaw.com