# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

A & E AUTO BODY, INC. *et al.*,

     Plaintiffs,

     v.

21ST CENTURY CENTENNIAL INS. CO, *et al.*,

     Defendants.

Case No. 6:14-cv-310-Orl-31TBS

**DISPOSITIVE MOTION**

## DEFENDANT WESTFIELD INSURANCE COMPANY'S MOTION TO DISMISS

**FOX ROTHSCHILD LLP**

**s/ Alejandro Miyar**
Alejandro Miyar
Florida Bar No. 105399
Southeast Financial Center
200 S. Biscayne Blvd. Suite 3590
Miami, FL 33131-2395
Telephone: (305) 442-6549
Facsimile: (305) 442-6541
amiyar@foxrothschild.com

**s/ John J. Haggerty**
John J. Haggerty (*pro hac vice*)
2700 Kelly Road, Suite 300
Warrington, PA 18976
Telephone: (215) 345-7500
Facsimile: (215) 345-7507

*Attorneys for Defendant*
*Westfield Insurance Company*

July 11, 2014

Defendant Westfield Insurance Company ("Westfield") moves pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiffs' first amended complaint ("FAC") in its entirety.  In support of this motion, Westfield relies on the points and authorities in the below memorandum of law, which Westfield submits herewith and incorporates herein in its entirety along with the points and authorities cited by all other Defendants filing motions to dismiss the FAC.

## PRELIMINARY STATEMENT

Plaintiffs' FAC fails to state a claim under the antitrust laws and does not address the "host of problems" identified by the Court in its June 11, 2014 Order.  Although Plaintiffs allege that the prices for their services have been reduced because each of the Plaintiffs freely and voluntarily entered into a specific type of agreement with one or more of the Defendant insurers, there are no allegations to support a claim that Westfield acted to *restrain* trade or competition in any way.  At most, Plaintiffs accuse Westfield of being part of an insurance industry that keeps prices down for insureds by *promoting* competition within the auto repair industry.  The FAC fails to specify how any of the alleged conduct has restricted competition in any manner whatsoever.

Plaintiffs' claims in tort and equity are also fatally flawed due to the existence of a written contract governing the relationship between the parties.  Such claims are doubly barred in the insurance context, where the benefit allegedly conferred is to the insureds and claimants, not the insurer.  Even if Plaintiffs stated otherwise actionable claims in equity, those claims would be barred by the doctrine of "unclean hands" based on Plaintiffs' participation in the same direct repair programs ("DRPs") they now allege are somehow unlawful.

Plaintiffs' claim for tortious interference is fatally deficient because it alleges no supporting facts and because Westfield was a party, not a stranger, to the contractual relationships at issue.  Finally, the claim for conversion fails because the FAC does not show that specific, identifiable money is at issue and because a conversion claim will not lie where there is an underlying contract.

Although Plaintiffs amended their complaint, these deficiencies persist, along with the procedural flaws identified by this Court's Dismissal Order of June 11, 2014. For these reasons, and those explained below, Westfield respectfully requests that the Court dismiss Plaintiffs' FAC with prejudice.

## STATEMENT OF FACTS

Plaintiffs are Florida corporations, limited liability companies, and sole proprietors operating auto body repair shops in the state of Florida.  (FAC ¶¶ 1-22; *see id* ¶ 64.)  They are "in the business" of recovering and repairing motor vehicles damaged in collisions.  (*Id.* ¶ 64.)   Plaintiffs allege that "over the course of years" they have repaired the damaged vehicles of Defendants' policyholders and claimants.  (*Id.* ¶ 66.)

Defendants are various insurance companies who provide automobile insurance to policyholders.  (FAC ¶¶ 23-62, 65.)  This insurance includes payment for repairs of policyholders' and claimants' vehicles damaged in collisions.  (*See id.* ¶ 66.)

### A. Plaintiffs Entered Into Agreements for Preferred Status with Defendants

Plaintiffs allege that Defendants prefer Florida auto body shops participating in DRP agreements with Defendants for repair of policyholders' and claimants' vehicles. (*See* FAC ¶¶ 68-69.)  Plaintiffs "originally" entered into these DRP agreements.  (*See id.* ¶¶ 69-70.)  Now, however, Plaintiffs allege that the concessions in price required by the

DRP agreements are "not balanced by the purported benefits" to them as "preferred provider[s]." (*See id.* ¶ 70.) In essence, Plaintiffs claim that the agreements they entered into have not been as profitable as they had hoped.

Plaintiffs further allege that Defendant State Farm Automobile Mutual Insurance Company ("State Farm") conducts "surveys" of auto body shops participating in its DRP. (FAC ¶¶ 78-86.) The surveys require auto body shops to provide information about their businesses. (*See id.* ¶¶ 81-84.) Based on the auto body shops' self-reporting, State Farm establishes a "market rate" for auto repair—the rate it pays auto body shops participating in its DRP. (*Id.* ¶¶ 78-84.) State Farm also ranks participating auto body shops on criteria of quality, efficiency, and competitiveness. (*Id.* ¶ 88.) Quality is determined based on customer satisfaction. (*See id.* ¶ 89.) Efficiency is judged based on repair times. (*See id.* ¶ 90.) Competitiveness is assessed based on the average cost of repair, repair duration, and cost of replacement parts. (*See id.* ¶ 91.)

Based on these indicia of quality, State Farm establishes a "Scorecard," with each shop's respective rating "determining [shops'] position[s] on the list of preferred providers." (FAC ¶¶ 87-94.)

### B.    Plaintiffs Allege an Industry-Wide Conspiracy Based on State Farm's Alleged Conduct

Plaintiffs allege, in conclusory terms, barren of any facts, a coordinated effort by 40 Defendants to suppress the market rate for auto repair. The claim is that Defendants have conspired to pay no more than the market rate established by State Farm. (FAC ¶ 123; *see id.* ¶¶ 67-86.) Plaintiffs do not, however, plead any direct factual evidence of such concerted action. Westfield, for example, is mentioned (outside the cutting and pasting of its name along with every other defendant) only once in the FAC. (See *id.* ¶

57.)  Plaintiffs make only circumstantial allegations that are insufficient to establish the required plausible inference of conspiracy or agreement among Defendants.  They also fail to plead facts sufficient to support their equitable and tort claims.

