# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

A & E AUTO BODY, INC., et al.,

     Plaintiffs,

 v.

                                    Case No: 6:14-cv-310-Orl-31TBS
                              (MDL docket: 6-14-cv-2257-GAP-TBS)

21ST CENTURY CENTENNIAL
INSURANCE COMPANY, et al.,

     Defendants.

_____

# ORDER

     This matter comes before the Court after a hearing on motions to dismiss (Doc. 191, 192,

201, 204, 209-212, 215, 216, 235, 243, 249, 254, 270, 273) filed by various Defendants, the

response in opposition (Doc. 284) filed by the Plaintiffs,[1] and replies (Doc. 285-288) filed by

various Defendants.

    **I.**      **Background**

     According to the allegations of the Amended Complaint (Doc. 167), which are accepted in

pertinent part as true for purposes of resolving these motions to dismiss, the Plaintiffs are a group

of twenty Florida automobile repair shops.   (Amended Complaint at 10).   Between seventy and

ninety-five percent of the repairs performed at the Plaintiffs' shops are paid for by insurance.[2]

---

[1] The Plaintiffs' response in opposition addresses only the arguments regarding their state law claims, not their federal law claims.   Because the complaint in the Mississippi case (*Capitol Body Shop, Inc. v. State Farm Mutual Automobile Insurance Company*, Case No. 6:14-cv-6000-Orl-31TBS) raises federal law claims that are substantively identical to those raised in this case, the Court has reviewed the briefs filed in that case in resolving the instant motions.

[2] The Plaintiffs do not specify whether the insurers pay the repair shops directly, or reimburse their insureds after the fact, or some combination of the two.

(Amended Complaint at 17).   The Defendants are a group of forty insurers who collectively control approximately two-thirds of the automobile insurance market in Florida.   (Amended Complaint at 16).   The Plaintiffs allege that the Defendants have improperly combined to control and depress the amounts they pay for automobile repairs on behalf of their insureds in the state of Florida.[3]   (Amended Complaint at 11).

The Defendants in this case are alleged to "exert control" over the Plaintiffs' businesses (and the hourly rates paid by the Defendants) in a number of ways, beginning with agreements generally referred to as "direct repair programs" or "DRPs".   (Amended Complaint at 12).   To participate in a particular insurer's DRP, a repair shop typically agrees to certain concessions in regard to such things as the prices it will charge and the priority given to vehicles owned by people who have insurance through that insurer.   (Amended Complaint at 13).   In exchange, the repair shop is listed as a "preferred provider".   (Amended Complaint at 13).   However, the Plaintiffs complain that the prices that they were permitted to charge under the DRPs were unfairly manipulated, that even repair shops that were not participating in DRPs were restricted to those price ceilings,[4] and that repair shops that complained about these practices or tried to charge higher prices faced intimidation and boycotts from the insurers.   (Amended Complaint at 15).

As a general proposition, each DRP contains language obligating the repair shop to charge the insurance company no more than the "market rate" for repairs in the general area.   (Amended

---

[3] Similar suits asserting a conspiracy on the part of auto insurers to suppress reimbursement rates for automobile collision repairs have been filed in numerous other states.   On August 8, 2014, the United States Judicial Panel on Multidistrict Litigation centralized those actions before the undersigned pursuant to 28 U.S.C. § 1407.   (Doc. 1 in Case No. 6:14-md-2557-Orl-31TBS).   As of the date of this order, 22 such cases are before this Court for coordinated or consolidated pretrial proceedings.

[4] Only six Plaintiffs participate in DRPs, including three that participate in DRPs with more than one Defendant.   (Doc. 167-4).

Complaint at 18).   State Farm Mutual Automobile Insurance Company ("State Farm"), a Defendant in this case, determines this market rate.   (Amended Complaint at 18-19).   State Farm surveys the repair shops in a given area, determines the hourly rate charged by each repair technician, and then designates a rate just above the midpoint of all rates charged to be the "market rate."[5]   (Amended Complaint at 19).   However, the Plaintiffs complain that State Farm alters the survey results to achieve a "wholly artificial 'market rate'" (Amended Complaint at 19) and uses this artificially lowered result to negotiate price decreases from repair shops (Amended Complaint at 23).   If a repair shop attempts to raise its hourly rate, State Farm will, among other things, remove it or threaten to remove it from the DRP.   (Amended Complaint at 23).

The other Defendants, who do not perform such surveys, "specifically advised the Plaintiffs that they will pay no more than State Farm pays for labor."   (Amended Complaint at 23).   The Defendants refuse to pay a higher labor rate even to Plaintiffs who are not participating in a DRP.   (Amended Complaint at 24).