## ARGUMENT

### I.        PLAINTIFFS LACK ANTITRUST STANDING

Plaintiffs' antitrust claims must be dismissed because they do not have the requisite "antitrust standing" to pursue them.  Standing may be denied if plaintiffs are not deemed the proper parties to bring their antitrust claims.  *See generally Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*").

The Eleventh Circuit has set forth a two-prong test for antitrust standing.  *Palmayra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010) (citing *Todorov v. DCH Healthcare Auth.*, 921 F. 2d 1438, 1448 (11th Cir. 1991)).  First, a court must determine whether plaintiffs have an "antitrust injury."  *Id.* (citing *Todorov* at 1449); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) ("*ARCO*").  Then, if plaintiffs can establish antitrust injury, the court must determine whether any of the so-called "*AGC* factors," which largely relate to the directness and identifiability of plaintiffs' injuries, permit the plaintiffs to be "efficient enforcers" of the antitrust laws.  *Palmayra*, 604 F.3d at 1299 (citing *Todorov*, 921 F. 2d at 1449).  Plaintiffs fail both prongs of this test.

**A.    Plaintiffs Fail to Plead a Reduction in Competition and Therefore Have Not Alleged an "Antitrust Injury"**

The antitrust laws are not intended to provide a remedy for every type of purportedly objectionable conduct; their purpose is to protect *competition*. *See Brunswick*, 429 U.S. at 488; *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962) (antitrust laws "protect competition, not competitors."). Consistent with this purpose, the antitrust injury requirement seeks to ensure "that a plaintiff can recover only if the loss stems from a *competition-reducing* aspect or effect of the defendant's behavior." *ARCO*, 495 U.S. at 344 (emphasis added); *see Austin v. Blue Cross & Blue Shield*, 903 F.2d 1385, 1387 (11th Cir. 1990). This requirement applies equally to all antitrust plaintiffs, including those that allege *per se* violations of the antitrust laws. *Id.* at 341-42.

**1.    The Antitrust Laws Protect Competition, Not Businesses**

Businesses naturally prefer fewer rivals and less aggressive competition: "the less the competition, the greater the competitor's ability to increase prices and profits." J. Jacobson & T. Greer, 66 ANTITRUST L. J. 273, 286 (1998). However, "[t]he purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 458 (1993). Courts consistently bar businesses from pursuing antitrust suits where the injuries reflect increased, rather than decreased, competition in the affected market. *See, e.g.*, *Brunswick*, 429 U.S. at 488; *Cargill v. Munfort of Colo., Inc.*, 479 U.S. 104, 116-117 (1986); *Brown Shoe Co.*, 370 U.S. at 320.

Plaintiffs' allegations address discrete injuries to Plaintiffs as individual businesses, not injury to the competitiveness of the auto body repair industry. For example:

- Defendants allegedly "refus[e] to compensate the shops for replacement parts" (FAC ¶ 104);
- Defendants allegedly "require[e] discounts or concessions be provided" (*id.*);
- Defendants allegedly "coerce the Plaintiffs into accepting less than actual and/or market costs for materials and supplies" (*id.* 103);
- Defendants have allegedly "steered" their repair work "to favored, compliant shops through misrepresentation, insinuation, casting aspersions upon the business integrity and quality of disfavored repair centers." (*Id.* ¶ 124.)

However, even an act of pure malice against a business does not, without an injury to *competition*, confer a claim under the federal antitrust laws. *See Austin*, 903 F.2d at 1389-90 (antitrust injury "requires the private antitrust plaintiff to show that his own injury coincides with the public detriment tending to result from the alleged violation . . . increas[ing] the likelihood that public and private enforcement of the antitrust laws will further the same goal of increased competition.") (quoting P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 335.1, 261 (Supp. 1987)).  Those laws are not "a federal law of unfair competition" providing "remedies for all torts committed by or against persons engaged in interstate commerce." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (citing *Hunt v. Crumboch*, 325 U.S. 821, 826 (U.S. 1945)).

The only industry-wide, non-tort, non-contract allegation by Plaintiffs is Defendants' alleged "suppression" of labor rates.  But low pricing must be *predatory* to be actionable under the antitrust laws, as explained below.  As a result, courts considering suits brought by auto body shops against insurers alleging unlawful low price-fixing have been skeptical of the alleged antitrust injuries sustained by the body shops.  *See Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F. 2d 1195, 1201 (7th Cir. 1981); *see also Walker v. USAA Cas. Ins. Co.*, 474 F. Supp. 2d 1168, 1175 (E.D. Ca. 2007) ("*Walker I*").

## 2.   Low Pricing Strains Businesses, Not Competition

Plaintiffs allege Defendants' pricing causes "depressed" rates for labor and materials.  (FAC ¶¶ 67-79, 99-101, 102-103, 124, 153-69.)  But this is only a plea for *protection from competition*, not a plea for *preservation of competition*.  "As a result" of Defendants' pricing, Plaintiffs admit, "the plaintiffs are unable to compete or act in any competitive manner within their industry as the financial margins which have been imposed upon them prevent them from doing so."  (Doc. No. 77 [Pls.' Resp. Def. GEICO's Mot. Dismiss] at 21; FAC ¶ 160 (Plaintiffs are not "able to engage in competitive business practices")).)

The antitrust laws, however, "do not require the courts to protect small businesses from the loss of profits due to continued competition . . . ."  *Cargill*, 479 U.S. at 116.  This is true to the pro-consumer underpinnings of the antitrust laws, which the Supreme Court has described as a "consumer welfare prescription."  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979); *Spectrum Sports*, 506 U.S. at 459; *cf. ARCO*, 495 U.S. at 360 (Stevens, J., dissenting).  And low prices are a prime indicator of continued competition, "benefit[ing] consumers regardless of how those prices are set."  *See State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997) (citing *ARCO*, 495 U.S. at 340)).