The Plaintiffs also allege that the Defendants improperly lowered the amounts that they paid for repairs by, among other things, refusing to pay for replacement parts even where the repair shop thought replacement was a better option than repair and by requiring utilization of used parts even where new parts were available.   (Amended Complaint at 26).   The Plaintiffs also complain that the Defendants (1) are refusing to abide by the estimates set forth in the industry's leading collision-repair-estimating databases (Amended Complaint at 27); (2) that they are refusing to pay for certain required materials and practices on the grounds that those items are included in the price of the repair (Amended Complaint at 30); and (3) that they have imposed

---

[5] The actual methodology employed is a bit more complex, involving rankings and a "half plus one" counting method, but this description is sufficient for present purposes.

arbitrary caps on the amount they are willing to pay for paint as part of a repair.   (Amended Complaint at 31).[6]

In the Amended Complaint, the Plaintiffs assert five claims against the Defendants that arise under Florida law: quantum meruit (Count I); unjust enrichment (Count II); quasi-estoppel (Count III); tortious interference with business relations (Count IV); and conversion (Count V). They also assert two claims arising under § 1 of the Sherman Act: price fixing (Count VI) and boycott (Count VII).   By way of the instant motions, the Defendants seek dismissal of all counts.

## II.      Procedural Background

On June 11, 2014, this Court entered an order (Doc. 110) dismissing the original Complaint (Doc. 1) *sua sponte*.   Among other problems, the Complaint failed to adequately allege the existence of subject matter jurisdiction and incorporated every word, whether relevant or not, into every succeeding count, resulting in a prohibited "shotgun pleading."   (Doc. 110 at 1-2). The Amended Complaint addressed the shotgun pleading issue, not by identifying the factual allegations that were intended to be incorporated into each count, but by eliminating all incorporation.   Despite this, the Court has attempted to discern the factual allegations that were intended to support particular counts.

The June 11 order also required identification of those Plaintiffs who were participating in DRPs.   (Doc. 110 at 2).   The Plaintiffs complied by attaching a list to the Amended Complaint, showing that six of them were participating in DRPs.[7]

---

[6] In the Amended Complaint, the Plaintiffs repeatedly refer to a consent decree entered in a 1963 suit between the United States on one side and three insurance trade associations on the other.   (Doc. 167-5).   Although some of the practices at issue in the consent decree are alleged to have occurred in the instant case, none of the parties in this case were parties to the 1963 case, and the Court does not find the 1963 consent decree to have any relevance to the instant case.

[7] Strangely, three of the Plaintiffs' DRP status is listed as "unknown."

The Court's final basis for dismissing the Complaint was as follows:

> With limited exceptions, the allegations of wrongdoing are attributed, collectively, to every Defendant and alleged to have been perpetrated upon every Plaintiff. While there may be situations in which such collective descriptions are sufficient, at least some of claims asserted here require individualized allegations.

(Doc. 110 at 2).   Rather than providing appropriately individualized allegations, counsel for the Plaintiffs responded by adding the names of all 40 Defendants to the end of every paragraph that includes the phrase "the Defendants."   So, for example, Paragraph 65 in the Complaint consisted of the following:

> 65.   One of the methods by which the Defendants exert control over Plaintiffs' businesses is by way of entering program agreements with the individual Plaintiffs. Although each Defendant's program agreements have unique titles, such agreements are known generally and generically within the collision repair industry as direct repair program agreements ("DRPs").

(Doc. 1 at 10).   The corresponding paragraph in the Amended Complaint reads:

> 68.   One of the methods by which the Defendants exert control over Plaintiffs' businesses is by way of entering program agreements with the individual Plaintiffs. Although each Defendant's program agreements have unique titles, such agreements are known generally and generically within the collision repair industry as direct repair program agreements ("DRPs"). The individual Defendants specifically included within the use of the term "the Defendants" in this paragraph include 21 Century Centennial Insurance Company, 21 Century Indemnity Insurance Company, Acceptance Indemnity Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Insurance Company, Bristol West Insurance Company, Direct General Insurance Company, Encompass Indemnity Company, Esurance Property & Casualty Insurance Company, Esurance Insurance Company, First Acceptance Insurance Company, Inc., Florida Farm Bureau General Insurance, Florida Farm Bureau Casualty Insurance Company, Foremost Insurance Company, GEICO General Insurance Company, Hartford Accident and Indemnity Company, Hartford Underwriters Insurance Company, Horace Mann Insurance Company, Infinity Auto Insurance Company, Liberty Mutual Insurance Company, Mercury Insurance Company of Florida, MGA Insurance Company, Inc., National General Insurance Online, Inc., Nationwide Insurance

> Company of Florida, Inc., Nationwide Mutual Insurance Company,
> Ocean Harbor Casualty Insurance Company, Old Republic
> Insurance Company, Progressive American Insurance Company,
> Progressive Select Insurance Company, Safeco Insurance Company
> of America, Security National Insurance Company, Sentry Insurance
> A Mutual Company, State Farm Mutual Automobile Insurance
> Company, The Cincinnati Insurance Company, Travelers Indemnity
> Company, USAA Casualty Insurance Company, United Services
> Automobile Association, Westfield Insurance Company, Windhaven
> Insurance Company, and Zurich American Insurance Company.