Low prices do not threaten competition unless they are below "predatory levels."  *State Oil*, 522 U.S. at 15; *Brooke Group*, 509 U.S. at 223 ("[W]e have rejected … the notion that above-cost prices that are below general market levels or the costs of a firm's competitors inflict injury to competition under the antitrust laws.") (citation omitted); *see also ARCO*, 495 U.S. at 338, 339-40 ("To hold that the antitrust laws protect competitors from the loss of profits due to non-predatory price competition

would, in effect, render illegal any decision by a firm to cut prices in order to increase market share.") (citation omitted).  In fact, "cutting prices" to remain competitive "is the very essence of competition." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986).  Low prices either "reflect the lower cost structure of the alleged predator, and so represent competition on the merits, or [are] beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling illegitimate price-cutting." *Brooke Group*, 509 U.S. at 223 (citation omitted).  This is true regardless of the type of antitrust violations alleged. *See id.*; *ARCO*, 495 U.S. at 340.  Accordingly, "*low prices cannot give rise to antitrust injury.*" *ARCO*, 495 U.S. at 340 (emphasis added); *see also Brooke Group*, 509 U.S. at 224 ("That below-cost pricing may impose painful losses on its target is of no moment to the antitrust laws if competition is not injured").

Plaintiffs do not, and cannot, allege that Defendants' prices are predatory or below cost.  They allege only that an auto body shop's agreement to Defendants' purported labor rates "end[s] in a shop operating at or near a loss for each repair."  (FAC ¶ 121.)  After all: "[i]t is difficult to imagine that numerous [other] independent auto body shops" would willingly agree to "depress[ed] auto body rates paid to those same auto body shops"—particularly if prices were set at predatory levels.[1]  *See Walker I*, 474 F. Supp. 2d at 1175; *see also Matsushita*, 475 U.S. at 589 ("[P]redatory pricing schemes are rarely tried, and even more rarely successful").  Such a scheme becomes even more improbable here because it requires coordinated action among many firms. *Brooke Group*, 509 U.S. at 227 (citing *Matsushita*, 475 U.S. at 590).

---

[1] This is especially so in light of the consent decree in *United States v. Assoc. of Cas. and Surety Cos.*, Civ. No. 3106 (S.D. N.Y. Oct. 23, 1963), which Plaintiffs assert "has been 'on the books' for fifty years and is well-known within the insurance industry."  (FAC ¶¶ 129-131.)

The Florida auto body repair industry, as depicted by Plaintiffs, is one in which repair shops strive vigorously to remain profitable while attracting work from insurers.  The result—low prices—is a boon to consumers.  This challenging environment allegedly "places Plaintiffs in the difficult position of either performing incomplete and/or substandard repairs . . ., or performing labor and expending materials without proper compensation and thereby jeopardizing continuing viability of the business enterprise."  (Compl.] ¶ 103.)  But that is not the result of anticompetitive business practices.  *See ARCO*, 495 U.S. at 337-38 ("A firm complaining about the harm it suffers from nonpredatory price competition 'is really claiming that it [is] unable to raise prices.'") (quoting R. Blair & J. Harrison, RETHINKING ANTITRUST INJURY, 42 VAND. L. REV. 1539, 1554 (1989)).  It is also no antitrust injury.  *See Todorov*, 921 F.2d at 1454.

This is true even if, unlike here, the low pricing "nominally violate[s] the antitrust laws" and even if it may "cause serious harm to individual" firms like Plaintiffs.  *ARCO*, 495 U.S. at 344.  Instead, "the discounts negotiated between the insurance companies and the direct repair providers," however demanding, "reflect the *proper functioning of the market* to bring about lower prices to consumers."  *Walker v. GEICO Gen. Ins. Co.*, 558 F. 3d 1025, 1027 (9th Cir. 2009) ("*Walker II*") (emphasis added).  At the core of their claims, Plaintiffs complain of a Florida auto repair industry that is *too* competitive as a result of competitive pricing—not less.  But where, as here, prices charged are not predatory, there can be no antitrust injury.  *State Oil*, 522 U.S. at 15; *Brooke Group*, 509 U.S. at 223.  To find otherwise would "chill the very conduct that the antitrust laws are designed to protect."  *Matsushita*, 475 U.S. at 575; *see Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 478 (1992).

**B.    Plaintiffs are Not "Efficient Enforcers" of the Antitrust Laws Because Their Damages Are Highly Speculative and Complex**

In addition to demonstrating antitrust injury, a plaintiff must be an "efficient enforcer" of the antitrust laws.  *Palmyra*, 604 F.3d at 1299 (citation omitted).  No bright-line rule governs this determination.  *Id.* (citation omitted).  Instead, the Supreme Court in *AGC* established factors for courts to consider when deciding whether a plaintiff would be an efficient enforcer:

- The directness or indirectness of the injury;
- The remoteness of the injury;
- Whether other potential plaintiffs are better suited to vindicate the harm;
- Whether the damages are highly speculative;
- The extent to which the apportionment of damages is highly complex and would risk duplicative recoveries; and
- Whether the plaintiff would be able to efficiently and effectively enforce the judgment.

*Todorov*, 921 F.2d at 1451-52 (citing *AGC*, 459 U.S. at 540).