Not surprisingly, the term "the Defendants" appears throughout the Amended Complaint. As a result of the unwarranted inclusion of these names wherever that phrase appears, the Amended Complaint is more than twice as long as the (already lengthy) Complaint, and much more difficult to read.   This is unacceptable, and will result in sanctions if not cured in subsequent pleadings.   A requirement to provide "individualized allegations" cannot reasonably be read as a requirement to repeat the name of every individual Defendant, over and over.

Counsel for the Plaintiffs argue that, wherever they use the term "the Defendants," they always intend to refer to every single Defendant.   But this does not appear to always be the case. For example, in the paragraphs quoted above, the Plaintiffs allege that "the Defendants" enter DRP agreements with the individual Plaintiffs.   But according to the list that the Plaintiffs attached to the Amended Complaint, only a handful of the Defendants have entered into DRPs with any Plaintiff.   (Doc. 167-4).   And some Defendants have informed the Court that they have never participated in a DRP with any repair shop.[8]   The Plaintiffs should insure that their references to "the Defendants" are, in fact, intended to encompass every single Defendant.

---

[8] In addition, counsel for the Plaintiffs have not addressed the Court's concerns over their attempt to proceed collectively on state law claims, such as conversion and unjust enrichment, which would seem to require individualized allegations.   As those claims are being dismissed on other grounds, and in the absence of detailed briefing on the issue, the Court will not spend more time on the issue.   However, the issue has not been settled, and any party may raise it in connection with future pleadings.

### III.    Legal Standards

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief" so as to give the defendant fair notice of what the claim is and the grounds upon which it rests, *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957), *overruled on other grounds*, *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).   A Rule 12(b)(6) motion to dismiss for failure to state a claim merely tests the sufficiency of the complaint; it does not decide the merits of the case. *Milbum v. United States*, 734 F.2d 762, 765 (11th Cir.1984).   In ruling on a motion to dismiss, the Court must accept the factual allegations as true and construe the complaint in the light most favorable to the plaintiff.   *SEC v. ESM Group, Inc.*, 835 F.2d 270, 272 (11th Cir.1988).   The Court must also limit its consideration to the pleadings and any exhibits attached thereto.   Fed. R. Civ. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993).

The plaintiff must provide enough factual allegations to raise a right to relief above the speculative level, *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1966, and to indicate the presence of the required elements, *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1302 (11th Cir.2007).   Conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal.   *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court explained that a complaint need not contain detailed factual allegations, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.   A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id*. 678, 129 S.Ct. at 1949 (internal citations and quotations omitted).   "[W]here the well-pleaded

facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the plaintiff is entitled to relief.'"   *Id.* at 679, 129 S.Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

## IV.   Analysis

Count I and Count II – Quantum Meruit and Unjust Enrichment

Under Florida law, "quantum meruit" is a legal doctrine which, in the absence of an express agreement, imposes legal liability on a contract that the law implies from facts where one receives goods or services from another under circumstances where in the normal course of common affairs a reasonable person receiving such benefit would ordinarily expect to pay for it. *See, e.g., Osteen v. Morris*, 481 So.2d 1287, 1289 (Fla. 5th DCA 1986).   This fiction was adopted to provide a remedy where one party was unjustly enriched – where that party received a benefit under circumstances that made it unjust to retain it without giving compensation.   *Hull & Company, Inc. v. Thomas*, 834 So.2d 904, 906-07 (4th DCA 2003) (citing *Commerce Partnership 8098 Ltd. Partnership v. Equity Contracting Co.*, 695 So.2d 383, 386 (Fla. 4th DCA 1997).   The elements of an action for quantum meruit are that (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred; and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it.   *Id.*

At least in some instances, Florida courts also refer to the foregoing action as one for "unjust enrichment," with essentially identical elements.   For example, in *Hillman Const. Corp. v. Wainer*, 636 So. 2d 576 (Fla. 4th DCA 1994), the court recited the elements of a cause of action for "unjust enrichment" as

> (1) plaintiff has conferred a benefit on the defendant, who has
> knowledge thereof; (2) defendant voluntarily accepts and retains the

> benefit conferred; and (3) the circumstances are such that it would
> be inequitable for the defendant to retain the benefit without paying
> the value thereof to the plaintiff.