Like the claims rejected in *AGC*, Plaintiffs' claims "rest at bottom on some abstract conception or speculative measure of harm."  459 U.S. at 543 (internal citations and quotations omitted); *see also Mid-West Paper Prods. Co. v. Cont'l Group, Inc.*, 596 F.2d 573, 585 (3d Cir. 1979). Any attempt to analyze how each Plaintiff has been injured by Defendants' allegedly anti-competitive conduct would be an exercise in pure conjecture and speculation.  The measure of Plaintiffs' injury is not simply the difference between what each Defendant, in Plaintiffs' view, ought to have paid them; rather, it is the measure of what each Defendant would have paid Plaintiffs, accounting for adjustments by all of the co-Defendants who Plaintiffs accuse of also establishing anti-

competitive pricing.[2]  Because such an inquiry would necessarily rely on speculation and assumptions, rather than a quantifiable amount in damages, Plaintiffs are inefficient enforcers of the antitrust laws.

## II.   PLAINTIFFS DO NOT ADEQUATELY PLEAD A CONTRACT, COMBINATION, OR CONSPIRACY

Section 1 of the Sherman Act, 15 U.S.C. § 1, proscribes joint action in restraint of trade.  It does not reach single firm conduct.  An essential element of Plaintiffs' section 1 claim is that Defendants acted together; that is, they joined in a "contract, combination, or conspiracy," all of which requires some form of agreement to engage in the competitive restraint.  *Id.*  The FAC here must be dismissed because it fails to make allegations sufficient to raise a plausible inference of such concerted action.

The Supreme Court addressed precisely this issue in the leading precedent on pleading.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  Just as here, the plaintiffs in *Twombly* sought to sustain a price-fixing conspiracy charge based solely on circumstantial allegations.  The Court held that to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face."  *Id.* at 570.  This requirement serves a critical gate-keeping role, particularly in complex antitrust cases where the threat of vast and costly discovery can provide

---

[2] Determining those injuries would be highly speculative because Plaintiffs' claim for damages is built on an unstable plank of at least five assumptions. *First*, Plaintiffs generously assume that but for Defendants' allegedly anti-competitive conduct, they would receive work from Westfield and its co-Defendants. *Second*, they assume they would receive a higher price for that work.  Plaintiffs' *third* assumption is that they could perform even the higher-priced work at a profit.  *Fourth,* Plaintiffs further assume that more competitive firms would not have performed the work for the prices requested by Defendants. *Cf. Nynex Corp. v. Discon, Inc.*, 525 U.S. 128, 137 (1998).  And, *fifth*, Plaintiffs assume Westfield and its co-Defendants would not have managed to keep costs low any other way, for example by taking repair operations in-house to keep costs low, as many of them have with legal services.

plaintiffs with significant leverage, regardless of the ultimate merits of their claims. *See id.* at 557-59.

Because section 1 of the Sherman Act does not prohibit all restraints of trade, only *agreements* to restrain trade, a complaint alleging a section 1 violation must contain "enough factual matter (taken as true) to suggest that an *agreement* was made." *Id.* at 553, 556 (emphasis added). "[I]t is not enough to make allegations of an antitrust conspiracy that are consistent with an unlawful agreement," *Transhorn, Ltd. v. United Techs. Corp. (In re Elevator Antitrust Litig.*), 502 F.3d 47, 50 (2d Cir. 2007), and "neither parallel conduct nor conscious parallelism, taken alone, raise the necessary implication of conspiracy," *Twombly*, 550 U.S. at 561 n.7. The Court also expressly held in *Twombly* that allegations consisting of mere "labels and conclusions" and a "formulaic recitation of the elements of a cause of action" are wholly inadequate to satisfy the plausibility pleading standard for antitrust conspiracy claims. *Id.* at 555; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [under *Twombly*].").

Moreover, the alleged facts must be specific to *each* defendant; the use of the "global term[s] defendants [and cartel] to apply to numerous parties without any specific allegations that would tie each particular defendant to the conspiracy is not sufficient' under *Twombly*." *BanxCorp. v. Apax Partners, L.P.*, No. 10-cv-4769 (SDW), 2011 WL 1253892, at *4 (D.N.J. Mar. 28, 2011) (alterations in original).[3]

---

[3] *Accord Pierson v. Orlando Reg'l Healthcare Systems*, 619 F. Supp.2d 1260, 1273 (11th Cir. 2012), *aff'd*, 451 Fed. App'x 862 (11th Cir. 2012), *cert. denied*, 133 S. Ct. 940, 184 L. Ed. 2d 725 (2013) (granting motion to dismiss because complaint grouped defendants together "and does not describe what action each of them allegedly took against Plaintiff"); *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430 (6th Cir. 2012)

Where, as here, a complaint seeks to raise an inference of an agreement indirectly through allegations of parallel conduct, rather than through specifically alleged communications or other direct indicators of an "actual agreement," *Twombly*, 550 U.S. at 564, the alleged parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct *that could just as well be independent action*." *Id.* at 557 (emphasis added).  Parallel conduct resulting from "independent responses to common stimuli, or mere interdependence unaided by an advanced understanding among the parties" is similarly insufficient to plead a conspiracy.  *Id.* at 556 n.4.

### A.        Plaintiffs Allege No Direct Evidence of Conspiracy

The FAC contains no direct allegations of any "actual agreement" to engage in the conduct alleged.  It does not, for example, purport to identify when, where, how, or by whom any alleged agreement to suppress the auto body repair market rate was supposedly made.  (*See* FAC ¶¶ 101, 154 ("The remaining Defendants, intentionally and by agreement and/or conscious parallel behavior"; "[t]hrough parallel actions, and/or explicit agreement, the Defendants have formed and engaged in a vertical conspiracy")．)  Plaintiffs appear to admit this reality.  (*See* Doc. No. 77 (Pls.' Resp. GEICO Def.'s Mot. Dismiss at 13 ("Fortunately, the complaint does allege facts which satisfy this