*Id.* at 577 (citing *Henry M. Butler Inc. v. Trizec Properties Inc.*, 524 So.2d 710 (Fla. 2d DCA 1988)).

Thus, the causes of action set forth in Count I and Count II appear to be treated by the Florida courts as legally equivalent.   The parties to this case also do not distinguish between them, discussing Count I and Count II collectively.   Accordingly, the Court addresses them together here.

The efforts to state a claim in Counts I and II fail because the Plaintiffs have not conferred a benefit upon the Defendants.   The Plaintiffs point to the repairs they performed, asserting that they "benefitted Defendants and Defendant's insured/claimants for whom Defendants are required to provide payment for repairs."   (Amended Complaint at 43).   However, the Amended Complaint provides no support for this assertion.   The repairs at issue obviously provided a benefit to the owners of the vehicles.   But so far as the Amended Complaint discloses, the only effect of such a repair on the insurance company is the incurring of an obligation to pay for it.   *Cf. Adventist Health System/Sunbelt, Inc. v. Medical Sav. Ins. Co.*, 2004 WL 6225293 at *6 (M.D.Fla. Mar. 8, 2004) (Fawsett, J.) (in unjust enrichment case, stating that "a third party providing services to an insured confers nothing on the insurer except a ripe claim for reimbursement," and citing cases).

In their brief as to the Florida law portions of the motions to dismiss (Doc. 284) (henceforth, the "Florida Brief"), the Plaintiffs assert that they have conferred a benefit "to the extent that the Defendant insurance companies are wrongfully retaining the monies that otherwise are rightfully those of the Plaintiff shops."   (Florida Brief at 4).   But this gets it backward.   The shop must confer a benefit on the insurance company <u>before</u> the insurance company's retention of

any money would be wrongful; the retention itself cannot make the retention wrongful.

Moreover, even if one could characterize it as a "benefit," the insurance company's retention of its

money is certainly not something that has been conferred upon it by the repair shop.

Thus, Count I and Count II will be dismissed.   Though those dismissals will be without

prejudice, it appears unlikely that the Plaintiffs can state a claim for unjust enrichment/quantum

meruit on these facts.   As stated by the United States Court of Appeals for the Eleventh Circuit:

> An unjust enrichment occurs when the defendant holds something
> that belongs to the plaintiff or receives, without legal cause, a
> transfer of goods or services from the plaintiff. *The law of unjust
> enrichment is concerned solely with enrichments that are unjust
> independently of wrongs and contracts.* When the plaintiff relies on
> a breach of contract to supply the "unjustness" of the defendant's
> holdings, the right on which he or she relies arises from the breach
> of contract, not from an unjust enrichment; analogously, when the
> plaintiff relies on a wrong to supply the "unjust factor," the
> causative event is a wrongful enrichment rather than an unjust
> enrichment. *See* Peter Birks, <u>Unjust Enrichment and Wrongful
> Enrichment</u>, 79 Texas L. Rev. 1767, 1783 (2001).

*Flint v. ABB, Inc.*, 337 F.3d 1326, 1331 (11th Cir. 2003) (emphasis added).   In the instant case,

the Plaintiffs are contending that the Defendants engaged in wrongful conduct – conspiring to fix

the prices they had to pay for repairs – and as a result ended up with money that would otherwise

have been paid over to the Plaintiffs.   The allegation of wrongful conduct takes this matter outside

of the bounds of an unjust enrichment claim.   Aside from the alleged price-fixing, there appears

to be nothing in the Amended Complaint that would even arguably support a conclusion that the

Defendants should have to turn money over to the Plaintiffs.   However, the Court will not

prohibit the Plaintiffs from attempting to state such a claim.

<u>Count III – Quasi-Estoppel</u>

Florida courts describe "quasi-estoppel" as a legal doctrine, applicable in certain limited

circumstances, which provides that "[a] party cannot, either in the course of litigation or in

dealings *in pais*, occupy inconsistent positions."   *Campbell v. Kauffman Milling Co.*, 29 So. 435, 439 (Fla. 1900).   Quasi-estoppel is similar to the doctrine of equitable estoppel, but it does not require a misrepresentation by one party or actual reliance by the other.   *See Grauer v. Occidental Life Ins. Co. of Cal.*, 363 So. 2d 583, 585 (Fla. 1st DCA 1978) ("'Equitable estoppel' precludes a person from maintaining a position inconsistent with another position … which was asserted at a previous time … to the prejudice of another who has acted in reliance on such conduct.")   Florida courts have long recognized that equitable estoppel serves only as a defense.   *See Kerivan v. Fogal*, 22 So.2d 584, 586 (Fla. 1945) ("[E]quitable estoppel is not designed to aid a litigant in gaining something, but only in preventing a loss.   In other words, it will not avail in offense but only defense.")