---

(the allegations "must specify how [each] defendant [was] involved in the alleged conspiracy") (citation omitted); *In re Elevator Antitrust Litig.*, 502 F.3d at 50-51 (general allegations "without any specification of any particular activities by any particular defendant . . . .do[] not supply facts adequate to show illegality" (internal quotation marks and citation omitted)); *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907 (N.D. Ill. 2009), *vacated and remanded*, 657 F.3d 650 (7th Cir. 2011), *reh'g en banc granted, opinion vacated*, (Dec. 2, 2011) *and order aff'd*, 683 F.3d 845 (7th Cir. 2012), *cert dismissed*, 134 S. Ct. 23, 186 L. Ed. 2d 936 (2013) ("Allegations of conspiracy under the Sherman Act 'must adequately allege the involvement of each defendant and put defendants on notice of the claims against them.'"); *Hinds County, Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499 (S.D. N.Y. 2009); *White Mule Co. v. ATC Leasing Co. LLC*, 540 F. Supp. 2d 869 (N.D. Ohio 2008);.*American Sales Co, Inc. v. AstraZeneca*, 2011 WL 1465786 (S.D. N.Y. Apr. 14, 2011); *Stanislaus Food Products Co. v. USS-POSCO Indus.*, 2010 WL 3521979 (E.D. Cal. 2010).

requirement" that "where parallel conduct is the baseline for pleading a . . . conspiracy, bare allegations . . . are insufficient.").)

Even accepting Plaintiffs' allegations as true, the circumstantial evidence alleged in the FAC does not create any inference of *concerted* action to engage in the conduct alleged sufficient to withstand a motion to dismiss.

**B.    Opportunity to Conspire Is Not Evidence Of Conspiracy**

In the FAC, Plaintiffs allege as evidence of a conspiracy an alleged statement that State Farm representative Tim Bartlett made that there are monthly "insurance industry meetings." (FAC ¶ 115.) Plaintiffs make no attempt to explain what these meetings are about, who attends them, or where they are held. And, because Plaintiffs allege their request to attend such meetings has been "refuse[d]" (*id.* ¶ 116), they cannot know what is said in the alleged meetings.

At bottom, the alleged meetings attended by Defendants offer only an *opportunity* to conspire. The Eleventh Circuit, however, has explained that the mere opportunity to conspire, even when "paired" with parallel conduct, does not support an inference of a conspiracy to fix prices. *In re Fl. Cement and Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1316 (11th Cir. 2010); *Todorov*, 921 F.2d at 1456; *see also Blomkest*, 203 F.3d at 1036 (opportunity to conspire "not necessarily probative evidence of price-fixing conspiracy."); *In re Citric Acid*, 191 F.3d at 1103 (opportunities to conspire are insufficient to support an inference of conspiracy because they "do not exclude the possibility of legitimate activity"); *In re Baby Food*, 166 F.3d at 126 (finding that "communications between competitors do not permit an inference of an agreement to fix prices unless 'those communications rise to the level of an agreement, tacit or

14

otherwise.'"").   Moreover, because Plaintiffs allege nothing more than parallel conduct and motive to conspire, Defendants' opportunity to conspire is not evidence of conspiracy.

**C.      Plaintiffs' Allegations of a Motive are Insufficient to Support an Inference of Conspiracy**

Plaintiffs allege that Defendants' motive to conspire is "to coerce the Plaintiffs into accepting the artificially created less-than-market labor rates . . . ."  (*See* FAC ¶ 101.) And, Plaintiffs have argued in another pleading that Defendants' alleged motive is a so-called "plus factor" sufficient to show evidence of a conspiracy.  (Doc. No. 77 (Pls.' Resp. GEICO Def.'s Mot. Dismiss) at 13.)  But whether or not Defendants had a motive to conspire, such motive is inadequate to support an inference of concerted action.

The Eleventh Circuit has expressed deep skepticism that motive is a "plus factor" supporting an inference of conspiracy.  *E.g.*, *Holiday Wholesale Grocery Co. v. Phillip Morris, Inc.*, 231 F. Supp.2d 1253, 1306 (11th Cir. 2002) (explaining plaintiffs' characterization of motive as plus factor was "questionable") (quoting *In re Baby Food*, 166 F.3d at 122 (noting concept of "conspiratorial motivation" is ambiguous because it merely restates the interdependence that characterizes an oligopolistic market).   And other courts have held that an alleged motive to enter an antitrust conspiracy is never sufficient to plead that the alleged conspiracy occurred.  *See, e.g.*, *Williams v. Citigroup, Inc.*, No. 08 Civ. 9208, 2009 WL 3682536, at *10 (S.D.N.Y. Nov. 2, 2009), *aff'd in part and vacated in part on other grounds*, 433 F. App'x 36 (2d Cir. 2011); Areeda & Herbert, ¶ 1433a, at 259.  Every auto insurer, for example, would like lower prices for collision repair, but that hardly provides a basis to infer a conspiracy to lower prices.

For all these reasons, Plaintiffs fail the *Twombly* test.  *See, e.g.*, *In re Elevator Antitrust Litig.*, 502 F.3d at 51 (rejecting inference of conspiracy based on conduct that was "just as much in line" with conspiracy as "with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market" (quoting *Twombly*, 550 U.S. at 554)).

## III.  PLAINTIFFS FAIL TO ALLEGE A RESTRAINT OF TRADE

### A.  There are No Allegations of a Conspiracy to Fix Prices

Plaintiffs do not allege an essential element of an antitrust conspiracy: that Defendants *restrained competition* in the marketplace.  All allegedly anticompetitive conduct here stems from use of the DRPs.  A sub-set of that conduct is use of allegedly inaccurate surveys by State Farm to establish the market rate for auto repairs.  (*See* FAC ¶¶ 78-86.)  But repair shops are free to accept or reject participation in the DRPs.  And the surveys are just an index of value and are not in themselves marketplace transactions.  Plaintiffs therefore allege no restraint on each Plaintiff shop's freedom to compete on whatever terms it chooses—Plaintiffs were always free to refrain from participating in the DRPs or completing the surveys.  Plaintiffs also do not allege any restraint on Defendants' own ability to refrain from or cease in participation in the DRPs or use of surveys.