Quasi-estoppel often arises in the context of an election of remedies, as in the *Kauffman Milling* case, where it was applied to prevent a party that had obtained a monetary judgment for the value of a certain asset from also seeking to obtain the asset itself.   *Id.* at 438-39.   However, it is not limited to such situations.   *See, e.g.*, *Hodkin v. Perry*, 88 So.2d 139 (Fla. 1956) (holding that quasi-estoppel barred physician seeking reinstatement to hospital staff from questioning validity of hospital bylaw that he had previously voted for and supported but which now barred his reinstatement).

In Count III, the Plaintiffs seek to have quasi-estoppel applied in regard to the repair-estimating databases referred to above.   The Plaintiffs allege that the Defendants "have relied upon and asserted the validity/authority of the databases … when it has been to their respective advantage"[9] but that, in other instances, the Defendants "have refused to compensate and/or fully

---

[9]  As an example, the Plaintiffs allege that where a repair shop estimates that a job will take twenty hours of labor to complete, but the database notes that fifteen hours is standard for that type of repair, the Defendants will cite the database and pay for only fifteen hours of labor.

compensate Plaintiffs for materials expended and work performed, including labor and labor rates, upon reliance of these very same guides, claiming that they are unnecessary to complete the work at hand." (Amended Complaint at 47). The Plaintiffs seek to have the Defendants estopped from denying the applicability and reasonableness of the repair databases. (Amended Complaint at 49).

However, while Florida courts recognize the doctrine of quasi-estoppel, they do not recognize it as a cause of action. The Plaintiffs do not seriously attempt to argue to the contrary, and do not cite any cases in which a Florida court has permitted anyone to bring suit on the grounds of "quasi-estoppel." The Court's research has also failed to uncover any such cases. Accordingly, Court III will be dismissed with prejudice.

Count IV – Tortious Interference with Business Relations

In Count IV, the Plaintiffs attempt to assert a claim for tortious interference with business relations. More particularly, the Plaintiffs contend that the Defendants have "repeatedly engaged in malicious actions and a course of conduct designed to interfere with and injure the Plaintiffs' business relations and prospective business relations" by "steer[ing] and attempt[ing] to steer customers away from the Plaintiffs' respective businesses through … misrepresentations of facts, failure to verify facts damaging or tending to cause damage to the Plaintiffs' business reputations … and, *inter alia*, implications of poor quality work, poor quality efficiency, poor business ethics and practices, and unreliability." (Amended Complaint at 50-51).

Under Florida law, the elements of tortious interference with a business relationship are: (1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified

_____

(Amended Complaint at 29).

interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship. *Tamiami Trail Tours, Inc. v. Cotton*, 463 So.2d 1126, 1127 (Fla. 1985).

The Defendants argue that they had a financial interest in the relationship between their insureds and the Plaintiffs, and that they were therefore privileged to interfere with that relationship. As to this point, they are correct. For tortious interference to be unjustified, the interfering defendant must be a third party, a stranger to the business relationship. *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1294 (11th Cir. 2001). Under Florida law, a party is not a stranger to a business relationship when it has a supervisory interest in how the relationship is conducted or a potential financial interest in how a contract is performed. *Palm Beach Cnty. Health Care Dist. v. Prof'l Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009). As the money for any repairs would ultimately be paid by insurance, the Defendants clearly had a financial interest in any relationship between their insureds and a repair shop, and were privileged to interfere in that relationship.

However, a party's privilege to interfere is qualified, not absolute. "In those circumstances in which there is a qualified privilege to interfere with a business relationship, the privilege carries with it the obligation to employ means that are not improper." *McCurdy v. Collis*, 508 So.2d 380, 383 (Fla. 1st DCA 1987). A tortious interference claim may succeed if improper methods were used to accomplish the interference. *KMS Restaurant Corp. v. Wendy's Intern., Inc.*, 361 F.3d 1321, 1327 (11th Cir. 2004). *See, e.g., Morsani v. Major League Baseball*, 663 So.2d 653 (Fla. 2d DCA 1995) (finding privilege to interfere not applicable where plaintiffs had "alleged the use of threats, intimidation, and conspiratorial conduct"). *See also* Florida Standard Jury Instruction (Civil) 408.6. (stating that one who uses physical violence,

misrepresentations, illegal conduct or threats of illegal conduct has no privilege to use such methods, and interference using such methods is improper).   The Defendants are alleged to have interfered by way of, among other things, misrepresentations about the Plaintiffs, and therefore the privilege would not apply.