Section 1 of the Sherman Act only prohibits conspiracies "in restraint of trade or commerce."  The "end sought [by the Sherman Act] was the prevention of restraints to free competition in business and commercial transactions."  *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493 (1940).  To be an antitrust violation, the alleged agreement must

actually restrain trade.  *See, e.g.*, *Dedication & Everlasting Love to Animals v. Humane Soc'y of the United States, Inc.*, 50 F.3d 710, 712-13 (9th Cir. 1995).

Plaintiffs do not adequately allege any competition-reducing aspects of the DRPs with respect to the process by which those programs are set, nor with respect to the ways in which they are used.  Even Plaintiffs "originally" entered into the programs because they appeared to Plaintiffs as "a mutually beneficial opportunity."  (*See* Compl. ¶ 66.)  Moreover, the DRPs foster competition by challenging firms to provide low prices and permitting those that cannot, or will not, to generate their own business.

With respect to the surveys, such joint action by industry participants to create a policy or index does not restrain trade if it nonetheless leaves members free to compete in the marketplace.  For example, in *Schachar v. Am. Acad. Of Ophthalmology, Inc.*, an association of doctors published a joint statement that a procedure was "experimental." 870 F.2d 397, 397 (7th Cir. 1989).  Plaintiffs—doctors who performed the procedure— claimed that the statement constituted a conspiracy to discourage use of the procedure. *Id.* at 398.  The court (Easterbrook, J.) disagreed, explaining that "[t]here can be no restraint of trade without a restraint.  That truism decides this case."  *Id.* at 397.  The association's statement did not restrain conduct in the marketplace.  It "did not require its members to desist from performing the operation or associating with those who do."  *Id.* at 398; *see also United States v. Am. Soc'y of Anesthesiologists, Inc.*, 473 F. Supp. 147, 155 (S.D.N.Y. 1979) (holding that a trade association's creation of a relative value guide for anesthesiology services did not restrain trade because the association "has never employed formal or informal sanctions to discourage individual anesthesiologists from independently determining their own fees").

Notably, Plaintiffs do not allege that use of surveys themselves is inherently anticompetitive.  To the contrary, Plaintiffs concede that "[t]here could, arguably, be some validity to [the survey] method" if it better "accounted" for subjective "quality variables" such as, for example, "skill of technicians."  (FAC ¶ 83.)  Plaintiffs' only complaint is that the information that Westfield allegedly provides about its shops is somehow false or misleading.  Plaintiffs, however, fail to tie that allegation to any alleged harm to competition.  Indeed, Plaintiffs' theory runs directly counter to the antitrust rule that the provision of allegedly false information generally does not constitute a restraint of trade.  *See Aquatherm Indus., Inc. v. Florida Power & Light Co.*, 145 F.3d 1258, 1262-63 (11th Cir. 1998) (holding that electric company's false promotion of energy inefficient pumps intended to increase customers' use of electrical power did not constitute a restraint of trade); *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623-24 (7th Cir. 2005) (Easterbrook, J.) (holding similarly with respect to dissemination of false information disparaging a competitor's products).  The Sherman Act is "not a code of . . . ethics or methodology."  *Schachar*, 870 F.2d at 400; *see also Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413 (7th Cir. 1989).  Rather, "[u]nless one group of suppliers diminishes another's ability to peddle its wares . . . there is not even the beginning of an antitrust case."  *Schachar*, 870 F.2d at 399.  Plaintiffs here have not alleged, and the law does not support, any theory under which the use of surveys could be a restraint of trade.

For both the DRPs and the survey component of these programs, there is no basis to infer that use of either in the marketplace renders the alleged conduct anticompetitive.  Plaintiffs do not, and cannot, allege any agreement among Defendants or anyone else to

require the use of the surveys or the DRPs.  Even accepting as true Plaintiffs' allegations

that the DRPs and/or market surveys injure Plaintiffs, both Defendants and body shops

are entirely free not to use State Farm's survey process and not to enter into DRPs.

Unlike a true price-fixing conspiracy, which would bar participants from withdrawing

from (and thereby cheating on) the conspiracy by offering better terms in the

marketplace, here there is a complete absence of allegations related to "enforcement

mechanisms [which] are the 'restraints' of trade."  *Schachar*, 870 F.2d at 399.

### B.   There are No Allegations of Any Actionable "Boycott"

In Count VII of the Complaint, Plaintiffs assert a boycott claim based on

Defendants' alleged "steering" of customers from Plaintiffs by "alleg[ing] and

intimat[ing]" that Plaintiff shops are unsuitable places to take their vehicles for repair.

(FAC ¶ 163.)  This claim fails because Plaintiffs (1) have failed to properly allege

concerted action and (2) have not alleged that Defendants refused to deal with them.

To sustain a claim for group boycott under the antitrust laws, Plaintiffs must

allege a concerted refusal to deal.  *See Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d

1555, 1568 (11th Cir. 1991) ("group boycott" involves situation where multiple parties

agree that each "will 'refus[e] to deal with a particular customer or customers'") (citation

omitted); *see also Quality Auto Body, Inc.*, 660 F.2d at 1206.  As pointed out in Section II

above, Plaintiffs have failed to properly allege concerted action by Defendants.

Plaintiffs do not allege that Defendants cut business off from them or did not

reimburse claimants patronizing Plaintiff shops, much less that *all* Defendants refused to

deal with any particular body shop or shops.  (*Cf.* FAC ¶¶ 162-69.)  Instead, they have

alleged, at most, that Defendants have "steered" potential customers away from them by

using repair shops willing and able to meet the terms of DRP agreements.  But that is not

an actionable boycott.  *See Quality Auto Body, Inc.*, 660 F.2d at 1206 (Defendants' use of

certain shops over plaintiffs not a "refusal to deal but rather defendants' refusal to pay

more than the prevailing competitive price"); *Custom Auto Body, Inc. v. Aetna Cas. &

Sur. Co.*, No. 78-0301, 1983 WL 1873, at *19 (D. R.I. Aug. 3, 1983) (plaintiff auto body

shop "at all times has been free to compete for the business of the defendant and its

insureds by offering lower prices or higher quality services"); *Nationwide Mut. Ins. Co. v.