However, while a plaintiff may properly bring a cause of action alleging tortious interference with present or prospective customers, no cause of action exists for tortious interference with a business's relationship to the community at large.   *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994).   "As a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered."   *Id.*   The Amended Complaint cannot plausibly be read to allege that the individuals to whom the Defendants made their misrepresentations about poor quality work and the like had actual or identifiable understandings or agreements with one or more of the Plaintiffs that likely would have been completed but for those misrepresentations.   So far as the Amended Complaint discloses, the insureds to whom the Defendants made misrepresentations never had any contact with the repair shop that was being disparaged, much less an "actual and identifiable understanding or agreement."   *See, e.g., Sarkis v. Pafford Oil Co.,* 697 So. 2d 524, 526 (Fla. 1st DCA 1997) (affirming dismissal with prejudice of tortious interference claim for failure to identify the customers who were the subject of the alleged interference).   Accordingly, Count IV will be dismissed without prejudice.

Count V – Conversion

In Count V, the Plaintiffs contend that they have "performed necessary work and expended appropriate labor and materials" for which the Defendants have refused to make full payment and,

therefore, the Defendants are "wrongfully in possession of monies which should have been expended to pay repair bills of [Defendants'] policyholders."   (Amended Complaint at 52, 55).   The Plaintiffs' effort to state a conversion claim does not warrant much discussion.   Under Florida law, to establish a claim for conversion of money, a plaintiff must demonstrate (1) specific and identifiable money; (2) possession or an immediate right to possess that money; (3) an unauthorized act which deprives the plaintiff of that money; and (4) a demand for return of the money and a refusal to do so.   *U.S. v. Bailey*, 288 F.Supp.2d 1261, 1264 (M.D.Fla. 2003) (citing *Navid v. Uiterwyk Corp.*, 130 B.R. 594, 595-96 (M.D.Fla. 1996)).   The Plaintiffs are seeking sums that they believe should have been paid to them, not specific money of which they have been deprived or that could be returned, as required to state a claim for conversion.   A mere obligation to pay money cannot be enforced by a conversion action.   *Belford Trucking Co. v. Zagar*, 243 So.2d 646, 648 (Fla. 4th DCA 1970) (citing cases).   Again, it seems unlikely that the Plaintiffs can ever state a conversion claim, but the Court will permit them an opportunity to do so if they so choose.

### Count VI – Violations of the Sherman Act – Price-Fixing

In Count VI, the Plaintiffs assert that the Defendants have conspired to impose maximum price limits upon the Plaintiffs' products and services[10] in violation of § 1 of the Sherman Act.

---

[10]   At the outset of the discussion of the anti-trust claims, the Court notes that there appears to be some confusion as to the nature of the scheme alleged by the Plaintiffs.   At one point in Count VI, the Plaintiffs allege that the Defendants "have formed and engaged in a vertical conspiracy or combination to impose maximum price limits upon the Plaintiffs for their products." (Amended Complaint at 56).   They also cite to *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951), a vertical price-fixing case involving distilleries that were setting maximum prices above which wholesalers could not sell the distilleries' products.   (Amended Complaint at 56).   Presumably as a result of this, a number of Defendants have analyzed the Plaintiffs' antitrust claims as alleging a vertical restraint on competition.   However, the Amended Complaint is shot through with allegations that the Defendant insurance companies agreed between themselves to fix the prices they would have to pay for their insureds'

(Amended Complaint at 56-57).   In support of their allegation that the Defendants have so conspired, the Plaintiffs cite "explicit statements by Defendants [that] they will conform to State Farm's unilaterally imposed payment structure, admitting the baseline application of the industry database but failing to conform to that minimum standard, [and] uniformity of action by all Defendants."   (Amended Complaint at 59).

Section 1 of the Sherman Act, 15 U.S.C. §1, prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."   While § 1 could be interpreted to bar every agreement in restraint of trade, the Supreme Court has long recognized that Congress intended to outlaw only unreasonable restraints.   *See*, *e.g.*, *Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332, 342-43, 102 S.Ct. 2466, 2472-73, 73 L.Ed.2d 48 (1982) (citing *United States v. Joint Traffic Assn.*, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259 (1898)).   Even where a restraint of trade is unreasonable, § 1 only prohibits it if was effected by a contract, combination or conspiracy.   *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775, 104 S.Ct. 2731, 2743, 81 L.Ed.2d 628 (1984).   Because of this, the "crucial question" in § 1 cases is whether the challenged anticompetitive conduct "stems from independent decision or from an agreement, tacit or express."   *Twombly*, 550 U.S. at 553, 127 S.Ct. at 1964 (alterations and citations omitted).   A showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, but it falls short of conclusively establishing agreement or itself constituting a Sherman Act offense.   *Id.*

---

auto repairs.   This is a horizontal restraint, not a vertical restraint.   *See, e.g., Business Electronics Corp. v. Sharp Electronics Corp*., 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) ("Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints.")   Accordingly, the Court analyzes the Amended Complaint as alleging a horizontal restraint on competition.