Auto. Serv. Councils of Delaware, Inc.*, No. 78-323, 1981 WL 2053, at *2-4 (D. Del. Apr.

10, 1981) (no "suggestion of an outright refusal" to deal by insurer for telling insureds

plaintiffs' "prices were too high" and that insurer "would not guarantee full

reimbursement").

Because Defendants have not refused to deal with Plaintiffs, but only refused to

pay the prices Plaintiffs prefer, Plaintiffs have not sufficiently alleged a boycott in

restraint of trade in violation of section 1 of the Sherman Act.

## IV.   PLAINTIFFS' EQUITABLE CLAIMS SHOULD BE DISMISSED

In addition to their purported antitrust claims, Plaintiffs assert equitable claims for

*quantum meruit*, unjust enrichment, and quasi-estoppel.  (FAC ¶¶ 134-45.)  Yet all three

of Plaintiffs' equitable claims fail from the outset because Plaintiffs seek equity only

*after* participating in the same DRPs, which they now claim are unfair.   Plaintiffs

"originally" viewed DRPs "as a mutually beneficial opportunity" for themselves and

insurers.  (*Id.* ¶ 69.)  "In exchange for providing certain concessions of price, priority and

similar matters," they admit they sought the benefit of "the individual Defendants . . .

list[ing] the body shop as a preferred provider."  (*Id.*)  Plaintiffs were thus willing to enter

into agreements conferring "preferred" status and a steady source of customers—to the detriment of non-preferred body shops—when they originally agreed that the DRPs were in their best interest.

Now, only in hindsight and after they contend "the concessions . . . were not balanced by the . . . benefits" (FAC ¶ 70), Plaintiffs ask the Court to grant them equitable relief.  But that relief is not available here.  To seek equity, Plaintiffs "must come with clean hands."  *Hillsborough County v. De Sear*, 162 So. 703, 705 (Fl. 1935).  This Court does not "assist one wrongdoer against another" and so "[h]e who seeks equity must do equity."  *Id.*  If the DRPs wrongly prefer certain body shops to the detriment of others, as Plaintiffs contend, they also did so when Plaintiffs acted to exploit them.  As a result, Plaintiffs enter the Court with unclean hands and must be denied all equitable claims.

### A.    Quasi-Estoppel

Put simply, quasi-estoppel is not a cause of action.  *De Gochicoa v. Keystone Texas Prop. Holding Corp.*, No. 04-02-00078-CV, 2001 WL 31272370, at *2 (Tex. Ct. App. Sept. 30, 2002).  Instead, under Florida law, quasi-estoppel is a doctrine precluding a party from "occup[ying] inconsistent positions."  *Hodkin v. Perry*, 88 So.2d 139, 140 (Fla. 1956).  Furthermore, Plaintiffs have alleged *no facts* in connection with Westfield taking inconsistent positions, or how Westfield's allegedly inconsistent positions have harmed Plaintiffs.  *Hodkin*, 88 So.2d at 140.  Accordingly, Plaintiffs self-styled claim for "quasi-estoppel" (Compl. ¶¶ 132-136), must be dismissed.

### B.    *Quantum Meruit* and Unjust Enrichment claims

Plaintiffs' *quantum meruit* and unjust enrichment claims (FAC ¶¶ 134-41) must be dismissed because they purport to rely on a contract, and because they fail to

adequately allege a benefit conferred by Plaintiffs to Westfield.  To properly plead such claims, Plaintiffs must show (1) that they conferred a benefit on Westfield; (2) that Westfield has knowledge of the benefit; (3) that Westfield has accepted or retained the benefit; and (4) under the circumstances, it would be inequitable for Westfield to retain the benefit without paying fair value for it.  *Absolute Marine Towing & Salvage, Inc. v. S/V Iniki*, No.: 6:09-CV-1712-Orl-31KRS, 2010 WL 2652466, at *2 (M.D. Fla. June 22, 2010) (Presnell, J.).  A contract will only be implied if the parties have "in fact" entered into an agreement lacking "sufficient clarity," requiring the court to "give definition to their unspoken agreement."  *Tooltrend, Inc. v. CMT Utensili, SRL*, 198 F.3d 802, 806 (11th Cir. 1999) (citation omitted).

Plaintiffs' equitable claims fail because Plaintiffs allege that they entered into express, DRP agreements with Westfield.  These agreements "have unique *titles*."  (FAC ¶ 68 (emphasis added).)  They also contain extensive "*terms*" but "contain no *provisions*" for certain contents Plaintiffs desire.  (*Id.* ¶ 79 (emphases added).)  What is more, "each . . . contains a *general statement* that the body shop will charge the respective insurance company no more for any particular repair than is the going rate in the market area."  (*Id.* ¶ 77 (emphasis added).)

There can be no doubt that the DRP agreements on which Plaintiffs bring their *quantum meruit* and unjust enrichment claims are express, written contracts.  Because these claims are based on express, written agreements, they should be summarily dismissed.  *White Holding Co., LLC v. Martin Marietta Materials, Inc.*, 423 Fed. App'x 943, 947 (11th Cir. 2011); *Five for Entm't S.A. v. Rodriguez*, No. 11-24142-CIV, 2013

WL 3975671, at *7 (S.D. Fla. July 31, 2013); *Ocean Communications, Inc. v. Bubeck*, 956 So.2d 1222, 1225 (Fl. Dist. Ct. App. 4th Dist. 2007).

Even if there was not an express, written contract between the parties, these equitable claims are fatally flawed because Plaintiffs fail to allege that they conferred any benefit to Westfield.  Plaintiffs allege that they performed services and materials which "benefitted Defendants and Defendant's [*sic*] insured/claimants for whom Defendants are required to provide payment for repairs." (FAC ¶ 135.)  But whether Plaintiffs conferred a benefit on Westfield's insureds and claimants is not the relevant inquiry; instead, Plaintiffs must allege that they "conferred a benefit on *the defendant*." *Absolute Marine*, 2010 WL 2652466 at *2 (emphasis added).  Plaintiffs conferred no such benefit—nor have they pleaded one—outside of a recitation of this element of their claim. (Compl. ¶ 135.)