(citations omitted).   Because of this, stating a claim under § 1 of the Sherman Act requires "a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965.   The Plaintiffs' allegations in this case fall far short of meeting that standard.

To start with, aside from conclusory allegations that it exists, the Plaintiffs offer no details at all in the Amended Complaint about the alleged agreement, such as how the Defendants entered into it, or when.[11]   Though not fatal to their Sherman Act claims, this bears noting.

The Plaintiffs attempt to demonstrate the existence of a price-fixing agreement by pointing to "explicit statements by Defendants" that they will "conform to State Farm's unilaterally imposed payment structure."   It is not obvious what constitutes the "payment structure" to which the Plaintiffs refer here.   In the "Facts" section of the Amended Complaint, the Plaintiffs state that (1) State Farm conducts a survey of repair shop labor rates and manipulates the results to set a depressed "market rate" that it is willing to pay, and (2) the other Defendants "advised the Plaintiffs they will pay no more than State Farm pays for labor."   (Amended Complaint at 22-23). However, the Plaintiffs do not allege that State Farm does anything similar in regard to the other items involved in an automobile repair – such as replacement parts or paint – and they do not

---

[11] In the Amended Complaint, the Plaintiffs assert that during a meeting in Mississippi between Mississippi repair shop owners and a State Farm representative over payment issues, the State Farm representative informed those present that "insurance industry meetings" were being held locally, once a month.   (Amended Complaint at 33).   More particularly, the State Farm representative told those present that a State Farm representative would discuss the repair shop owners' payment issue at the next such meeting.   (Amended Complaint at 33).   At the hearing on these motions, counsel for the Plaintiff pointed to these Mississippi meetings as something supporting the Plaintiffs' contention that insurance companies were getting together to agree to fix prices.   However, the Plaintiffs never allege, in the Amended Complaint, that any such agreement was entered into at one of these meetings.   The fact that State Farm and unnamed members of the "insurance industry" meet regularly does not suggest that any Defendant insurance company entered into a price-fixing agreement.

allege that the other Defendants refuse to pay any price other than the price State Farm pays for these other items.   Rather than referring to an entire "payment structure," it appears that the "explicit statements" put at issue by the Plaintiffs in Count VI relate only to the (so-called) market rate for labor established by State Farm.

The Defendants' statements about paying no more than State Farm pays for labor do nothing to demonstrate that the Plaintiffs are entitled to relief.   It is not illegal for a party to decide it is unwilling to pay a higher hourly rate than its competitors have to pay, and the fact that a number of the Defendants made statements to that effect does not tip the scales toward illegality. The Sherman Act does not restrict the "long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell."   *U.S. v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919).   The fact that a number of the Defendants have indicated an unwillingness to pay more than State Farm has to pay does not, itself, raise Sherman Act concerns.   In the words of the Supreme Court, "lawful parallel conduct fails to bespeak unlawful agreement."   *Twombly*, 550 U.S. at 556, 127 S.Ct. at 1965.

Without more, statements such as these suggest that the party is acting out of its own economic self-interest rather than because of an agreement to fix prices, as required to violate § 1. When allegations of parallel conduct are set out to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.   *Twombly*, 550 U.S. at 557, 127 S.Ct. at 1966.   The Plaintiffs have failed to do so in this case.   Rather, the Plaintiffs themselves suggest that the Defendants might have been acting in response to perfectly lawful motivations.   After discussing the methods

by which State Farm can manipulate the (so-called) market rate for labor, the Plaintiffs allege that "[t]he remaining Defendants, intentionally and by agreement *and/or conscious parallel behavior*, specifically advised the Plaintiffs they will pay no more than State Farm pays for labor." (Amended Complaint at 23) (emphasis added).[12]

The second item that the Plaintiffs attempt to rely on to establish the existence of a price-fixing agreement is that the Defendants "admit[] the baseline application of the industry database but fail[] to conform to that minimum standard."   (Amended Complaint at 59).   In the Facts section of the Amended Complaint, the Plaintiffs assert that there are three leading collision repair-estimating databases in their industry, that "[o]ver the course of years the Defendants have admitted the accepted position of the estimating databases within the industry," and that the Defendants "refus[e] to make full payment for procedures and materials" in accord with those databases.[13]   (Amended Complaint at 27-28).