Where a third-party confers a benefit on an insured, the benefit flows to the insured—not the insurer.  *Hialeah Physicians Care, LLC v. Conn. Gen. Life Ins. Co.*, No. 13-21895-CIV, 2013 WL 3810617, at *3 (S.D. Fla. July 22, 2013) ("HPC can hardly be said to have conferred any benefit, even an attenuated one, upon the Plan's insurer by providing the Plan beneficiaries with health care services."); *Adventist Health Sys/Sunbelt, Inc. v. Med. Sav. Ins. Co.*, No. 6:03-cv-1121-Orl-19KRS, 2004 WL 6225293, at *6 (M.D. Fla. Mar. 8, 2004) (Fawsett, C.J.).  Accordingly, because Plaintiffs only allege that they conferred benefits on Westfield's insureds and claimants, not Westfield, their claim fails to plead an essential element of a *quantum meruit* cause of action.

## V.     PLAINTIFFS' TORT CLAIMS SHOULD BE DISMISSED

Both of Plaintiffs' tort claims suffer fatal flaws based on the facts alleged—or, more precisely, based on the lack of facts alleged.  The claim for tortious interference with business relations (FAC ¶¶ 146-49) is insufficiently pleaded and does not apply to the facts alleged.  The claim for conversion fails because the alleged failure to honor an obligation to pay money does not give rise to a claim of conversion in tort.

### A.     Tortious Interference with Business Relations

To successfully assert a claim of tortious interference with business relations under Florida law, Plaintiffs must plead (1) a business relationship; (2) Westfield's knowledge of the relationship; (3) an "intentional and unjustified interference" with the relationship by Westfield; and (4) resulting damages.  *Palm Beach County Health Care Dist. V. Prof'l Med. Educ., Inc.*, 13 So.3d 1090, 1094 (Fla. 4th Dist. Ct. App. 2009). Plaintiffs have altogether failed to allege facts supporting *any* of these elements.

Like their claims for *quantum meruit* and unjust enrichment, Plaintiffs' tortious interference claim also fails because the DRP agreements establish a business relationship.  In essence, a proper defendant is a stranger to the business relationship.  *See Cox v. CSX Intermodal, Inc.*, 732 So.2d 1092, 1099 (Fla. 1st Dist. Ct. App. 1999) ("Generally, a tortious interference claim 'exists only against persons who are not parties to a contractual relationship.'"); *Bortell v. White Mountains Ins. Group, Ltd.*, 2 So.3d 1041, 1049 (Fla. 4th Dist. Ct. App. 2009) ("A tortious interference claim exists only against persons or entities who are not parties to the contractual relationship."). Westfield is no stranger to its policyholders and claimants, who are beneficiaries to the contractual relationship between Westfield and its policy holders.

### B.     Conversion

A claim for conversion of money under Florida law requires a plaintiff to show (1) specific and identifiable money; (2) possession or an immediate right to possess that money; (3) an unauthorized act which deprives plaintiff of that money; and (4) a demand for return of the money and a refusal to do so.  *IberiaBank v. Coconut 41, LLC*, No. 2:11-cv-321-FTM-29DNF, 2013 WL 6061883, at *19 (M.D. Fla. Nov. 18, 2013); *see also Deutsche Bank Nat'l Trust Co. v. Foxx*, No. 8:13-cv-115-T-35TBM, 2013 WL 5291128, at *9 (M.D. Fla. Sept. 19, 2013) ("Conversion is an unauthorized act that deprives a person of his property permanently or for an indefinite time.").

Plaintiffs have identified no specific, identifiable money owed them by any Defendant, much less Westfield.  Their conversion claim fails on that basis alone.  *See U.S. v. Mystic Equestrian, LLC*, No. 11-81130-CIV, 2013 WL 616938, at *3 (S.D. Fla. Feb. 19, 2013) ("The identification requirement ensures that a fund of money actually exists to pay a specific debt owed and the claimant is not merely transforming a contract dispute into a conversion claim.").  Yet their claim is even more fundamentally flawed: neither an obligation to pay money nor a breach of contract, as plaintiffs have essentially alleged under the DRP agreements, gives rise to a claim of conversion in tort.  *Adv. Surgical Techs., Inc. v. Automated. Instruments, Inc.*, 777 F.2d 1504, 1507 (11th Cir. 1985).  Accordingly, Plaintiffs' conversion claim must be dismissed.

### <u>CONCLUSION</u>

For the foregoing reasons, Westfield respectfully requests that Plaintiffs' First Amended Complaint be dismissed with prejudice.

Respectfully submitted,

**FOX ROTHSCHILD LLP**

**s/Alejandro Miyar**
**Alejandro Miyar**
Florida Bar No. 105399
Southeast Financial Center
200 S. Biscayne Blvd. Suite 3590
Miami, FL 33131-2395
Telephone: (305) 442-6549
Facsimile: (305) 442-6541
amiyar@foxrothschild.com

**s/ John J. Haggerty**
**John J. Haggerty (*pro hac vice*)**
2700 Kelly Road, Suite 300
Warrington, PA 18976
Telephone: (215) 345-7500
Facsimile: (215) 345-7507
jhaggerty@foxrothschild.com

*Attorneys for Defendant*
*Westfield Insurance Company*

## CERTIFICATE OF SERVICE

I certify that on **July 11, 2014**, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to all counsel of record and other participants in the Court's ECF filing system. I further certify that I will mail a true and correct copy of the foregoing document to any non-ECF participant as identified by the ECF notification system.

**s/Alejandro Miyar**
Alejandro Miyar
Attorney at Law
Florida Bar No. 105399