As with the refusal to pay more than State Farm's allegedly depressed market rate, there is nothing about the refusal to pay in accord with repair-estimating databases, standing alone, that suggests that the Defendants are acting out of anything other than their own economic self-interest.   And the Plaintiffs have not placed this refusal to adhere to the databases in a context that suggests a preceding agreement.   *See Twombly*, 550 U.S. at 557, 127 S.Ct. at 1966.   They do not, for example, allege that the Defendants formerly accepted the databases as authoritative but,

---

[12] Similarly, in Count VI itself, the Plaintiffs allege that the Defendants' price-fixing came about as a result of "*parallel actions* and/or explicit agreement."   (Amended Complaint at 56) (emphasis added).

[13] According to the Plaintiffs, the estimates generated by these databases include "the ordinary and customary repairs, repair time (labor) and materials necessary to return a vehicle to its pre-accident condition."   (Amended Complaint at 28).

around the same time, stopped doing so.   In fact, the Plaintiffs do not allege that any of the

Defendants ever strictly abided by the databases.

It is not even clear that the Defendants' actions in regard to the databases could even be

described as parallel behavior.   The Defendants are not alleged to have acted uniformly, such as

by only agreeing to pay the same fraction of the estimate provided by a database.   Accepting the

Plaintiffs' allegations as true, the Defendants are simply refusing to be bound by third-party

estimates that they are not legally obligated to follow.   If this constitutes parallelism, it is an

extremely minimal version.

Finally, the Plaintiffs cite, as evidence of the conspiracy, "uniformity of action by all

Defendants."   (Amended Complaint at 59).   The Amended Complaint contains no further

explanation regarding this "uniformity of action."   This conclusory statement does nothing to aid

the Plaintiffs' cause.

To prove an agreement to restrain trade, a plaintiff must demonstrate a unity of purpose or

a common design and understanding, or a meeting of minds in an unlawful arrangement.   *City of

Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 569 (11th Cir. 1998) (citation omitted).   To

adequately plead that such an agreement exists requires allegations plausibly suggesting – not

merely consistent with – agreement.   *Twombly*, 550 U.S. at 557, 127 S.Ct. at 1966.   Because the

Plaintiffs have failed to meet this burden, Count VI will be dismissed without prejudice.

<u>Count VII – Violation of the Sherman Act – Boycott</u>

In this Count, the Plaintiffs allege that the Defendants

> have engaged … in boycott and boycotting activity through their
> repeated actions of steering customers away from the Plaintiffs
> through allegations and intimations of poor quality work, of poor
> efficiency in performing work, of questionable business practices, of
> overcharging, impugning integrity, and similar actions so as to

> withhold and/or enlist others to withhold patronage from the
> Plaintiffs.

(Amended Complaint at 63-64).   The Plaintiffs allege that the purpose of the boycott was to

coerce them into accepting the Defendants' price caps.   (Amended Complaint at 68).   The

Plaintiffs do not specify a time period or periods when this boycotting activity occurred.[14]

The generic concept of "boycott" refers to a method of pressuring a party with whom one

has a dispute by withholding, or enlisting others to withhold, patronage or services from the target.

*St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 98 S.Ct. 2923, 2930, 57 L.Ed.2d 932

(1978).   Group boycotts, or concerted refusals to deal, clearly run afoul of Section 1 of the

Sherman Act.   *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 625, 73 S.Ct. 872, 889,

97 L.Ed. 1277 (1953).

However, the Amended Complaint does not set forth a "concerted refusal to deal."   The

Plaintiffs allege (in conclusory fashion) that the Defendants "steer[] customers away" by

badmouthing shops that seek to charge higher prices.   But there is no allegation that any

Defendant refused to allow any of its insureds to obtain a repair from such a shop, or refused to

pay for repairs performed at such a shop.

In addition, to state a claim for a violation of § 1 by way of a boycott also requires

allegations plausibly suggesting an agreement by the Defendants.   The Plaintiffs offer even less

"evidence" of an agreement to boycott than they did of an agreement to fix prices.   Count VII will

be dismissed without prejudice.

---

[14] Presumably, the boycott is not ongoing, as the Plaintiffs allege elsewhere in the
Amended Complaint that the Defendants provide the bulk of the automobile insurance in the state
and that seventy to ninety-five percent of the repairs done in the Plaintiffs' shops are paid for by
insurance.

**V.      Conclusion**

In consideration of the foregoing, it is hereby

**ORDERED** that the motions to dismiss (Doc. 191, 192, 201, 204, 209-212, 215, 216, 235, 243, 249, 254, 270, 273) are **GRANTED IN PART AND DENIED IN PART** as set forth above. Count IV of the Amended Complaint (Doc. 167) is dismissed with prejudice, and the remaining counts are dismissed without prejudice.   The Plaintiffs may file an amended pleading reasserting those counts that have been dismissed without prejudice on or before February 10, 2015.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on January 21, 2014.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party