# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION

A & E AUTO BODY, INC.,
AMERICAN PAINT & BODY, INC.,
AUTO & COACH WORKS OF CENTRAL
      FLORIDA, INC., D/B/A HI TECH
      AUTO & R.V. PARTS AND REPAIR
AUTO BODY CONCEPTS, INC.,
BOCA'S COURTESY COLLISION, INC.,
C&C AUTOMOTIVE, INC.,
COLLISION CONCEPTS OF DELRAY, LLC,
ELITE EURO CARS COLLISION SERVICES, INC.,
EXPRESS PAINT & BODY, INC.,
GUNDER'S AUTO CENTER, INC.,
HAUSER OF THE PALM BEACHES, INC.
      D/B/A ELITE PAINT AND BODY SHOP
JUSTICE COLLISION, LLC,
MARSHALL'S BODY MASTERS, LLC,
NORTH BAY AUTO SERVICE, INC.,
OLD DIXIE PAINT AND BODY, LLC,
ORLANDO AUTO BODY, INC.,
QUALITY COLLISION REPAIR, INC.,
STEWART AGENCY INC., D/B/A EARL
      STEWART TOYOTA OF NORTH
      PALM BEACH,
STEWART AUTO REPAIR, INC.
MICHAEL'S PAINT & BODY, INC.                 **PLAINTIFFS**

VS.                     **CAUSE NO. 6:14-CV-310-ORL-31TBS**

21ST CENTURY CENTENNIAL INSURANCE COMPANY
21ST CENTURY INDEMNITY INSURANCE COMPANY
ACCEPTANCE INDEMNITY INSURANCE COMPANY
ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY
ALLSTATE INSURANCE COMPANY
BRISTOL WEST INSURANCE COMPANY
DIRECT GENERAL INSURANCE COMPANY
ENCOMPASS INDEMNITY COMPANY
ESURANCE PROPERTY & CASUALTY INSURANCE
      COMPANY
ESURANCE INSURANCE COMPANY,
FIRST ACCEPTANCE INSURANCE COMPANY, INC.
FLORIDA FARM BUREAU GENERAL INSURANCE
      COMPANY,

FLORIDA FARM BUREAU CASUALTY INSURANCE
    COMPANY,
FOREMOST INSURANCE COMPANY
GEICO GENERAL INSURANCE COMPANY
HARTFORD ACCIDENT AND INDEMNITY
    COMPANY
HARTFORD UNDERWRITERS INSURANCE
    COMPANY
HORACE MANN INSURANCE COMPANY,
INFINITY AUTO INSURANCE COMPANY,
LIBERTY MUTUAL INSURANCE COMPANY
MERCURY INSURANCE COMPANY OF FLORIDA,
MGA INSURANCE COMPANY, INC.,
NATIONAL GENERAL INSURANCE ONLINE, INC.,
NATIONWIDE INSURANCE COMPANY OF
    FLORIDA, INC.,
NATIONWIDE MUTUAL INSURANCE COMPANY,
OCEAN HARBOR CASUALTY INSURANCE COMPANY,
OLD REPUBLIC INSURANCE COMPANY,
PROGRESSIVE AMERICAN INSURANCE COMPANY,
PROGRESSIVE SELECT INSURANCE COMPANY,
SAFECO INSURANCE COMPANY OF AMERICA,
SECURITY NATIONAL INSURANCE COMPANY,
SENTRY INSURANCE, A MUTUAL COMPANY,
STATE FARM MUTUAL AUTOMOBILE INSURANCE
    COMPANY,
THE TRAVELERS INDEMNITY COMPANY,
USAA CASUALTY INSURANCE COMPANY
UNITED SERVICES AUTOMOBILE ASSOCIATION,
WESTFIELD INSURANCE COMPANY,
WINDHAVEN INSURANCE COMPANY,
ZURICH AMERICAN INSURANCE COMPANY                  DEFENDANTS

---

## SECOND AMENDED COMPLAINT

## JURY TRIAL DEMANDED

---

COMES NOW, the above-captioned Plaintiffs, pursuant to the Federal Rules of Civil

Procedure, this Court's Orders of 21 January, 2015 (Docket No. 291) and September 15, 2014 (Docket No. 42) and other applicable authority and file this, their Second Amended Complaint against the above-captioned Defendants, and in support thereof, states the following:

## AMENDMENTS TO PARTIES

_____1.      Plaintiff Michael's Paint and Body, Inc., is being added as a Plaintiff.

2.      Plaintiff Stewart Collision Group, LLC, d/b/a Bernie's Body Shop is deleted as a Plaintiff.

3.      Defendant Cincinnati Insurance Company is deleted as a Plaintiff and voluntarily dismissed for purposes of this Cause of Action.

## PARTIES

4.      Plaintiff A & E Auto Body, Inc., is a Florida Corporation licensed to do business and is doing business at 12002 Highway 17 North, Eagle Lake, Florida 33839.

5.      Plaintiff American Paint & Body, Inc., is a Florida corporation registered to do business and is doing business at 2210 Garden Street, Titusville, Florida 32796.

6.      Plaintiff Auto & Coach Works of Central Florida, Inc., d/b/a Hi-Tech Auto & RV Collision Center, is a Florida corporation registered to do business and is doing business at 3650 Havendale Boulevard NW., Winter Haven, Florida 33881

7.      Plaintiff Auto Body Concepts, Inc., is a Florida Corporation registered to do business and is doing business at 1000 927 NW. 40th Court, Pompano Beach, Florida 33064.

8.      Plaintiff Collision Concepts of Delray, LLC, is a Florida limited liability corporation registered to do business and is doing business at 1875 SW. 4th Avenue, C-1, Delray Beach, Florida 33444.

9.     Plaintiff Elite Euro Cars Collision Services, Inc., Is a Florida Corporation licensed to do business and is doing business at 15740 County Line Road, Spring Hill, Florida 34610.

10.    Plaintiff Express Paint and Body, Inc., Is a Florida Corporation licensed to do business and is doing business at 706 North Wabash Avenue, Lakeland, Florida 33815.

11.    Plaintiff Gunder's Auto Center, Inc., Is a Florida Corporation licensed to do business and is doing business at 930 Griffin Rd., Lakeland, Florida 33805.

12.    Plaintiff Justice Collision, LLC, is a Florida limited liability Corporation licensed to do business and is doing business at 1190 Wendy Court, Spring Hill, Florida 34607.

13.    Plaintiff Long Wholesale Consultants, is a Florida sole proprietorship licensed to do business and is doing business at 827 Saint Michel Drive, Rockledge, Florida 32955.

14.    Plaintiff Marshall's Body Masters is a Florida sole proprietorship licensed to do business and is doing business at 1825 Canova Street SE., Palm Bay, Florida 32909.

15.    Plaintiff Old Dixie Paint and Body, LLC, is a Florida limited liability corporation licensed to do business and is doing business at 983 12th Street, Suite D, Vero Beach, Florida 32960.

16.    Plaintiff Orlando Auto Body, Inc., Is a Florida corporation licensed to do business and is doing business at 7052 Old Cheney Highway, Orlando, Florida 32807.

17.    Plaintiff Quality Collision Repair, Inc., Is a Florida corporation licensed to do business and is doing business at 989 Kings Post Road, Rockledge Florida 32955.

18.    Plaintiff SPS Business Investments, Inc., d/b/a Babbsco Auto Collision, is a Florida corporation licensed to do business and is doing business at 4453 Todd Street, Lake Worth, Florida 33461.

19.     Plaintiff Stewart Agency, Inc., d/b/a Earl Stewart Toyota of North Palm Beach, is a Florida corporation licensed to do business and is doing business at 1215 Federal Highway, Lake Park, Florida 33403.

20.     Plaintiff Stewart Auto Repair, Inc., Is a Florida corporation licensed to do business and is doing business at 1990 42nd Street, NW., Winter Haven, Florida 33881.

21.     Plaintiff Michael's Paint & Body, Inc., is a Florida corporation licensed to do business and is doing business at 1041 Amber Road, Orlando, Florida, 32807.

22.     Plaintiff Hauser of the Palm Beaches, Inc., d/b/a Elite Paint and Body, is a Florida corporation licensed to do business and is doing business at 3613 Avenue K, Riviera Beach, Florida 33404.

23.     Plaintiff Boca's Courtesy Collision, Inc., Is a Florida corporation licensed to do business and is doing business at 2565 NW. 1st Avenue, Boca Raton, Florida 33431.

24.     Plaintiff C&C Automotive, Inc., is a Florida corporation licensed to do business and is doing business at 111Manatee Lane, Cocoa Beach, Florida 32931.

25.     North Bay Auto Service, Inc., is a Florida corporation licensed to do business and is doing business at 3102 Alt. 19 N., Palm Harbor, Florida 34683.

26.     At all times material hereto, 21st Century Centennial Insurance Company, was and is a Pennsylvania insurance company registered and authorized to do business within the State of Florida.

27.     At all times material hereto, Acceptance Indemnity Insurance Company, was and is a Nebraska  insurance company registered and authorized to do business within the State of Florida.

28.     At all times material hereto, 21st Century Indemnity Insurance Company, was and is a Pennsylvania  insurance company registered and authorized to do business within the State of Florida.

29.     At all times material hereto, Allstate Fire and Casualty Insurance Company, was and is an Illinois  insurance company registered and authorized to do business within the State of Florida.

30.     At all times material hereto, Allstate Insurance Company, was and is an Illinois insurance company registered and authorized to do business within the State of Florida.

31.     At all times material hereto, Direct General Insurance Company, was and is an Indiana  insurance company registered and authorized to do business within the State of Florida..

32.     At all times material hereto, Bristol West Insurance Company, was and is an Ohio  insurance company registered and authorized to do business within the State of Florida.

33.     At all times material hereto, Encompass Indemnity Company, was and is a Florida corporation registered as a domestic for-profit corporation with the Florida Secretary of State  The address provided to the Florida Secretary of State as this Defendant's Principal Address is identical to that of the Allstate Defendants in Northbrook, Illinois.  As of the date of the filing of this Amended Complaint, the Florida Department of Insurance Regulation has no record of this Defendant being issued authority to sell and/or issue policies of insurance within the State of Florida.

34.     At all times material hereto, Esurance Property & Casualty Insurance Company was and is a Wisconsin  insurance company registered and authorized to do business within the State of Florida.

35.     At all times material hereto, Esurance Insurance Company, Inc., was and is a Wisconsin corporation registered and authorized to do business within the State of Florida.

36.     At all times material hereto, First Acceptance Insurance Company, Inc., was and is a Texas corporation registered and authorized to do business in Florida.

37.     At all times material hereto, Foremost Insurance Company, was and is a Michigan insurance company registered and authorized to do business within the State of Florida.

38.     At all times material hereto,  GEICO General Insurance Company is a Maryland insurance company registered and authorized to do business within the State of Florida.

39.     At all times material hereto, Hartford Accident and Indemnity Company was and is a Connecticut  insurance company registered and authorized to do business within the State of Florida.

40.     At all times material hereto, Hartford Underwriters Insurance Company was and is a Connecticut insurance company registered and authorized to do business within the State of Florida.

41.     At all times material hereto, Horace Mann Insurance Company was and is an Illinois insurance company registered and authorized to do business within the State of Florida.

42.     At all times material hereto, Infinity Auto Insurance Company was and is an Ohio insurance company registered and authorized to do business within the State of Florida.

43.     At all times material hereto, Liberty Mutual Insurance Company was and is a Massachusetts insurance company registered and authorized to do business within the State of Florida.

44.     At all times material hereto, Florida Farm Bureau General Insurance Company was and is a Florida insurance company registered and authorized to do business within the State of Florida.

45.    At all times material hereto, Mercury Insurance Company of Florida was and is a Florida insurance company registered and authorized to do business within the State of Florida.

46.    At all times material hereto, MGA Insurance Company, Inc., was and is a Texas corporation registered and authorized to do business within the State of Florida.

47.    At all times material hereto, National General Insurance Online, Inc., was and is a Missouri corporation registered and authorized to do business within the State of Florida.

48.    At all times material hereto, upon information and belief, Nationwide Insurance Company of Florida is an Ohio insurance company registered and authorized to do business within the State of Florida.[1]

49.    At all times material hereto, Ocean Harbor Casualty Insurance Company was and is a Florida insurance company registered and authorized to do business within the State of Florida.

50.    At all times material hereto, Old Republic Insurance Company, was and is a Pennsylvania insurance company registered and authorized to do business within the State of Florida.

51.    At all times material hereto, Progressive American Insurance Company was and is an Ohio insurance company registered and authorized to do business within the State of Florida..

52.    At all times material hereto, Safeco Insurance Company of America was and is a New Hampshire insurance company registered and authorized to do business within the State of Florida.

---

[1]The domicile state of this Defendant is somewhat clouded.  Defendant reported to the Florida Department of Insurance Regulation that its home state is Ohio.  However, the Defendant reported to the Florida Secretary of State's Office that its home state is Iowa.  In both instances, the corporate officers are designated at addresses in Ohio and this forms the basis of Plaintiffs' belief this Defendant is a domestic corporation within the State of Ohio and the filing with the Florida Department of Insurance Regulation is correct.

53.     At all times material hereto, Sentry Insurance A Mutual Company was and is a Wisconsin insurance company registered and authorized to do business within the State of Florida..

54.     At all times material hereto, State Farm Mutual Automobile Insurance Company was and is an Illinois insurance company registered and authorized to do business within the State of Florida.

55.      At all times material hereto, Florida Farm Bureau Casualty Insurance Company is a Florida insurance company registered and authorized to do business within the State of Florida.

56.     At all times material hereto, Travelers Indemnity Company is a Connecticut insurance company registered and authorized to do business within the State of Florida.

57.     At all times material hereto, USAA Casualty Insurance Company is a Texas insurance company registered and authorized to do business within the State of Florida.

58.     At all times material hereto, United Services Automobile Association is a Texas insurance company registered and authorized to do business within the State of Florida.

59.     At all times material hereto, Westfield Insurance Company is an Ohio insurance company registered and authorized to do business within the State of Florida.

60.     At all times material hereto, Windhaven Insurance Company is a Florida insurance company registered and authorized to do business within the State of Florida.

61.     At all times material hereto, Zurich American Insurance Company is a New York insurance company registered and authorized to do business within the State of Florida.

62.     At all times material hereto, Progressive Select Insurance Company is an Ohio insurance company registered and authorized to do business within the State of Florida.

63.     At all times material hereto, Nationwide Mutual Insurance Company is an Ohio insurance company registered and authorized to do business within the State of Florida.

64.     At all times material hereto, Security National Insurance Company is a Florida insurance company registered and authorized to do business within the State of Florida.

## JURISDICTION AND VENUE

65.     Original jurisdiction and venues exists in this Court pursuant to 28 U.S.C. § 1331, as the Plaintiffs assert causes of action arising under the United States Constitution, and/or laws and treaties of the United States; and 28 U.S.C. § 1391(b)(2), as it is the judicial district in which a substantial part of the events or omissions giving rise to the claim(s) occurred.

## FACTS

66.     Each individual Plaintiff is in the business of recovery and/or repair of motor vehicles involved in collisions.

67.     Plaintiffs perform repairs on vehicles primarily garaged at locations throughout the State of Florida.  As Florida is a well-established tourist destination for visitors from throughout the world, Plaintiffs also perform work on vehicles primarily garaged at locations outside the State of Florida.  Upon occasion, certain Plaintiffs have performed repairs on vehicles primarily garaged within the country of Canada.

68.     Each individual Defendant is an insurer providing automobile policies to consumers throughout the state of Florida.

69.     The Plaintiff body shops have done business at various times over the course of years with the Defendants' policyholders and claimants by providing to these policyholders and claimants motor vehicle collision repair services.

70.     Each Defendant is individually responsible for payment for those repairs for their respective policyholders and claimants.

71.     Over the course of several years (as further described below), the Defendants have engaged in an ongoing, concerted and combined intentional course of action and conduct to improperly and illegally control and depress automobile damage repair costs to the detriment of the Plaintiffs and the substantial profit of the Defendants.

72.     Defendants have intentionally combined to utilize their aggregated market power to exert control over every aspect of the collision repair industry, including but not limited to price fixing of labor rates, price fixing of replacement parts, compulsory use of substandard or dangerous replacement parts, compulsory use of a parts procurement program which directly financially benefits State Farm Defendants and indirectly benefits the remaining Defendants, boycotting shops which refuse to comply with either fixed prices or use of substandard or improper parts, and interfering with Plaintiffs' current and prospective business relations by intentionally misrepresenting and making knowingly false statements regarding the quality, efficiency and ethical reputation of Plaintiffs' businesses, exerted economic duress and coercion upon both the Plaintiffs to capitulate and upon consumers, including direct threats to consumers to refuse coverage or portions of available coverage if consumers persist in their efforts to patronize Plaintiffs' businesses.

73.     Defendants' actions have caused a complete eradication of competition within the body shop industry.

74.     Defendants' actions violate federal and state law.

        Defendants' Market Share within the Market Area of the State of Florida

-11-

75.    According to the information reported to the National Association of Insurance Commissioners, as of December 31, 2012, **the named Defendants hold over ninety percent (90%)** of the private passenger auto liability market in the market area of the State of Florida.  See ****, attached hereto as Exhibit "1."

76.    Market shares of reported respective Defendants are:

- State Farm Group                                                     18.21%

- Berkshire Hathaway Group                                     18.04%

  Berkshire Hathaway Group includes all
  GEICO entities

- Progressive Group                                                   12.39%

- Allstate Insurance Group                                        12.19%
  Allstate Insurance Group includes the
  Allstate Defendants as well as Allstate
  subsidiaries eSurance and Encompass

- United Services Automobile Association Group    5.46%
  United Services Automobile Association Group
  includes all United Services and USAA
  entities

- Zurich Insurance Group                                          3.84%

- Liberty Mutual Group                                             3.55%
  Liberty Mutual Group includes Defendant
  Liberty Mutual and its subsidiary, named Defendant
  Safeco

- Travelers Group                                                      2.6%

- Infinity Property & Casualty Group                        2.52%

- Nationwide Corporation Group                              1.88%

- Hartford Fire & Casualty Group                            1.77%

| | | |
|---|---|---|
| • | Direct General Group | 1.56% |
| • | Mercury General Group | 1.18% |
| • | Ocean Harbor Group | 0.97% |
| • | Windhaven Insurance Company | 0.91% |
| • | Southern Farm Bureau Casualty Group<br>Southern Farm Bureau Casualty Group includes<br>subsidiaries Florida Farm Bureau Casualty and<br>Florida Farm Bureau General | 0.85% |
| • | MGA Insurance Company, Inc. | 0.80% |
| • | Sentry Insurance Group | 0.60% |
| • | First Acceptance Insurance Group | 0.22% |
| • | Horace Mann Group | 0.18% |

77.     The 2012 data does not account for the market share of Defendants 21st Century Centennial, 21st Century Indemnity, Acceptance Indemnity, Old Republic, or Farmers Group subsidiary defendants Bristol West, Foremost and Security National.

78.     Even if one supposes an extremely modest market share for these unreported Defendants, the total market share controlled by the named Defendants well exceeds ninety percent (90%).

79.     While each individual Defendant below the top four market share holders may seem insignificant, the market share percentages do not convey the importance of the Florida market to the insurer.  For instance, USAA's market share of a "mere" 5.46% actually translates into earned

premiums of more than $150,000,000.00 and Horace Mann's 0.18% equals reported earned premiums of over $18,000,000.00.  See Exhibit "1."

80.    Overall, courts have acknowledged the significant role played by insurance companies in funding automobile collision repairs, as well as the ability and market power to exert substantial influence and control over where consumers will take a wrecked car for repairs.  See, e.g., *Allstate Ins. Co. v. Abbott*, 2006 U.S. Dist. LEXIS 9342 (N.D. Tex. 2006)(aff'd, *Allstate Ins. Co. v. Abbott*, 2007 U.S. App. LEXIS 18336 (5th Cir. 2007).

81.    State Farm holds the majority market share.  However, what is more important for purposes of this Complaint is the near totality of the market the Defendants collectively represent and, thus, the nearly complete collective control over claims for auto body collision repairs, whether as first-party insurer or third-party liability carrier within the market area of the State of Florida.

82.    State Farm does play a leading role in establishing the fixed prices and boycotting, as well as other violations of law.

<u>Body Shop Cost and Revenue Structure</u>

83.    Body shops have several sources of cost and revenue: labor, parts, paint and materials, mechanical, electrical and administration.  Each of these categories often include subcategories with variable costs.

A.    <u>Labor</u>

84.    Collision repair involves several stages, each of which involves different activities and processes: body labor, painting and refinishing.  Ordinarily, each of these labor stages have individual labor rates.  For instance, posted labor rates for Plaintiff Ideal Auto Body include body

labor at $48.00 per hour, paint labor at $48.00 per hour and refinishing at $48.00 per hour and paint and materials at $30.00 per hour.

A.1.    Body Labor

85.    Body Labor is the repair process wherein damage to the body of the vehicle is repaired, either by replacing a damaged part or mending it.

86.    Within body labor, there are different rates which vary with the material of which a vehicle is constructed.  Fiberglass composites and aluminum are more difficult to repair than steel, require additional, specialized equipment and different skill sets of its technicians.  Therefore repairs on vehicles made of fiberglass composites (such as Corvettes) or aluminum body panels (such as Buick LeSabre, BMW Z8 and 7 Series and Nissan Altima) have higher hourly labor rates.

87.    Another aspect of labor is frame/unibody repair.  In order to repair the frame/unibody of a vehicle, the vehicle must be stabilized on a dedicated frame machine so as not to further damage the frame/unibody, measured (usually by a laser measuring tool or other computerized optic or manual measuring tool) to determine both where the frame/unibody is damaged and how much damage has been sustained. The frame is then slowly pulled via hydraulic towers to reverse the incurred damage.  This process must be done at a deliberate pace as a rushed frame pull may cause further damage or destroy the frame altogether.

A.2..    Refinish

88.    Refinishing includes the processes necessary to complete repairs and smooth the repaired or replaced body surfaces once the body repair has been completed in preparation for painting.   Common refinishing processes include application of primer, sealer (a barrier coat between the bare material and paint necessary to prevent negative reaction with the paint), base coat,

and, depending upon the finish of the vehicle, an additional mid-coat.  Refinishing also includes the mixing of the liquid component colors to match and blend with the undamaged paint on the vehicle.

89.     Refinish labor rates are usually equal to or slightly less than body labor rates (see above).

A.3.    Paint and Materials

90.     Painting a vehicle is, in many ways, a process which does not require explanation. However, application of paint to a vehicle is not a one-step process.  Paint is usually applied in a paint booth, a self-contained controlled environment, separate from the repair areas of a shop.  The booth must have a clean air intake filtering system to filter and reduce contaminants entering the booth, and an outgoing filtering system to reduce the contaminants released into the atmosphere.[2]

91.     Prior to painting, the vehicle must be washed.  the undamaged portions of the vehicle must be covered (or "masked") and taped off to avoid over-spray, including tires and wheel wells. Once the paint has been completed,  a clear coat is applied and the vehicle left to dry.

92.     The process from repair to refinish to paint is usually not linear.  Most repairs require several refinishing processes and paint processes at various points in the repair.  For example, replacing a bumper.  The bumper must be sanded, primed and the inside of the bumper painted to match the vehicle before it is bolted onto the vehicle and the vehicle is returned to the refinish and paint processes to complete the repair.  Depending on the nature of the repair made and its location on a vehicle, a repair may require several refinish and paint procedures interspersed with repair procedures before completion.

---

[2]The Environmental Protection Agency has regulations for hazardous material emissions with which shops are required to comply.  Shops must also comply with hazardous material disposal requirements.

93.     Additionally, it is not only the damaged portion of a car which must be addressed. In order to avoid clashing paint at the point where the repaired portion meets the undamaged portion, the undamaged portion must be sanded  and the paint blended into the existing color to create a seamless transition between original paint and new paint.

94.     Because it is not possible, even in the controlled environment of a paint booth, to completely remove all dust and contaminants from a vehicle that has been on the open roads (particularly the undercarriage), the air pressure of the paint process causes some amount of dust and small contaminants to become airborne and settle in the paint.   When the paint dries, these contaminants cause an uneven surface in the paint.   An additional refinish process must be completed to smooth out the imperfections.  While there is some regional variation in the name, this process is generally recognized as de-nibbing and finessing.  Without this process, the finished product would not return the vehicle to its pre-loss condition.

95.     Traditionally, paint labor rates have included material costs, calculated as a percentage of refinish hours for a given repair, and expressed as an hourly rate based upon a standard repair.  However, in many instances, this method does not compensate the shop for the actual costs of labor and materials and result in the shop working at a loss.  For instance, pearlized finishes on vehicles require multiple steps, different paints and finishes to be applied in several coats and the job takes far longer and requires more labor than a one-step coat of white paint.

96.     Other times, vehicles have unique colors that require both special-order paints and mixing to achieve the desired result to blend with the undamaged portion of the vehicle.  Ferrari red, for example, is a unique color with high color saturation and brightness.

97. Because of this variability, which has become more frequent in recent years, the traditional method has not kept pace with the actual costs of completing repairs. Many shops, though not all, have begun using a paint and material calculator, or PMC. A PMC is a computer program which calculates the cost of the paint and materials actually used in a particular repair. Actual costs are pre-programmed to account for the costs of specific materials (i.e., Sikkens brand of paint versus Axalta brand of paint). A shop can load the type of repair completed and the program calculates the amount and cost of the materials used, produce an invoice and this becomes part of the final bill along with the paint labor costs.

B.     Parts

98. Parts constitute a significant expense for shops. There are three types of parts generally recognized in the body shop industry: Original equipment manufacturer parts ("OEM" parts) are new parts manufactured by the same manufacturer as the vehicle. OEM parts are specifically designed for specific cars.

99. Aftermarket parts are new parts manufactured by a company other than the original equipment manufacturer. These are frequently referred to as imitation or counterfeit parts.

100. Salvage parts are parts stripped from previously wrecked vehicles. Salvage parts are often referred to as "recycled parts" by insurance companies.

101. Body shops do not keep a supply of all parts on hand. Parts are ordered as needed.

102. With occasional exceptions, Defendant insurers write estimates requiring use of aftermarket or salvage parts. Aftermarket and salvage parts are, ostensibly, less expensive than OEM parts and, at least according to Defendant insurers, of equal quality to OEM parts. This is simply not true, as discussed below.

-18-

103.    Some insurers, such as State Farm, require use of an online parts procurement program called PartsTrader by its preferred shops.  PartsTrader is a subscription online vendor market place.  In theory, a subscribing shop can go onto the PartsTrader web site, input the part required and will receive bids from vendors who have the part available for sale and from these bids, the shop may select the proper part at a competitive price or, if a quality part is not available, may purchase the part elsewhere.

104.    In reality, State Farm requires compulsory use of PartsTrader for its direct repair facilities (see below).  A shop is not permitted to select the proper part or shop elsewhere if a quality part is not available through PartsTrader.  State Farm requires the purchase of the cheapest part available, even if it is not of like kind or quality, originates from a source of questionable or unknown provenance or even is known to be manufactured of poor quality.

105.    If a shop refuses to purchase such parts, but opts for a higher quality, safer part, the Defendant insurers, particularly but not exclusively State Farm, will pay only the amount for which the part could have been purchased, regardless of its quality or lack thereof.

106.    With respect to State Farm in particular, this practice benefits it in two direct fashions.  First, it immediately reduces the amount it must pay out in repair costs.  Second, State Farm is a primary investor in PartsTrader.  It underwrote the cost of developing the program and has a contract with the ostensibly independent company for repayment of this investment as well as a portion of the profits going forward.

107.    With respect to the other Defendants, they benefit also by insisting on use of aftermarket or salvage parts as a means of reducing claims payments.  In many instances, a Defendant insurer will order the parts independently and ship them to the body shop or directly

specify a part and vendor from which a purchase must be made, again, regardless of quality, kind or fit.

108.    Photographic examples of some of the parts mandated for use by Allstate and State Farm are attached collectively hereto as Exhibit "2.  These parts are clearly not fit for use.  When they were rejected by Plaintiff Ideal Auto, Allstate refused to pay for parts needed for a safe and complete repair.  Plaintiff Ideal was required to pay for parts without full compensation so as to ensure the safe repair of its customers' vehicles.

109.    Professional repairers on the whole prefer and recommend use of OEM parts for both safety and quality reasons.  Aftermarket parts, while new, are often inferior.  There are no federal safety requirements for aftermarket crash parts.  Aftermarket parts are often made of thinner materials, or multiple pieces spot-welded together instead of a single piece, which directly affects a vehicle's safety performance in a crash.  Because they are not subject to federal safety testing, aftermarket parts are not guaranteed to perform as OEM parts.

110.    For instance, in a front-end crash, the bumper plays a critical role in deployment of a vehicle's air bags.  The bumper is the first structure to absorb impact which creates a series of vibrations which then alert air bag sensors to the possible need to deploy and how fast they need to deploy.  Often being made of different, thinner, cheaper materials, aftermarket bumpers do not vibrate in the same manner as OEM bumpers, if they vibrate at all, and can result in failure of the air bag system.

111.    Vehicle hoods are also designed to crumple in a particular manner so as to absorb and distribute impact energy to protect people within the passenger compartment.  Aftermarket hoods,

again made of thinner, cheaper material, do not crumple in the same manner OEM parts are designed and tested to perform, thereby endangering people within the vehicle.

112.    Even aftermarket windshield glass poses a safety risk to vehicle occupants.  In a rollover crash, the windshield works to keep the vehicle roof from collapsing.  Aftermarket glass is thinner than OEM glass, and is not designed to fit a particular vehicle.   As with other aftermarket parts, replacement glass is not subject to crash testing requirements, thinner glass may shatter rather than providing protection in a rollover or may simply pop out altogether.

113.    The majority of the time, aftermarket parts simply do not fit properly.  A study conducted by the California Department of Consumer Affairs, Bureau of Automotive Repair found that four of five non-OEM crash parts tested were inferior to OEM parts.  Non-OEM parts had to be modified to fit a vehicle they were supposed to fit without modification, resulting in additional labor time, the cost of which, in addition to the cost of the part itself, actually make the non-OEM part more expensive than the OEM part.

114.    However, in the vast majority of instances, Defendant insurers refuse to pay the additional labor time to modify non-OEM parts they themselves insisted on using, calling it "the cost of doing business."

C.    Mechanical

115.    Often, collision repair involves not only damage to the body of the vehicle but also to mechanical parts such as the engine.  In order to complete the repair, mechanical repairs are necessary.

116.    Some shops have mechanical repair specialists on premises.  When they do, a separate hourly rate applies to work performed by mechanics.   For instance, Plaintiff Ideal performs mechanical work at the rate of $ 85.00 per hour.

117.    Shops which do not perform mechanical work in house sublet the job to an outside source.  The cost of repair includes the actual cost of the mechanical repairs plus a "mark up" ranging between twenty five and thirty five percent (25-35%) of the mechanical bill to cover the cost of transporting the vehicle to and from the sublet location.  The mark up covers not merely the actual costs of transportation, such as gasoline or a tow truck when needed, but also the cost of the employee who must transport the vehicle and be diverted from in-house duties.

D.      Administrative Costs

118.    Administrative costs are those fees assessed for necessary non-repair work.  Almost exclusively, non-repair administrative work is tasks compelled by the Defendant insurers.  Insurers often require numerous photographs be taken and transmitted electronically before approval for work will be given.

119.    Alternatively, many of the Defendant insurers will refuse to pay for processes or procedures performed or parts utilized unless a photograph is provided.

120.    Defendant Direct General will demand pictures of each stage of repairs.  This is not required of all repairs but is demanded erratically and without schedule and will threaten to refuse all payment in the absence of photographs.

121.    Defendant State Farm demands photographs of denib and finesse procedures for every repair or will refuse to pay for the procedure.

-22-

122.     Defendant Allstate frequently demands photographs of repairs at various stages or will refuse to pay for repairs.

123.     Parts must be received and inspected.  As most aftermarket and salvage parts required by the Defendant insurers are inappropriate, broken or of poor quality, they must be repackaged and returned to the seller, and new parts ordered, utilizing employee time, resources and expenditure of funds which would not be required but for the Defendant insurers stipulations.

124.     Administrative fees vary from shop to shop.  Some bill by flat fee, others by task.  For instance, Plaintiff Gunder's charges $1.00 per photograph.  But again, almost universally, the Defendant insurers refuse to pay these charges though the tasks are compelled by the insurers under threat of refusing to pay for repairs.

ROLE OF DIRECT REPAIR PROGRAMS

125.     At their initiation, direct repair programs ("DRPs") were apparently intended to benefit consumers by ensuring a pre-screened pool of reputable, quality body shops existed to which customers and claimants could be referred.  Allstate is generally believed to have been at the forefront of the DRP initiative in the 1970s.

126.     In addition to Allstate, the vast majority of major insurers created DRPs over the years, including State Farm, Progressive, GEICO,[3] Liberty Mutual, Nationwide, USAA, the Farmers companies, The Hartford,  Zurich, and Shelter.[4]  Some smaller insurers, such as Defendant Westfield, also developed DRPs.

---

[3]In pleadings filed publicly in another case, GEICO denied it has or ever had a DRP. However, this is not true.  GEICO offers its ARX Program

[4]Shelter announced in the fall of 2014 it was disbanding its DRP.

127.    Over the course of intervening years, the emphasis of DRPs completely shifted course and direction. Defendant insurers tout their programs publicly as beneficial, time-saving and cost-saving for consumers.  One-stop shopping for collision repairs–going to a DRP, a consumer can take of their claim needs, rental car needs and collision repair needs in one neat package.

128.    This continues to be the face of direct repair programs.  The reality, however, is starkly contrary.  Instead of ensuring quality repairs, DRPs became vehicles for suppressing repair costs to the detriment of the Plaintiffs and consumers.  Insurers steer or coerce consumers to their DRP shops, again proclaiming their benefits, while knowing many DRP shops across the nation consistently and willfully fail to make safe and proper repairs.

129.    Not all DRPs are poor repair facilities, not even most.  Most are honorable, hardworking and professional collision repairers.  Many Plaintiffs have associated with DRPs from time to time over the last twenty years, though the majority have since left all such programs.

130.    DRPs are not in and of themselves a problem.  It is the use to which the Defendant insurers have put them, primarily over the last ten to fifteen years, which have created a national atmosphere where one industry, insurers, control and direct the entire business of a wholly separate industry, auto body collision repair shops.

131.    DRPs were originally presented to body shops as a mutually beneficial opportunity. In exchange for providing guarantees of pricing under a "most favored nation" ("MFN") clause, as well as preferential timing of repairs, the individual Defendants would list the body shop as a preferred provider.

132.    However, over the course of years, the concessions demanded by the individual Defendants with DRPs increased incrementally until, in the present day, insurers exert complete control over every aspect of a body shop's business.

133.    At present, Defendant insurers with direct repair programs require a shop to not only accept fixed prices on labor, fixed prices on paint and materials, fixed pricing procedures on parts, refusal to compensate or fully compensate for processes and procedures, but many compel the shop to include the DRP sponsor as an additional insured on the shop's liability insurance (even though the sponsor holds no lien or other ownership interest), compel indemnification for liability assessed to the sponsor, compel primary assumption of liability for repairs using parts provided by or insisted upon by the sponsor, compel mandatory production of the shop's financial information and books upon demand, and authority to obtain background checks upon the shop's employees at the sponsor's will and pleasure.

134.    Some terms of DRP agreements are consistently disregarded by the sponsoring insurer when it is in their immediate financial interest.  For example, State Farm's Select Service DRP requires use of certified parts for crash-related parts such as bumper assembly and radiator supports. However, State Farm regularly and routinely writes estimates including and will only pay for salvaged crash-related parts of unknown provenance and without any indicia of soundness or crash worthiness.

135.    As noted above, DRP agreements also require the shop to both maintain the sponsoring insurer (in this example, State Farm) as a named insured on the shop's liability insurance, and  require indemnification for any liability as a result of parts failure even when, as State Farm does, the sponsoring insurer regularly and routinely breaches its own requirements.

-25-

136.    Failure to comply with DRP terms results in a pattern of coercion and implied threats to the pecuniary health of the individual Plaintiff businesses.  Failure to comply with any express term or failure to comply with a self-selected avoidance of a term by the sponsoring insurer (such as described immediately above) results in  either removal from the program(s) combined with improper "steering" of customers away from the Plaintiffs' businesses, or simply punishment to decrease the number of customers utilizing the Plaintiffs services, and/or increasing ongoing and improper refusals to pay for certain repair procedures and/or charges without valid or reasonable justification.

Non-DRP Shops and Defendant Insurers Without DRPs

137.    Whether or not an insurer sponsors a formal direct repair program is irrelevant. Equally irrelevant is whether or not a body shop has associated with any DRPs.  The Defendant insurers collectively and through exertion of their combined market share power, enforce against non-DRP Plaintiffs, non-compliant DRP Plaintiffs and other body shops as many DRP "concessions" as they possibly can, either explicitly or by de facto substitute.

138.    Borrowing the concept of a "most favored nation" clause while turning it on its head, the Defendant insurers compel acceptance of a fixed pricing structure by asserting they, as a group and with the power of a group, have the ability to set the rates the Plaintiffs are permitted to charge for their services.  The details of the pricing structure are set out below.

139.    No law or other authority has ever been identified which permits the Defendant insurers to set the pricing structure of the collision repair industry, nor compel them to purchase certain parts or materials, nor determine the work which constitutes a full and safe repair.  Yet that

is precisely what the Defendant insurers have done, simply by imposing their collective will upon the body shop industry, and exploiting every possible financial vulnerability.

140.    Insurers assert they are merely paying the "market rate" or "prevailing rate." However, this is a misrepresentation.  "Market rate" and "prevailing rate" are terms used to describe a median or average of rates in a particular industry as they ebb and flow over both time and geography, react to market influences, innovations and advances in the field, and competition between practitioners of that trade or profession.

141.    In other words, in any other industry, an MFN or "market rate" discussion would assume the existence of a free market.  Gas stations compete with each other, introducing new products they hope will appeal to the public,  raising and lowering their prices, sometimes with astonishing speed, based upon the competitions' published prices, market availability of an increasingly scarce resource, government regulation and world events.  A trucking company entering into an MFN agreement with a gas station would require the best price that gas station makes available to any other customer.

142.    It would be wholly inconsistent with accepted principles of a free market, the law and contract term interpretation if that company decided that instead of demanding the best price available from the gas station, it banded together with nearly every other trucking company to exploit the gas stations' need for gasoline to be delivered by the trucking companies and arbitrarily decided what gas should cost for themselves.  And not just at a single gas station but at every gas station in America.

143.    That is precisely what has occurred, aided by the formatting of DRPs and the enormous power the Defendants collectively hold.

144.    Defendants cannot legally compel non-DRP body shops to agree to parts discounts the insurers have independently contracted with parts suppliers as required in DRP agreements.

145.    The Defendants can, however, and do compel non-DRP shops to accept the de facto equivalent–Defendant insurers, as a concerted and agreed upon action, simply refuse to pay more for parts that the cheapest a part can be purchased.  This is so whether or not the part is safe, appropriate, of like kind or quality, or even available.  More than one insurer has limited parts compensation to what a part could be purchased for in some other location, even if it isn't available where the part is needed.

146.    Defendants cannot legally compel non-DRP body shops to assume indemnification of them for liability arising out of repair procedures dictated by the Defendants, or parts purchases dictated by the Defendants, or product defects from the materials the Defendants dictate must be used.

147.    They can, however, and do ensure that all documentation they prepare and produce clearly and unambiguously advises the consumer no liability for any of those things is accepted by the Defendants for any unfortunate results of their dictates.

148.    And certainly no legal authority permits the Defendants to arbitrarily and through artificial, manipulated means, impose labor rates determined wholly within the insurance industry upon the collision repair industry.  Nor does any legal authority permit the Defendants to maintain this status quo through combining their collective power, acting with uniform intent in concert in exercise of that collective power and exacting group retribution against those who do not comply.

149.    Yet that is precisely what they are doing.

150.    All of these actions are in violation of state and federal law.

## PRICE FIXING

A.      Labor Rates

151.    All Defendants assert they will pay no more than the market rate for labor in the market area.  Why the Defendant insurers believe they are legally entitled to determine the rates an entirely separate industry is permitted to charge has never been publicly disclosed.

152.     However, even setting that aside, only one company, State Farm, conducts any sort of inquiry into body shop rates, what it terms its "surveys" to purportedly determine a labor market rate in a market area.  This survey is described below.

153.    None of the other Defendants conduct any form of body shop-industry labor rate studies.[5]

154.    State Farm conducts its purported survey by asking shops to fill in their individual rates for body labor, refinish labor, paint, and so forth, via an online site, State Farm's Business2Business portal, or B2B.

155.    However, State Farm does not merely collect the information provided and perform statistical or arithmetic calculations.  Upon receipt of rates it unilaterally deems too high, State Farm will either contact the shop and order it to amend the survey response to a lower number it finds acceptable or it will unilaterally alter a shop's information without the knowledge or consent of the shop involved.

---

[5]Since the inception of this litigation, one or two Defendants appear to have made an effort at conducting some form of survey.  However, these purported surveys have not had any discernable effect on the Defendants' group behavior.

156.   Most often, though not exclusively, State Farm's orders to reduce or unilateral reduction of rates occurs with larger shops or independent shops which operate more than one location.  The reason for this is described below.

157.   When State Farm selects the first option as an initial action, the order to reduce the rates entered on the B2B portal are accompanied by threats of removal from the DRP and promises to steer business away from the non-compliant shop.

158.   Once the information has been altered to State Farm's satisfaction (whether by a shop under duress or unilaterally without the shop's knowledge), it them performs its "half plus one" form of math.  State Farm lists the shops in a given market (as determined by State Farm) with the highest rates submitted at the top of the list and  the least expensive hourly rates at the bottom.

159.   State Farm then lists how many technicians a shop employs or the number of work bays available, whichever is lesser.  State Farm then totals the number of technicians or work bays and employs its "half plus one" math.  As an example, if the total number of technicians/work bays for a given area as determined by State Farm equals fifty, State Farm's magic number would be twenty-six (half fifty plus one).

160.   Beginning at the bottom of the list with the cheapest shops, State Farm then counts the number of technicians/work bays up the list until it reaches its magic number.  The rates of whichever shop this happens to fall upon is declared the "market" or "going rate."

161.   The problems with this methodology are numerous.  The rates themselves are artificially created by State Farm at the very beginning of the process.  The math does not represent any identifiable form of professionally accepted methodology, even if the numbers used in that process reflected the actual labor rates rather than the rates State Farm self selects.

162.    The method contains a built in bias towards the rates of larger shops or shops with more than one location as such facilities have greater capacity, more work bays and more technicians.  As the number of work bays or technicians determines State Farm's "half plus one" results, it becomes imperative for larger shops' labor rates to conform to State Farm's predetermined outcome, which State Farm ensures they do.

163.    Additionally, the method makes no provisions for work quality, equipment, quality of personnel or any other factor.  State Farm's method does not provide a range of going rates, it produces only one.  Therefore the worst shop in State Farm's determined market area is paid exactly the same as the best shop.

164.    State Farm does not disclose or make publicly available the geographic area it determines is a given "market area."  State Farm can and does alter a given "market area" to further manipulate the results or to punish a particularly noncompliant shop by including it in a different market area with lower rates.

165.    State Farm does not publish or otherwise make publicly available its "survey" results. State Farm has, in fact, made significant efforts to keep this and other internal information confidential. State Farm does not even disclose to its claims team leaders the criteria for determining a "market area" or the criteria for changing a "market area."

166.    Even in litigation, State Farm habitually obtains blanket protective orders for all information produced in discovery on the grounds that training manuals, policies and procedures and internal processes constitute trade secrets, proprietary information or confidential information.  See, e.g., *Hover v. State Farm Mut. Auto. Ins. Co.*, 2014 U.S. Dist. LEXIS 119162 (E.D. Wa. 2014), *Akins v. State Farm Mut. Auto. Ins. Co.*, 2011 U.S. Dist. LEXIS 82806 (E.D. Mich. 2011), *Foltz v.*

*State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122 (9th Cir. 2003), *Hamilton v. State Farm Mut. Auto. Ins. Co.,* 204 F.R.D. 420 (S.D. Ind. 2001).

167.   Despite the fact that State Farm does not make its results publicly available, the other named Defendants–who, again, do not conduct any form of survey–pay only what State Farm pays while calling it the "market rate."

168.   For instance, in 2013, Plaintiff Ideal Auto had posted body labor rates of $48.00 per hour for American and Japanese vehicles and $52.00 per hour for European and luxury vehicles. Palm Harbor, Florida, where Ideal Auto is located, only has three or four body shops within its city limits.  Of those few other shops, two had posted labor rates of $44.00 per hour.

169.   The mathematical rules of averaging does not permit an outcome of $42.00 unless the fourth shop only charged $32.00 per hour, a number so far below all other market area participants that it cannot be deemed representative of the area.

170.   Yet, State Farm, which did not survey Ideal Auto (which represents approximately one-quarter of the market in Palm Harbor), determined the "market rate" in Palm Harbor was only $42.00 per hour and that is all it would pay.

171.   Defendants Hartford, USAA, GEICO, Allstate, eSurance, Travelers, Infinity, Horace Mann, Security National, Progressive, Safeco, 21st Century Centennial, Nationwide, Sentry, Westfield and Mercury also all paid $42.00 per hour.

172.   None of the Defendants in the immediately preceding paragraph conduct labor rate surveys.

173.   None of the Defendants in Paragraphs above contacted the Plaintiffs over the last five years to ask what their current posted rates were.

174.    As noted above, State Farm also purports to establish market rates based upon "market area." This would presumably account for variations across metropolitan areas as well as discrete areas of a given state, such as Florida.

175.    However, under State Farm's method, there is apparently little to no variability anywhere within the State of Florida, as it determined the market rate of $42.00 per hour for vast portions of the state, from Fort Walton Beach in the Panhandle to Fort Myers, across the entire central portion of the state (Lakeland, Orlando) to the east Coast from Cocoa Beach to Rockledge to Delray Beach.

176.    Plaintiff Premier Paint and Body in Fort Walton Beach had posted labor rates in 2013 of $44.00 per hour body labor, $44.00 per hour refinish labor, $44.00 per hour paint labor, and $24.00  per hour for paint and materials.  State Farm, Allstate, The Hartford, USAA, GEICO, eSurance, Travelers, Infinity, 21st Century, Progressive, Security National, Horace Mann, National General, Nationwide, Mercury, Westfield, Sentry Encompass all paid $42.00 per hour for body labor, refinish and $24.00 per hour for paint and materials.

177.    Plaintiff Express Paint and Body in Lakeland had posted labor rates in 2013 of $48.00 per hour for body labor, refinish labor and paint labor and $30.00 per hour paint and materials.  State Farm, Allstate, The Hartford, USAA, GEICO, eSurance, Travelers, Infinity, 21st Century, Progressive, Security National, Horace Mann, National General, Nationwide, Mercury, Westfield, Sentry Encompass all paid $42.00 per hour for body labor, refinish and $24.00 per hour for paint and materials.

178.    Plaintiff C & C Automotive in Cocoa Beach had posted labor rates in 2013 of $46 per hour for body labor and refinish labor, and $26.00 per hour for paint and materials.  State Farm,

Allstate, The Hartford, USAA, GEICO, eSurance, Travelers, Infinity, 21ˢᵗ Century, Progressive, Security National, Horace Mann, National General, Nationwide, Mercury, Westfield, Sentry Encompass all paid $42.00 per hour for body labor, refinish and $24.00 per hour for paint and materials.

180.     The distance between these areas covers tens of thousands of square miles and numerous population centers, large and small.  Despite there being demonstrable differences in the rates charged throughout the state, the named Defendants as set forth in the preceding paragraphs, all assert the "market rate" in the "market area" was not only less than publicly posted rates but was less than publicly posted rates based upon data which could only have been provided by State Farm to its ostensible competitors.

181.     The odds of all the Defendants independently reaching the same conclusion as State Farm without conducting even a pro forma survey would be outside the realm of possibility.  This is even more obvious when one considers the possibility of reaching an identical conclusion to that of State Farm when State Farm's conclusion is based upon a labor rate State Farm manipulates and creates via a fatally flawed methodology.

182.     In addition to the above, available documents establish both conformity with and foreknowledge of a change in State Farm's unpublished "market rates" by the other Defendant insurers.  For example, when State Farm decided to raise the unpublished "market rate" to $44.00 per hour in mid-2014, GEICO announced an increase to $44.00 per hour the very next day.  Other Defendant insurers decided the market rate was $44.00 per hour within the following thirty days.

183.     Again, none of these Defendants conduct an independent survey of their own of body shop labor rates.  As the new "market rate" still did not reflect known actual posted rates, the

decision finding a "new market rate" could only have been provided by State Farm's internal and unpublished numbers to the other Defendants, based upon State Farm's own decision as to what the "market rate" should be rather than a reflection of what the market actually was in 2014.

184.    Over the last twenty years, in addition to manufacturing a "market rate," the Defendants have utilized other methods of intimidating the Plaintiffs and other body shops to suppress labor rates.

185.    Shops are frequently told they are the only shop trying to raise their rates, therefore the posted rates do not conform with "market rates" and the Defendants refuse to pay the posted rates.  As shown by the above rates examples, Defendants assertions are false.  Defendants who have told Plaintiffs this include but are not limited to State Farm, Allstate, GEICO, Progressive, Farm Bureau, Liberty Mutual, Nationwide and the subsidiary companies of these Defendants.

186.    Statements about being "the only one" have been made by the Defendants named in the preceding paragraph to, but not limited to, Plaintiffs Gunder's, Ideal, Elite, Orlando Auto, Express, Stewart, A&E, C&C, Hi-Tech Collision and Boca Courtesy.

187.    Defendants have threatened Plaintiff shops and others that if they discuss labor rates with each other, they will be price fixing and breaking the law.  Statements to this effect have been made by Defendants State Farm, GEICO, Progressive and Allstate specifically to Plaintiffs Gunder's and Ideal and announced at meetings of the Southeastern Auto Collision Association by representatives of the insurance industry.

188.    Plaintiffs believe the forgoing facts are sufficient to establish the probability that discovery will adduce additional information showing the Defendants have intentionally acted in

concert, combination and by agreement to fix and suppress the labor rates of the body shop industry in Florida.

B.     Repair Processes and Procedures

189.    The Defendant insurers have over the course of years exerted their combined market share power to refuse payment or full payment for repair processes and procedures required to return vehicles to pre-accident condition.

190.    This failure constitutes a selective failure by Defendants to follow collision repair industry standards for auto repairs.

191.    Three leading collision repair estimating databases are in ordinary usage within the auto body collision repair industry:

a)     ADP or Audatex;

b)     CCC; and

c)     Mitchell.

192.    These databases provide software and average costs associated with particularized types of repairs to create estimates.  The estimates generated by these databases include the ordinary and customary repairs, repair time (labor) and materials necessary to return a vehicle to its pre-accident condition.  These databases and the estimates they generate are accepted within the body shop industry as reliable starting points, subject to the shop's expert opinions and the necessarily present variability between the "best-case scenario" presented by the procedure databases and the actual needs of a particular repair.

193.    By default, database estimates are underestimates of actual repair times and materials. The database procedure pages set forth the anticipated repairs, repair times and materials for repair

of an undamaged vehicle using original manufacturer equipment which are specifically designed to fit that particular vehicle.  Wrecked cars are obviously not undamaged and original manufacturer parts are not always used, which can substantially affect real world repair procedures required, repair times and necessary materials.  It is, for instance, much faster and easier to remove an undamaged door from an undamaged vehicle than it is to remove a wrecked door from a wrecked vehicle, where removal often requires prying the damaged components apart from each other before they can be removed from the vehicle.

194.    Historically, these procedure databases were printed and distributed in hard copy to subscribers.  Throughout the industry, they are referred to as "p-pages."

195.    Although now housed in electronic form as computer databases, they are still popularly referred to as "p-pages."

196.    All of the Plaintiffs subscribe to one or more of these databases and use the same to generate estimates for individual repairs.

197.    CCC is currently or has been used by Defendants The Hartford, USAA, GEICO, Allstate, eSurance, Travelers, Infinity, 21st Century, Safeco, Security National, First Acceptance, Nationwide, Bristol West, Liberty Mutual, Sentry Insurance.

198.    Mitchell is currently or has been used by Defendants Progressive, Florida Farm Bureau, National General, Mercury, MGA, Westfield, Direct General and Allstate.

199.    ADP/Audatex is currently or has been used by Defendants State Farm, Horace Mann and Windhaven.

200.    Upon information and belief, Defendants Foremost and Zurich use CCC.

-37-

201.     Defendant Infinity also uses independent adjusters from time to time including but not necessarily limited to Johnston Appraisal Service.  Which databases are utilized by independent appraisers likely varies and cannot be ascertained with certainty at this time.

202.     Over the course of years, the Defendants have admitted the accepted position of the estimating databases within the industry, either through their own consistent use of these databases or more explicitly, as State Farm has done.

203.     As much as twenty years ago, State Farm assured the body shop industry it does and would continue to abide by the standard operations of the "p-pages."  Sitting on a panel discussion at the 1994 National Autobody Congress and Exposition, State Farm speaker Gerry Westerfield answered a question of how to handle State Farm adjusters who refused to pay for standard "p-page" operations with the following:

204.     "If a State Farm representative comes to your shop and says, 'We don't pay for that, it's company policy,' take it from me, we don't have that policy.  . . .  So tell them, 'I know your policy and that's not it.  Who's your supervisor?'"

205.     Despite public endorsement and daily use  of the databases, the Defendants have nonetheless engaged in a course of conduct of refusing to make full payment for procedures and processes. In many instances the Defendants will refuse to allow the body shop to perform required procedures and processes, thereby requiring the Plaintiffs to perform less-than-quality work or suffer a financial loss.

206.     A non-exhaustive list of procedures and processes the Defendants refuse to pay and/or pay in full is attached hereto as Exhibit "3."

207. At the same time, Defendants selectively rely upon and assert the definitive nature of these databases when doing so is to their respective financial advantage. For example, when a particular repair requires twenty hours of labor to complete but the database estimate notes fifteen hours of labor is standard for that type of repair, Defendant will cite the database estimate and pay for only fifteen hours of labor time.

208. Alternative but collateral to the above, Defendant insurers will alter the database estimates, unilaterally reducing either labor time or materials needed. Manual changes to database standards are automatically marked by the program either by underlining or an asterisk.

209 Defendant insurers will designate these as "judgment items" without any further authority or justification.

210. Quite often, though certainly not exclusively, these changes will be made by a Defendant insurer representative who is conducting a "desk review" of the shop repair estimate, without ever having personally seen the vehicle in question.

211. The Farmers companies (Defendants 21st Century, Bristol West, Foremost, Security National and Sentry) have gone to a desk review process for all repairs. Utilizing NuGen IT software, the Farmers companies no longer send an adjuster/appraiser to actually inspect a vehicle. Instead, the shop prepares an estimates, uploads the estimate along with photographs into the NuGen IT system and an amended estimate is sent back to the shop with what the NuGen IT software feels is appropriate.

212. Thus, the Farmers Defendants (see above) reduce estimates and eliminate procedures without ever viewing a vehicle. One of the problems with this system, which seems efficient on the surface, is that many points of damage cannot be accurately assessed via photograph or cannot be

photographed at all. A bent frame cannot be photographed; it can be felt in the way the vehicle pulls while in motion and can be measured via various assessment tools, but unless the vehicle is completely disassembled down to the raw frame, the damage cannot be visualized.

213. Severity of visible damage is difficult to assess via photograph. Shops consistently receive back from NuGen IT estimates with substantially reduced labor time to repair dents solely because a photograph "doesn't look so bad" to the desk reviewer.

214. Additionally, the system constitutes a windfall of free labor to the Farmers companies; body shop invoices for payment of time for completing work which is the responsibility of the insurer– inspection, estimating preliminary cost to repair, photographs and file documentation– are regularly refused payment.

215. However, the most common tactics for refusing to pay for necessary processes and procedures include, but are not limited to, simply refusing payment by making the false statement that a particular operation isn't a necessary operation, or the false statement that a particular operation is an included operation in another procedure and therefore payment for one is payment for both, or the false statements that either no other body shop in the area performs that operation or no other body shop in the area bills for that operation.

216. Processes and procedures are routinely excluded by the Defendant insurers, though when performed, they are necessary to return a vehicle to pre-accident condition. The databases specifically note these procedures are <u>not</u> included in other repairs or refinish procedures and thus must be billed and paid as separate items.

217. Examples of the foregoing include the following:

- Feather, prime and block: This procedure is a refinish operation that completes bodywork repair from 150 grit smoothness to the condition of a new undamaged panel.  While this procedure is not required on every repair, when it is performed, all three databases clearly state it is not an included operation and it is a refinish operation.

218.    Defendants State Farm, Progressive and USAA, among others, have historically consistently refused to pay for this procedure in its entirety to most of the Plaintiffs on the ground that it was an included body labor operation.  Defendants GEICO and Nationwide began paying for this procedure either shortly before or shortly after this lawsuit was originally filed.

219.    Within the last few weeks, State Farm has begun writing on estimates for payment of feather, prime and block but actually is not doing so.  Instead, it reduces body labor operations by 0.4 hrs and labels that carved out time as feather, prime and block.  Again, it is designated a body labor operation, instead of a refinishing operation and the shops are still denied materials compensation as a result.  That calculation is made for refinish operations, not body labor operations.  In the end, the shops are still not being paid for the work as State Farm's relabeling only works to change the line item entries, not the bottom line.

- Denib and finesse (also known as color sand and buff): This refinish procedure is described above. All three databases denote this procedure, when required, is not an included operation.

220.    Defendants refusing to pay for this procedure include but are not limited to State Farm, Progressive,[6] 21st Century, GEICO, Windhaven and Travelers.

---

[6]Progressive's record of payment for this procedure is spotty.  Historically, Progressive has paid for this procedure for short periods of time to some shops, such as Plaintiff Gunder's, which have been fighting for proper compensation for some years.  Within the last two weeks, Progressive has announced a complete halt to payment for this work.

•    Air conditioning procedures:  Procedures include evacuation and recharge of system, and refrigerant recover.  All three databases state these are not only not included operations, but each are separate items and not a group.

221.    Defendant State Farm has unilaterally discarded the database labor times for these items and imposed a cap of $110.00 for performing these procedures.  No authority has been provided to any of the Plaintiffs for this cap.  Upon questioning by Plaintiff Gunder's as to this cap, a State Farm representative advised State Farm had performed a survey of the shops in Polk County, Florida, and based upon that survey imposed the cap as a reasonable charge for these procedures.  However, after being told this by State Farm, Gunder's called nearly every other body shop in Polk County and could not locate a single other shop which had been surveyed as State Farm claimed.

222.    Interestingly, State Farm also imposes this cap in other counties, which it did not even claim to survey, including but not limited to Pinellas, and Brevard Counties.

223.    Another tactic is for the Defendant insurers to refuse payment for procedures and processes because that shop, whichever shop it may be, is "the only one" who either performs particular procedures and processes, or is "the only one" who bills for it.

224.    As recently as September, 2014, Defendants Infinity, Progressive, and eSurance  told Plaintiff Elite Euro Cars that Elite was "the only one" to demand payment for procedures such as denib and finesse, conducting post-repair safety inspections such as mandated seat belt checks, test drives and cleaning the car for delivery.  This is a false statement.  All of these Defendants received invoices and demands for payment for these procedures regularly, not only from Elite Euro Cars, but also Plaintiffs Ideal, C&C, Marshall and Express.

225.     Defendant Safeco, through its representative Christy Falzone, even advised Elite Euro Cars in May, 2014, that she saw no need to perform an electronic scan of wrecked cars for diagnostic codes that would indicate problems with the vehicle's safety control system.  Ms. Falzone stated this was ridiculous, "not fair" and not "reasonable in [Elite's] market," and refused to pay for same.

   3.     Paint and Materials

226.     As described above, traditionally, paint and materials have been compensated at an hourly rate.  Separate and apart from paint labor rates, paint and materials rates were intended to compensate shops for the actual cost of paint and materials used in a repair.

227.     However, as also described above, contemporary vehicle finishes and the materials necessary to complete repairs have costs which have outpaced the traditional method.  While it is inarguable  materials must be expended to repair automobiles, the Defendants simply refuse to pay for them or pay fully the paint and materials costs submitted, asserting additional costs are part of the cost of doing business.  This is the Defendants' position even when the authoritative databases specifically state that such materials are not included in the repair operations.

228.     The vast majority of the named Defendants continue with the traditional method.  As of 2013, Defendants State Farm, Geico, Allstate, eSurance, Travelers, USAA, Infinity, The Hartford, Progressive, Florida Farm Bureau, National General, Mercury and Nationwide were all paying a paint and material rate of $24.00 per hour.  This was consistent across the entire central portion of the State of Florida.

229.     All of the Defendants assert the paint and material rate they pay is the "going rate" or "market rates" in the area.

230.    However, none of the Defendants conduct any review of body shop posted rates to determine an area's "market rates," with the exception of State Farm.  As described in detail above, however, State Farm's method of determining rates is to create them out of whole cloth.  This is supported by the fact that Plaintiffs' posted rates are all higher than the purported "prevailing rate" and the utter lack of variability across the entire state of Florida, though posted labor rates do vary by region, as one would reasonably expect.

231.    As also noted above, State Farm does not publish or otherwise make publicly available the results of its purported surveys.

232.    Despite there being demonstrable differences in the rates charged throughout the state, the named Defendants, all assert the "market rate" in the "market area" was not only less than publicly posted rates but was exactly the same as the rate State Farm concluded was the "market rate" based upon its purported, unpublished survey.

233.    The odds of all the Defendants independently reaching the same conclusion as State Farm without conducting even a pro forma survey of their own are outside the realm of possibility. This is even more obvious when one considers the probability of reaching an identical conclusion to that of State Farm when State Farm's conclusion is based upon a labor rate State Farm manipulates and creates via a fatally flawed methodology.

234.    In addition to the above, available documents establish both conformity with and foreknowledge of a change in State Farm's underlined "market rates" by the other Defendant insurers.  For example, when State Farm decided to raise the underlined "market rate" for paint and materials to  $26.00 per hour in mid-2014, GEICO announced an increase to $26.00 per hour

the very next day.  Other Defendant insurers decided the market rate was $26.00 per hour within the following thirty days.

253.    Again, none of these Defendants conduct an independent survey of their own of body shop labor rates.  As the new "market rate" still did not reflect known actual posted rates, the decision finding a "new market rate" could only have been provided by State Farm's internal and unpublished numbers distributed by it to the other Defendants, based upon State Farm's own decision as to what the "market rate" should be rather a reflection of what the market actually was in 2014.

236.    The Defendants have been provided with invoices showing the actual cost of paint exceeds the entirety of compensation received and prices fixed by the Defendants as the ceiling are forcing body shops to operate at a loss for every car that is painted.  Uniformly, this has been ignored by the Defendants.

237.    In fact, Progressive's response to this problem was to tell Plaintiff Ideal Auto it was using too high a quality of paint and materials, which was a waste Progressive was not going to pay for because the average customer only keeps a vehicle for three years.

4.    Parts

238.    Numerous sources have found aftermarket parts inferior to OEM parts.  As noted above the California Bureau of Automotive Repair found aftermarket parts inferior and the majority of them simply did not fit.

239.    Ford Motor Company has conducted crash tests comparing OEM crash part performance to aftermarket crash part performance.  The results, which are publicly available, found

that not only did aftermarket parts fail to perform at the same level, but repair costs on vehicles fitted with aftermarket parts were often double that of OEM parts.

240. Consumer Reports reached the same conclusion, a report also publicly available.

241. Despite the fact that aftermarket and salvage parts have significant issues with safety, fit, form and function, the named Defendants insist on their use as the least expensive alternative.

242. Safety issues are particularly paramount in replacing crash related parts. Salvaged parts are not subject to any safety testing requirements or regulations. They are, by definition, parts removed from other vehicles, almost exclusively vehicles which have already been wrecked and most frequently vehicles which have been damaged so badly as to be declared total losses.

245. State Farm has recognized the safety issues associated with crash related parts by writing into its DRP language that "the following crash related parts, when subject to certification standards developed by an organization approved by State Farm, will be certified unless requested by the vehicle owner:

> -bumper components
> -lighting components
> -radiator supports/tie bars and associated mounting components
> -outer sheet metal and plastic/composite parts."

246. Despite this, State Farm regularly and routinely writes estimates compelling use of salvaged bumper components, lighting components, radiator supports for repairs conducted at Plaintiffs' shops. Examples include:

- Remanufactured (salvaged) bumper covers, front and rear, and salvaged bumper assemblies

- Used side panels (salvaged)

- Salvaged radiator panel, crossmember

- • "Recycled" (salvaged) headlamp assembly and side marker lens

- • Salvaged headlamp panel

- • Salvaged taillamp assembly

- • Salvaged radiator supports

247.     For the last, radiator supports, at least one State Farm adjuster found the thought of paying for a new radiator support so unpalatable, he made Plaintiff Ideal Auto perform repairs three times using the radiator support that was damaged in the collision for which repairs were being conducted.  Ideal had notified State Farm at the outside the radiator support would not be reusable, it was damaged and had to be replaced.  After three attempts established the damaged radiator support would not be sufficient, State Farm's response was to laugh and refuse to pay Ideal for the hours spent in trying to make the repairs State Farm had compelled against the better professional judgment of Plaintiff Ideal.

248.     Other insurers have publicly recognized the safety issues with using crash-related salvaged parts.  Farmers spokesperson Kitty Miller has publicly stated, "Farmers does not use salvage parts to replace axles, suspensions, or transmissions.  Most salvage parts are external sheet-metal parts."

249.     This is not a truthful statement.  The Farmers companies regularly require use of salvaged crash related parts including radiator supports, radiator assemblies, hoods,  bumper assemblies, and fender assemblies in estimates written for repairs at Plaintiffs' shops.

250.     The insurance-industry wide practice of insisting on aftermarket parts, which are materially inferior and simply do not fit, or salvaged parts of dubious or unknown provenance,

history and prior damage places Plaintiffs in the untenable position of either performing a repair with unsafe parts or performing safe repairs at their own expense.

251.    Despite the well-publicized advertising statements of insurers such as State Farm, GEICO, Liberty Mutual and Allstate, among others, that "guarantee" their repairs for as long as the consumer owns the repaired vehicle, these companies' own documentation disclaims this purported guarantee specifically with respect to aftermarket and salvaged parts.

252.    Defendant Progressive's repair estimates carry the warning, "This estimate has been prepared based on the use of crash parts supplied by a source other than the manufacturer of your motor vehicle.  The aftermarket crash parts used in the preparation of this estimate are warranted by the manufacturer or distributor of such parts, rather than the manufacturer of your vehicle."  This is, in fact, warranty language required to be disclosed under Florida statute.

253.    On the same page, Progressive clarifies exactly what part of repairs come with a lifetime guarantee: "sheet metal and plastic body parts."  That's it.  Nothing else is guaranteed and other language makes clear Progressive does not warrant the aftermarket parts it requires to be used. That must be taken up with the manufacturer or distributor, if a consumer is able to identify the manufacturer or distributor.

254.    Allstate's documents also contain limiting language.  "The insurance company guarantees the fit and corrosion resistance of any aftermarket/competitive outer body crash parts that are listed on this estimate and actually used in the repair of your vehicle for as long as you own it. If a problem develops with the fit or corrosion resistance of these parts, they will be repaired or replaced at the insurance company's expense."

255.    That is all.  If an exterior non-OEM part comes lose or rusts, Allstate will repair or replace it.  If a salvage or aftermarket radiator support, bumper assembly, hood hinges, steering column or assembly, air bag or air bag sensor installed at the insistence of Allstate fails, Allstate has no liability under its purported guarantee.

256.    Defendant Liberty Mutual, which runs an extensive television campaign advertising its purported lifetime guarantee on repairs provides only the statutory minimum–notice that the manufacturer or distributor warrants the parts Liberty Mutual required to be installed.

257.    The immediate cost to the Plaintiffs is the loss of revenue and time lost in modifying aftermarket parts to fit, which the Defendants refuse to pay.  With salvage parts, the shop must clean and often repair the parts prior to use, when they are usable, and that is also time and labor which the Defendant insurers refuse to compensate the Plaintiffs.

258.    The ultimate outcome of the limiting language used by the Defendant insurers is the body shops shoulder the immediate liability burden for failure or inadequacy of parts they had no voice in choosing.

259.    For shops which do remain associated with direct repair programs, the threat and potential cost is even greater.  Most DRP terms, such as those of State Farm, USAA, and Progressive, require the shop to not only maintain an extensive liability policy with the DRP sponsor as a named insured, (for which the shop bears solely premium payment responsibility) but also contain language requiring the shop to assume liability for any problems arising from parts selection and/or usage, and agree to indemnify the sponsoring insurer in the event the insurer is found liable for its own action with regard to parts.

260.     Again, in the face of the combined market power exerted by the Defendants and their unified insistence on use of aftermarket or salvage parts, the only recourse a shop has is purchase appropriate parts and work at a loss on each such repair.

## STEERING

261.     Within the body shop and insurance industry, "steering" is the term used to describe the practice of insurers of coercing or otherwise convincing a consumer to withhold patronage from a disfavored repair shop for failing to comply with fixed prices.

262.     Steering generally takes the form of an insurer relaying false or misleading information to a consumer after the consumer has identified a noncompliant target shop as the repair facility the consumer wants to perform repairs.  Insurers will also steer using threats of economic consequences to the consumer if they persist in using the shop of their choice.

263.     Regardless of which insurer is involved, the Defendants' insurance representative ordinarily provides the same list of false or misleading "information" to consumers after they have selected one of the Plaintiffs' shops as their choice of repair facility.  Examples of these statements include but are not limited to the following:

•       The selected shop is not on the insurer's preferred list;

•       The insurer has received complaints about the quality of the shop's work;

•       If the consumer takes their vehicle to the selected shop, repairs will take too long and the consumer will run out of rental car time and have to pay for a rental out of their own pocket;

•       The selected shop charges too much and the consumer will have to pay the difference;

•       The insurer has received complaints about that particular shop from other consumers.

- The consumer is required to take their vehicle to an approved facility for an estimate before they are allowed to go to the repair facility the consumer has identified as the repair facility of their choice.

- The insurer will provide a guarantee on repairs performed at its preferred shops.

264.   With respect to the statement that a consumer must visit a preferred shop for an estimate before proceeding to the shop of choice for repairs, while all Defendants engage in this practice to some degree, GEICO appears to be the most aggressive.  GEICO claims handling documents refer to this as "capture and retention."  If the GEICO employee handling the claim is successful at directing a vehicle to one of its direct repair shops for an estimate, the file is marked as a successful "capture."  If GEICO successfully compels repairs at the facility which "captured" the vehicle, this is designated a successful "retention."  GEICO internal documents repeatedly urge employees to capture and retain, directly tying such success to  increased company profits and increased profit-sharing bonuses for employees.

265.   The degree of steering has varied over the years but the hard core steering used by the Defendants against the Plaintiffs appears to have commenced in approximately 2004, continuing to the present day.

266.   Early examples of steering are not so very different from contemporary ones.  In 2004, a long-time customer of Plaintiff Gunder's was notified by State Farm that there were "issues" at Gunder's and strongly urged the customer to remove his vehicle to a State Farm preferred shop; the customer was told if he left his vehicle at Gunder's, it could take up to thirty days before State Farm could get around to inspecting his vehicle and the customer would have to cover the cost of additional rental expenses that State Farm would not pay.  This customer had previous repairs at

Gunder's for which State Farm paid the costs without difficulty.  Between those repairs, however, Gunder's had terminated its DRP status with State Farm.

267.    Also in 2004, Another customer was told by State Farm  he could take his car to Gunder's if he didn't mind his car "going in blue but coming out pink."

268.    In 2008 and 2009, two other customers were told explicitly by State Farm they could not take their vehicles to Gunder's "because it isn't on our list."

269.    Additional specific examples of these practices include the following:

Carissa Stone–GEICO

270.    Consumer Carissa Stone notified her insurer, GEICO, of an accident in February, 2014, and told GEICO she was taking her car to Plaintiff Express Paint and Body for repairs.  Miss. Stone specifically selected Express because she received several positive reviews of Express's work. Upon being notified of the chosen body shop, GEICO told Miss Stone she was not allowed to take her car to Express because it wasn't one of GEICO's preferred shop.  Ms. Stone was given a list of four other shops, all GEICO preferred shops, to which she was allowed to take her car.

271.    Ms. Stone selected Lakeland Gerber Collision from the list given her by GEICO. Gerber kept her car for several weeks.  When she brought it home after repairs were purportedly concluded, Ms. Stone's fiancee, Michael O'Sullivan looked it over.  Mr. O'Sullivan is a mechanic. Mr. O'Sullivan returned the vehicle to Gerber the following day because the vehicle was clearly not corrected, including pulling very hard to the right and clearly being out of alignment.

272.    Lakeland Gerber kept the vehicle on the second repair for a week.  When it was returned to Ms. Stone, no repairs whatsoever had been completed.  Gerber did attempt to buff out paint over-spray from the first repair but actually caused more scratches and damage to the paint as

a result.  Both Gerber and GEICO told Ms. Stone there was nothing else they would do and she just had to take the car as it was.

273.    Following this second repair, Ms. Stone took her vehicle to Plaintiff Express. Express conducted a quick inspection and found so many things wrong with the repairs by Gerber, that it was strongly recommended Ms. Stone take the vehicle to Plaintiff Gunder's for post-repair inspection and documentation.

274.    GEICO tried to tell Ms. Stone she was not permitted to do so but eventually allowed the vehicle to be taken to Gunder's, which found numerous substantial defects in the repairs performed by GEICO's "preferred" shop, including unrepaired frame damage, the steering intermediate shaft cracked in the accident had never been replaced or repaired, the hood clip had never been replaced,  a non-crash tested core support had been installed and the vehicle was not safe to drive.  Gunder's also found Gerber had used aftermarket and salvaged parts despite Ms. Stone's specific instructions to use OEM parts only.

275.    Gunder's report prompted GEICO to admit the two prior repairs were badly done but still told Ms. Stone GEICO would not pay for repairs done by Gunder's.  GEICO insisted the vehicle would have to return to Gerber, but conceded Ms. Stone could take the vehicle to a different branch, Valrico Gerber.  The third attempt by Valrico Gerber also failed to repair the vehicle, including failing to even attempt to repair the bent frame.  The vehicle was again taken to Gunder's, was inspected and reviewed in the presence of GEICO manager Jamie Cruz, who still refused to allow Gunder's to perform repairs.  Instead, Mr. Cruz declared the vehicle a total loss.

Ruby Srinivasan–Progressive

275.    In 2014, Consumer Ruby Srinivasan  told Progressive she was taking her vehicle to

Plaintiff Gunder's Collision for repairs.  Progressive told Ms. Srinivasan Gunder's was "not on our

program" and she had only two choices for repairs, Cannon Buick or a shop in another town.  Ms.

Srinivasan was unaware she could refuse these choices and took her vehicle to Cannon.  The repairs

performed by Cannon Buick were substandard and left the vehicle unsafe to drive.  Ms. Srinivasan

took her vehicle to Gunder's for post-repair inspection and Progressive's adjuster agreed Cannon's

repairs were substandard and ended up declaring the vehicle a total loss.

Michelle Niece–Allstate

276.    Consumer Michelle Niece, a first-party claimant, took her vehicle to Plaintiff Ideal

Auto for repairs in 2014.  Ideal had performed work for Ms. Niece on prior occasions to her

complete satisfaction. After evaluation, Ms. Niece was advised that due to the extent/nature of the

damage, repairs would take approximately three weeks.  When Ms. Niece, who did not have rental

car coverage under her policy, submitted her claim to Allstate, adjuster Paul Bacher told her the

repair estimate from Ideal was wrong, that if she took her vehicle to their DRP, the repairs would

only take nine days and Allstate would give her a free "loaner" car but if she stayed at Ideal Auto,

she would have to pay for her own rental car.  As Ms. Niece could not afford a rental and needed a

vehicle for work, she conceded to Allstate's directions. The repair at Allstate's DRP shop took nearly

a month to complete.  Ms. Niece brought her vehicle to Ideal for a post-repair inspection because it

visually did not look right to her.  Ideal found substantial unrepaired damage, including failure of

the DRP shop to reattach the seat belts, unrepaired impact damage that left the gas tank filler neck

and housing structure bent such that the gas cap would not close and one of the doors did not function properly.

Kathy Rivera–State Farm

277.    Consumer Kathy Rivera,  a former customer of Plaintiff A&E, identified A&E to State Farm as the shop she had chosen to repair her vehicle.  State Farm told Ms. Rivera she could not take her vehicle to A&E because it wasn't "on the program."  State Farm directed Ms. Rivera to take her vehicle to the Chevrolet Center for repairs.   The Chevrolet Center failed to restore the vehicle to pre-loss condition.  Ms. Rivera took the vehicle back to Chevrolet Center at least twice to try and resolve the insufficiencies but was unsuccessful.  Ms. Rivera then told State Farm that she was taking her vehicle to A&E, where she wanted to go in the first place, and State Farm disclaimed any further financial responsibility for the repair.  Upon information and belief, State Farm has still not paid for the necessary additional repairs.

Mary Davis–Farm Bureau

278.    In July, 2014, Consumer Mary Davis notified Matt Knight of Farm Bureau she was taking her vehicle to A&E Auto Body for repairs.  Mr. Knight told Ms. Davis she didn't need to bring her car to A&E because A&E charges too much and she would have to pay the difference.  Mr. Knight told Ms. Davis she had to go to one of Farm Bureau's shops, Chevrolet Center.  Chevrolet Center did not properly repair the vehicle and Ms. Davis took her car to A&E, where she had wanted to go in the first place.  A&E contacted Farm Bureau.  When notified of the poor repairs and need for additional repairs, Christie Parker of Farm Bureau declared the vehicle a total loss.  It was, however, A&E's professional opinion the vehicle was not a total loss and could have been repaired well within the threshold for total loss determinations.

-55-

## JT's Towing

        279.   JT's Towing performs 24-hour towing, including after-hours collision towing.  For several years to the present day, when JT's is notified by a vehicle owner they wish to have their vehicle taken to A&E Auto Body for repairs, State Farm and GEICO will countermand the owner's instruction with orders to take the vehicles to a DRP shop, often in other towns, including Orlando, more than an hour away.  This is done without the vehicle owner's knowledge or consent.

        280.   In each of these examples, the vehicle owner had clearly identified a Plaintiff as the repair shop the consumer wanted to deal with, or had already taken their vehicle to one of Plaintiffs' shops.   In each instance, a Defendant insurer directly intervened in the business relationship (commenced or intended) through false statements, misrepresentations, or (as is in Ms. Niece's case) played upon the financial vulnerability of the consumer.

        281.   Not all steering is successful.  In September, 2014, Ralph Montelone notified State Farm adjuster Steve Brannen he wanted his vehicle repaired at Plaintiff A&E Auto Body.  After making an appointment to meet Mr. Montelone at A&E for an inspection and estimate, Mr. Brannen called the consumer and told him not to take his vehicle to A&E because it was not a preferred shop and he gave Mr. Montelone the names of four shops the consumer was "allowed" to take his vehicle for repairs.  Mr. Montelone refused to take his car to any of the shops not of his choice.

        282.   In September, 2014, Peggy Morrison was told by GEICO she had to have her vehicle towed to one of GEICO's preferred shops instead of Plaintiff A&E.  Ms. Morrison refused to take her car to a shop not of her choice.

        283.   Austin Holmes was told by State Farm in December, 2014, that Plaintiff Stewart Auto Repair was not on its preferred list, that Stewart charged more than other shops in the area, that Mr.

Holmes would have to pay the difference, that repairs at Stewart would take longer, that if he went to a network shop, State Farm would warranty the repairs for as long as he owned his car and he was **required** to take his vehicle to another shop for an estimate.

284.   Third-party claimant Daniel Brickner identified A&E as his choice of repair facility to tortfeasor's insurer, GEICO.   GEICO refused to go to A&E to inspect the vehicle.   GEICO told Mr. Brickner he was required to take his vehicle to GEICO preferred shop, Bartow Ford, which was 25 miles away.   <u>GEICO told Mr. Brickner if he didn't go to Bartow Ford, he would have to file the claim with his own insurer despite GEICO's insured being admittedly at fault</u>.   Mr. Brickner did take his vehicle to Bartow Ford for an estimate but refused to allow them to perform repairs; he returned to A&E.

285.   Mr. Ben Adams identified A&E Auto as his choice of repair facility to State Farm. State Farm told Mr. Adams that he should not take his vehicle to A&E because it was not a preferred shop, that repairs would take longer, that State Farm could not pay the shop directly for repairs but if he went to one of the preferred shops, that shop could be paid directly and he would get his car back faster.   Mr. Adams refused.

286.   Ms. Alyson Johnson was told by Defendant Infinity Insurance in September, 2014, that Plaintiff Elite Euro Cars would charge her too much, that Elite Euro Cars had a bad reputation, that if she did not use one of "our" [Infinity's] shops, Ms. Johnson would be liable for storage charges and additional fees, and that Elite Euro Cars was known for being difficult to work with.

287.   Jane Doe[7], a third-party claimant, was told by <u>the tortfeasor's insurer, Defendant USAA, that she would have to file the claim with her own insurance</u>, Defendant 21st Century, though

---

[7]This witness asked that her name not be used in publicly filed documents.

USAA's insured had been cited at fault and ticketed by police for the accident.  Both USAA and 21st Century told Ms. Doe she should not take her vehicle to Plaintiff Elite Euro Cars, that Elite Euro Cars charges too much and she would be responsible for any charges they chose not to pay.  21st Century further told Ms. Doe that, although she wanted OEM parts put on her low mileage vehicle, "Florida law" only required the insurance company to pay for and install salvage parts and that was all 21st Century was authorizing.  USAA told Ms. Doe that it would only pay as liability coverage what 21st Century authorized.  As of the filing of this pleading, Elite Euro Cars has an outstanding balance due in excess of $5,000.00 for the repairs of this particular vehicle.

288.  Even as this pleading was being prepared, Defendant Progressive attempted to persuade consumer Deborah Kelly to remove her vehicle from Plaintiff Gunder's shop. Commencing shortly before January 30, 2015, Progressive, through its employee James Hunter, began calling Ms. Kelly repeatedly, telling her she had to sign a release to allow Progressive to tow her vehicle out of Gunder's for an estimate because Progressive did not have the tools to write an estimate at Gunder's.  Gunder's explained to Ms. Kelly this was not true, Progressive often wrote estimates at his shop.

289.  Progressive next told Ms. Kelly a wrecker had been sent to Gunder's to retrieve her vehicle for an estimate and been turned away (though Ms. Kelly had not authorized this).  On a three-way telephone call between Progress, Ms. Kelly and Gunder's, Gunder's pointed out no wrecker at appeared nor been turned away.  Progressive again told Ms. Kelly Progressive could not write an estimate at Gunder's shop because of lack of proper "tools."  Gunder's again pointed out Progressive wrote estimates there when Gunder's had Progressive insureds or claimants.

290.     Mr. Hunter next told Ms. Kelly if she didn't remove her vehicle from Gunder's, she would have to pay the storage fees.   Still on the three-way call, Gunder's told Ms. Kelly that Progressive's statements were untrue, that Mr. Hunter was merely trying to scare her into taking her vehicle away from Gunder's.   Interesting, Mr. Hunter never denied this.

291.     After Gunder's hung up, Mr. Hunter spent considerable more time trying to convince Ms. Kelly to move her vehicle, even enlisting the assistance of his supervisor.   Fortunately, Ms. Kelly did not believe Progressive's falsehoods.

292.     Because of the nature of such things, the vast majority of evidence of successful steering lies solely within the control and custody of the Defendants themselves.   There is, however, sufficient evidence of both successful and unsuccessful steering efforts by the Defendants to reasonably conclude discovery will produce additional evidence of Defendants' actions.

<u>Defendants' Steering Is Malicious, Punitive in Nature and Intentional</u>

293.     The punitive and malicious nature of Defendants' interference is exemplified by the failed steering instances described above.   In each instance, the Defendant insurer refused to pay the full cost of repairs, either by refusing to pay the posted labor rates, refusing to pay for necessary procedures or processes, utilizing salvaged parts or aftermarket parts instead of OEM parts designed to fit a particular vehicle, capping paint and materials or similar activities, or a combination of these actions.

294.     The outcome was the same–each Defendant paid only what it chose to pay regardless of the actual cost of repairs.

295.     Each Defendant paid only what it would have paid a direct repair or cost-compliant shop.   As such, steering becomes a financially pointless endeavor and does not benefit a

demonstrably legitimate interest of the Defendants.  If each Defendant refuses to pay the full cost of repairs, regardless of where the repairs are performed, steering customers away from Plaintiffs' businesses can only be performed as a means to punish through improper means and attempts to compel compliance through financial coercion.

296.    Additional evidence of malice is the misrepresentation to consumers that certain difficulties attributed to Plaintiffs are actually and solely the result of the Defendant insurers' own deliberate choice.  The statement that repairs will take longer at a Plaintiff shop is not the result of the shop taking longer to complete a repair but a Defendant insurer's decision to delay every part of the repair.

297.    This usually commences at the beginning of the process where the Defendant insurer will delay sending a representative to the shop to perform an initial evaluation but threatens the shop that if work begins before they inspect, payment for repairs will be withheld.

298.    Quite often a Defendant insurer will tell both the customer and the shop an estimator will be sent, but days or weeks will pass, calls are not returned and when someone finally answers the phone, will again assure all concerned an estimator is being dispatched, again with no result. Only after considerable time has passed will a representative arrive for the initial evaluation, claiming the repair had "just been assigned."

299.    A Defendant insurer will next delay in addressing supplements, often stating repeatedly over the course of days or weeks that supplements were never sent by the shop.  Even when proof is provided, such as emails or fax confirmation sheets, a Defendant insurer will deny receiving it, further delaying the repair.

300.     Even after acknowledging a supplement has been sent, a Defendant insurer will refuse to allow the additional work to commence until an in-person inspection of the supplemental work requested has been made.  Again, there are delays in returning to the shop.

301.     Alternatively, disagreement between a Defendant insurer and a shop on the scope and extent of repairs results in the insurer invoking the appraisal clause.  This results in the insurer waiting days or weeks to send an independent appraiser and/or days or weeks to acknowledge receipt of the appraiser's report, usually the reports prepared by the independent appraisers hired by both the insurer and the consumer.

302.     Specific examples of this behavior include but are not limited to the following:

•     Defendant State Farm routinely waits five to seven days to send a representative to perform an initial estimate.

•     Defendant MGA can take up to two weeks to arrive for an initial estimate.

•     Defendant GEICO routinely waits at least three to four days to arrive for an initial estimate.

•     Defendants State Farm, Allstate, GEICO, Progressive routinely order salvaged parts which are unfit for use, must be returned and others ordered (sometimes this cycles through two or three times because he set of parts are unfit for use), substantially increasing the length of time to complete repairs.

•     In cases where liability is clear, Defendants State Farm, Allstate, Horace Mann, Infinity, GEICO and Progressive frequently refuse to make the first move–tortfeasor's insured insists they cannot act before a subrogation demand is made; the claimant's insured saying they can't submit a subrogation demand until the tortfeasor's insurer has paid and exhausted policy limits.  This even extends to payment of rental car expenses during the repair process, leaving the insured to suffer that burden, and extends through storage fees, which continue to accrue because neither involved insurer will be the first to pay.

•     In at least one instance, the immediately preceding situation occurred between Peachtree, tortfeasor's insured, and Allstate, the claimant's insurer at Plaintiff Ideal Auto in July-October, 2014.  Allstate dragged their feet for over three months, insisting Peachtree had to pay while Peachtree insisted Allstate had to pay first.  Storage fees continued to accrue on the total loss vehicle.  Instead of either insurance company paying the fees, Allstate took title

to the car and filed a writ of replevin and took the vehicle, without ever paying a single portion of any of the bill, including the estimate and tear down. This occurred after Allstate promised full payment to Ideal in writing.

303.    Also reprehensible are the Defendants' assertions that Plaintiffs' work cannot be guaranteed but if the consumer goes to one their network or preferred shops, the insurer will guarantee the work.

304.    This is deeply misleading for three reasons. First, no insurance company and certainly none of the named Defendants performs any repair work. Therefore there is nothing for them to guarantee and asserting to Plaintiffs' customers and potential customers they will guarantee the work is both misleading and inaccurate. As phrased, Defendants' guarantee assertions reasonably lead consumers to believe the repairs are guaranteed by the insurer, which they are not.

305.    A correct statement would be the Defendant insurers require network and preferred shops to guarantee their own work. However, reality has proven that even when repairs are performed at a network or preferred shop, neither the shop nor the insurer can or does live up to even this hypothetical statement.

306.    As set out above, insurers and their network/preferred shops regularly and routinely perform poor work or simply fail to perform necessary repairs at all. Repeat trips for re-repairs usually yield nothing and more than once, failure to make required repairs in at least an adequate manner leads only to both the insurer and the network/preferred shop shrugging and walking away with the repairs incomplete, poor and often leaving a vehicle that is unsafe to drive.

307.    At the same time, these same insurers–who tout guarantees–flat refuse to allow another shop to make repairs. More often than not, "guaranteed" repairs end with a previously

reparable vehicle being declared a total loss, sometimes when the vehicle is still beneath the total loss threshold but the insurer simply does not wish to be bothered with it anymore.

308.    Third, Defendant insurers' statements mislead Plaintiffs' customer and potential customers into assuming Plaintiffs' do not guarantee their own work.  Were this not the intent, to lead listeners to this conclusion, there would be no effect or gain to the Defendant insurers in telling consumers that work done at a network/preferred shop would lead to a guarantee, coupled with disavowal of guarantees at the Plaintiffs' shops.

309.    No legitimate business interest of any of the Defendant insurers allows them to defame the Plaintiffs with falsehoods, accuse the Plaintiffs of misdeeds and malfeasance which is solely attributable to the insurers' own actions, or financially punish a shop when the cost of their own actions and inactions becomes more than they wish to pay.

310.    These actions are intentional, willful and malicious, conducted by the named Defendants with full knowledge of the falsity of their misrepresentations, without furtherance of a legitimate business interest and done with the intent to injure and damage the Plaintiffs individually.

Effect of Defendants' Illegal Steering

**311.**    As noted above, it is generally well accepted by the courts that insurers exert an enormous amount of influence over where consumers take damaged vehicles for repairs.

312.    Insurance-paying customers constitute between seventy-five and ninety-five percent of a given Plaintiffs' annual business.  Given these proportions, the effect of Defendants' steering is dramatic.

313.    As an example, Plaintiff Express Paint and Body was a GEICO DRP shop for several years.  Express left GEICO's DRP effective the end of March, 2013.  Although there had been no

change in quality of repairs, equipment or skilled technicians, GEICO immediately began its campaign–telling customers and prospective customers who had identified Express as their chosen body shop that GEICO had been receiving complaints about Express, that Express overcharged, that Express took too long to complete repairs, that the customer would have to pay out of pocket for Express's overcharging and may run out of car rental coverage, which the customer would then have to pay for, because of Express's slow service.

314.   GEICO began telling customers and potential customers these things, knowing they were false.  In fact, David Ousley, GEICO Auto Damage Supervisor for the area, repeatedly sent emails over the preceding two years congratulating Express for exceeding GEICO expectation cycle time (repair time) and customer goals.

315.   The effectiveness of GEICO's campaign of falsehood and misinformation is shown in the numbers.  In March, 2013, Express's revenue for repairs performed for GEICO insureds and claimants was $205,077.94.  In April, it was $29,712.32.

316.   These numbers are not aberrations.  In 2013, Express's average monthly revenue for GEICO insured and claimant repairs was $233,500.00.  For the entirety of 2014, Express's total revenue for  GEICO insured and claimant repairs was $85,468.00.

317.   Plaintiff Stewart Auto also experienced a similar precipitous drop when it left Progressive's DRP and Progressive began steering customers and potential customers away.  While on the DRP during January to July, 2014, Stewart's Progressive insured and claimant repairs revenue was over $400,000.00.  After it left the program at the end of July, and Progressive began steering, Stewart's revenue dropped to $105,000.00 for the period of August, 2014 to February 1, 2015.

318.    Stewart Auto's revenue for State Farm insureds and claimants was $665,572.00 in 2013 while it was  involved in State Farm's DRP.  Upon leaving State Farm's DRP and State Farm began steering customers and potential customers away, Stewart's revenue from State Farm insured and claimant customers dropped to $490,000.00 for 2014.

319.    As these numbers show, the effect of Defendants' steering has a dramatic impact upon the financial health of the Plaintiffs' businesses and their ability to remain open as a going concern.

320.    Defendants actions are intentional, willful and malicious, conducted by the named Defendants with full knowledge of the falsity of their misrepresentations, without furtherance of a legitimate business interest and done with the intent to injure and damage the Plaintiffs individually.

<u>Unity of Action by Defendants</u>

321.    Steering against noncompliant shops is not limited to retaliation by insurers whose DRPs a Plaintiff shop has left.  The Defendants share this information amongst and between themselves and steer business away from noncompliant shops as a group.  Noncompliant shops are specifically targeted by the group of Defendant insurers.

322.    Plaintiff Stewart Auto left State Farm's DRP at approximately the end of November, 2013, and Progressive's DRP at approximately the end of July, 2013.  In the year following, not only did these two insurers successfully steer customers away from Stewart (see above, Paragraphs **), but Stewart's number of customers for whom other insurers were responsible for payment also dropped substantially, including but not limited to the following:

• In 2013, Enterprise Insurance claimants and insureds represented 2.86% of Stewart's business.  In 2014, it dropped to 2.14%.

- In 2013, Defendant USAA claimants and insureds represented 1.10% of Stewart's business. In 2014, it dropped to 0.95%.

- In 2013, Farm Bureau claimants and insureds represented 1.41% of Stewart's business. In 2014, it dropped to 0.0%.

333.    Plaintiff Stewart Auto never associated with Defendants USAA or Farm Bureau's DRP. Nonetheless, both of these insurers began telling customers who identified Plaintiff Stewart as the repair shop of choice the very same false assertions as did State Farm and Progressive, to wit, Stewart overcharges, Stewart takes too long to repair cars and the consumer will have to pay for additional car rental days.

334.    Steering is not limited to shops which have left DRPs. Shops, such as Plaintiff Elite Euro Cars, which has never associated with any insurer direct repair programs, also suffer the shared wrath of the Defendant Insurers. Defendants State Farm, Infinity, USAA, 21st Century, Farmers, Progressive, and eSurance have all told customers that Plaintiff Elite Euro Cars overbills, charges more than any other shop in the area, that Elite wasn't on their program and cars would have to be taken elsewhere.

335.    Since these Defendants' steering efforts commenced with vigor in the late fall of 2013/early spring of 2014, Elite Euro Cars customers who were USAA insureds and claimants dropped by seventy five percent (75%); State Farm dropped by sixty five percent (65%); Progressive dropped by thirty eight percent (38%); and eSurance dropped by twenty percent (20%).

336.    Timing of steering is also indicative of malicious intent. Plaintiff A&E removed itself from association with GEICO's DRP in approximately mid-April, 2014. It disassociated from State Farm's DRP in December, 2013, and disassociated from Liberty Mutual's DRP in January, 2014.

Within just a few months, with the only change being self-removal from these DRPs, Defendants State Farm, GEICO, eSurance and Farm Bureau all began steering customers away.  These Defendant insurers began telling customers and prospective customers, among other statements, they were not permitted to take their vehicles to A&E, that A&E charged too much and customers would have to pay the difference, that A&E was the only shop to charge for certain repair procedures.

337.    In the absence of some notice by GEICO, State Farm and Liberty Mutual to the other insurers that Plaintiff A&E was no longer "protected," the sudden onset of steering by insurers who had no reason to engage in defamatory actions prior to the disassociation makes no sense.

338.    Significantly, while State Farm, Allstate, GEICO and the other Defendants were steering customers away from the Plaintiffs making identical false statements and misleading innuendo, there was a group silence and group failure to point out the shops the Defendants were steering to had <u>significant</u> complaints lodged against them.

339.    For example, even as GEICO was attempting to dissuade Peggy Morrison not to take her vehicle to Plaintiff A&E and go to one of its network/preferred shops, it did not disclose network shops with reported problems.  Just seven months earlier, GEICO was on notice of repeated failures of <u>two</u> of its network shops, Lakeland Gerber and Valrico Gerber, to make necessary repairs and, in fact, their purported repairs left Carissa Stone's vehicle unsafe to drive and eventually totaled.

340.    When State Farm was telling Ralph Montelone he couldn't take his vehicle to Plaintiff A&E, but had to go to one of its preferred shops in the area, it did not disclose that one of its preferred shops in the area, Chevrolet Center, had performed such poor repairs on Kathy Rivera's vehicle earlier in the year, and failed to remedy the problems after several attempts, that State Farm eventually just walked away, refusing to authorize any further repairs.

341.    Nor did State Farm disclose the failings of its network shops to Austin Holmes, particularly Chevrolet Center and the failed repairs on Ms. Rivera's vehicle, even as it was falsely stating Stewart Auto Repair overcharged, that Mr. Holmes would have to pay the difference, that Stewart took too long to perform repairs and that Mr. Holmes was required to take his vehicle to a network shop for an estimate.

342.    State Farm likewise did not disclose Chevrolet Center's failings to Mr. Ben Adams, even as it attempted to coerce him from patronizing Plaintiff A&E with the same misrepresentations and falsehoods it used with Mr. Holmes, above.

343.    Also significantly, none of the Defendant insurers ever actually identified a single instance of wrongdoing or malfeasance by any of the Plaintiffs they were defaming, not even with an example that omitted personally identifiable information.  They merely stated these bad acts were occurring.

344    The statements made by the Defendant insurers to intervene in the business relationship, established or prospective, between the Plaintiffs and the individuals discussed above were all false.  The statements withheld by the Defendant insurers about their network and preferred shops were all true.

345.    It would be absurd to suggest the Defendants simply forgot the truth about their own preferred shops but remembered falsehoods about non-network, target shops.

346.    It would be equally absurd to suggest that Defendants were unaware of the problems and reputations of the various network/preferred shops.  The vast majority of them share DRP shops. Gerber is a network shop for GEICO as well as State Farm and Allstate, but neither State Farm nor Allstate mentioned problems with Gerber to Kathy Rivera or Michelle Niece, respectively, when

steering them to their own network shops.  This was withheld despite the fact that two separate Gerber locations had failed spectacularly and repeatedly to repair Carissa Stone's car.

347.    Chevrolet Center is a shared DRP between State Farm and Farm Bureau, but neither mentioned Ms. Rivera's poor repair outcome to either Austin Holmes or Mary Davis, respectively. Farm Bureau's subsequent silence is, perhaps, understandable given Ms. Davis's repeated failed repairs and subsequent totaling of her vehicle..

348.    The only reasonable conclusion from these facts is the named Defendants shared information about and specifically targeted as a group the particular shops who refused to comply with Defendants fixed pricing structures, parts procurement rules designed to minimize cost and general belief the body shops simply be quiet and do as they are told by the insurance industry.

349.    Given the identical nature of the false statements made by numerous Defendants, it is also only rational to conclude the high probability of prior agreement as to the most effective statements to make to successfully steer customers away from the targeted shops.

350.    Defendants actions were intentional, coordinated, relied upon shared information and utilized identical methods and content.

351.    Defendants actions violate both state and federal law.

**OPPORTUNITIES FOR DEFENDANTS TO CONSPIRE**

352.    Opportunities for individuals sufficiently high enough within the Defendants' corporate structure to make or influence substantive decisions exist in abundance.

A.      Trade Associations

353. Currently available documentation established that every national insurer and the vast majority of regional insurer belong to at least one of the three major insurance industry trade associations:

- American Insurance Association (AIA) : Defendants Farmers Insurance Group, Farm Bureau, The Hartford, Safeco, Travelers, United Services Automobile Association, USAA and Zurich are all members of the AIA. In addition to general membership, from time to time over the course of at least ten years, Defendants Farmers, Safeco, the Hartford, Travelers, USAA and Zurich have all served in positions of authority within the AIA, including the PCI Board.

- The Property Casualty Insurer Association of America (PCI): Defendants Allstate, Geico, Liberty Mutual, Progressive, Selective, Sentry, Shelter, Westfield Group and Defendants Florida Farm Bureau and Florida Farm Bureau Casualty's parent company, Southern Farm Bureau, are all members of PCI.  In addition to general membership, from time to time over the course of at least ten years, these Defendants have all served in positions of authority within the PCI, including the PCI Board.

- The National Association of Mutual Insurance Companies (NAMIC): Defendants Nationwide and State Farm are members of NAMIC.  In addition to general membership, Nationwide and State Farm have, from time to time over the course of several decades, served in positions of authority within NAMIC, including the NAMIC Board.

354.    The members of the companies representing these Defendants on the respective boards, in  positions of authority and at general meetings are almost exclusively within the highest tier of executive level at each Defendant insurer company.

355.    For instance, GEICO CEO and Chair Tony Nicely has frequently assumed a position on the board of PCI.  Others who have served over the years include but are not limited to Westfield's former board of directors executive chair, Robert Joyce, Liberty Mutual's former chairman and CEO Edmund Kelly, 21st Century's current president Bruce Marlow and Allstate's president, chairman and CEO, Thomas Wilson.

356.    As Nationwide and State Farm have both been members of NAMIC since at least 1961, the list of executives of both companies who have served on the board of NAMIC and its various executive committees is extensive.

357.    Board meetings and other leadership obligations regularly bring the high ranking members of Defendants' companies together, specifically for the purpose of discussing insurance issues, how to advance insurance interests, lobby for legislative favor and generally increase the profitability of the insurance industry.

358.    The associations frequently act in concert, bringing the members and boards together as well, also specifically for the purpose of advancing the insurance industry.  For instance, the associations work together to prepare and present a joint statement on Senate Regulatory Reform Legislation, lobbying Congress to renew the Terrorism Risk Insurance Act, as well as the annual P/C Insurance Joint Industry Forum.

B.    Insurance Institute of Highway Safety

359.     The Insurance Institute of Highway Safety (IIHS) is described as "an independent, nonprofit scientific and educational organization dedicated to reducing the losses - deaths, injuries and property damage - from crashes on the nation's roads."

360.     This organization asserts that among other things, it conducts scientific tests upon vehicle crash worthiness and crash avoidance and rates the results, information which is often well publicized as a selling point in advertising the safety of a vehicle, or of a crash part.

361.     All Defendants except Ocean Harbor, National General, Acceptance, First Acceptance and Windhaven are members of IIHS, either directly or through membership of their parent corporations.   Current members of the board of directors include:

•     Defendant Farmer's head of public policy research and development, government and industry, Brian Braddock;

•     Defendant Shelter's executive vice president and treasurer, Dan Clapp;

•     Defendant Direct General's president and CEO, John Mullen,

•     Defendant GEICO's vice president and legislative counsel, Hank Nayden.;

•     Defendant Progressive's David J. Skove, general manager, South Region;

•     Defendant State Farm's Angela Spark, vice president and actuary;

•     Defendant Liberty Mutual's president, personal insurance, Timothy Sweeney;

•     Defendant The Hartford's vice president, product management, Randy Termeer;

•     Defendant Travelers's president, personal insurance, Greg Toczydlowski; and

•     Defendant Nationwide's association vice president, consumer safety, William Windsor, Jr.

362.    Not only does membership and board membership provide the vast majority of the Defendants (including all national insurers) with additional opportunities to meet and arrange agreements, goals, expectations and mutually beneficial plans, but the organization itself is influential in establishing the legitimacy of parts, including aftermarket parts as safe alternatives of like kind and quality to OEM parts.

363.    As discussed above, all of the Defendants regularly and routinely compel purchase and use of aftermarket and other non-OEM crash parts for use in the repairs for which each is financially responsible.  The organization therefore provides combination and conspiracy opportunities and incentives for multiple avenues of mutual interest and profit to the Defendants.

C.    CAPA

367.    CAPA, the Certified Automotive Parts Association bills itself as a non-profit organization established in 1987 to develop and oversee a test program guaranteeing the suitability and quality of automotive parts.  Specifically, aftermarket parts.

368.    When either the insurance industry or the collision repair industry discusses parts certification, almost exclusively the reference is to CAPA.  CAPA purportedly sets quality standards and conducts studies of aftermarket parts.

369.    What is generally not discussed is that CAPA was founded and predominantly funded by representatives of the insurance industry, including Defendant State Farm,  specifically for the purpose of reducing collision repair costs.

370.    Current Board of Directors for CAPA include State Farm, Allstate, Liberty Mutual and GEICO, Clark Plucinski, President of the Boyd Group, which operates the Gerber Collision repair shops (and DRP shops for Allstate, State Farm and GEICO), Tim Adelmann of

ABRA, Inc., another multi-state operator collision repair shop like Gerber (and also DRP shops

for Defendants State Farm, Allstate , GEICO, USAA, Farmer's companies, Nationwide and

Progressive. Allstate and State Farm

371. As with membership in the IIHS, board membership for CAPA provides not only

additional opportunities to meet and arrange agreements, goals, expectations and mutually

beneficial plans by and between the largest property casualty insurers in the United States but

CAPA is a crucial cog in its well-established corporate policy of purchasing less expensive

aftermarket parts whenever possible.

372. The Defendants have gone to great lengths over many years to convince the public

and various state agencies of the safety and interchangeability of aftermarket parts with OEM

parts. Acceptance of this premises is directly financially beneficial to the Defendants as it

provides immediate reward in the form of drastically reduced claims they must pay out.

373. The impartiality of CAPA, as the creation of the insurance industry, financed by

the insurance industry and openly working toward the insurance industry goal of reduced claims

costs, is worthy of gaze with a weather eye. This healthy skepticism is assisted by the substantial

number of aftermarket parts CAPA de-certifies because they are of too poor quality to be in the

stream of commerce.

374. It is important to remember de-certification removes certification from

aftermarket parts CAPA has already purportedly studied, tested and pronounced as quality

collision repair parts.

375. Last year, CAPA de-certified over a thousand aftermarket parts, many of them

crash and safety parts, many of them for the most popular vehicles in the country, including

hoods and fenders for Toyota Camrys, fenders, hoods and headlamp assembly for Honda

Accords, headlamp assemblies for Subaru Outbacks, hoods for the BMW 3-Series, hoods,

bumper covers, fenders and fog lights for BMW 5-Series, radiator supports for Dodge Chargers,

Ford Edge, Ford Focus, Lincoln MKX, Mazda 6, Nissan Altima, Volkswagen Jetta and Honda

Civic, among many others.

376.    Through this organization, the largest insurers representing the Defendants'

mutual interests are in a position to not only make agreements affecting the body shop payment

structure but to ensure a generous supply of thousands of inexpensive, imitation aftermarket parts

is available for the Defendants to compel purchase to further reduce the money they must pay out

as claims.

## MOTIVE TO CONSPIRE

377.    Each of the Defendants has an obvious motive to agree, combine and conspire to

fix prices, boycott and punish noncompliant shops and interfere with Plaintiffs' businesses at

every possible level.  Profit.

378.    If the profits were minimal, the value of such a combination or agreement would

be questionable.  However, the profits are not minimal.

379.    In 2013, State Farm reported a net income increase of 63%, resulting in a record

high net worth of $75.9 billion.  Its underwriting gain was announced at $230 million.

380.    Allstate reported a 2013 net income of $2.3 billion dollars.

381.    GEICO reported 2013 profits of $1.1 billion..

382.    Progressive reported 2013 net income of $1.16 billion.

383.    USAA reported 2013 net income of $2.7 billion dollars.

384.    Without even considering the remainder of the Defendants, these amounts can be placed into perspective:  The top five market share holders in the State of Florida had higher net incomes in 2013 than the gross national domestic product of eight African countries combined. It is represents more money than was spent on the entire defense budget by Oman, Jordan, Afghanistan, Venezuela or Pakistan in 2013, none of which are generally known as peaceful havens.

## IN THE ABSENCE OF AN AGREEMENT AMONG THE DEFENDANTS, THEIR ACTIONS WOULD INDIVIDUALLY BE CONTRARY TO BEST INTERESTS

385.    If taken individually, the Defendants' actions would be contrary to their own best interests.  Such actions would substantially harm a lone Defendant.

386.    An auto insurer's mandate is to insure risk and, when that risk is realized, to pay the loss incurred.  An auto insurer which regularly fails or refuses to pay for full and complete repairs to vehicles, insists on using salvaged or imitation parts, or in any fashion left a vehicle unsafe or noticeably less safe to operate would very likely soon find itself losing its customers to other insurers.

387.    This is particularly so in a world of instant communication, people like to share and they are able to share with the entire world in the push of a Twitter button or Facebook post. Stories of complete failure to repair and just as complete lack of concern by the insurer as related above, would substantially damage both the reputation and the viability of the business as a going concern.

388.    The overwhelming power exerted by the group of Defendants allows the evidenced scheme to succeed.  While one or two Defendants leaving the group could find

stability or even marginal additional success as the companies who care and pay for proper repairs, the remainder would far outstrip the minority in sheer profits.

## EFFECTS ON COMPETITION IN THE BODY SHOP INDUSTRY

389.     Defendants actions have effectively removed all competition from the collision repair industry.

390.     While it may certainly be said the Defendants actions have achieved great effect for the insurance industry, particularly in the area of financial profit, it cannot be said Defendants actions have in any fashion stimulated competition in the collision repair industry.  Whether competition between insurers is robust is irrelevant, whether the insurance industry has benefitted from its illegal actions is irrelevant.  Considering that would be very much the same as suggesting a thief who has profited by his deeds justifies the loss to the victim and is therefore excused.

391.     The Plaintiff body shops are not in competition with the Defendants.  As traders within an identifiable market product, auto collision repair, the effect of competition between collision repair shops is the only effect to be measured.

392.     In the present case, there is no competition whatsoever.  Competition presumes a free and open market, where innovation is encouraged.  That is not the present state of the body shop industry.  There have been no economies or efficiencies created within the body shop industry, nor have prices decreased as a result of a dynamic market, nor incentives created.

393.     The Defendants fix price ceilings for the Plaintiffs, as well as all other body shops.  The Defendants generally leave a particularly fixed price structure in place for several

years in a row.  The determined "market" or "prevailing" rate for the State of Florida was $42.00 per hour body labor for at least three years.

394.    Attempts at expansion are not rewarded, investments in capital equipment is risky, though necessary as federal guidelines regarding gas mileage minimums continue to rapidly evolve the physical structure of vehicles, requiring new equipment, new training and substantial investment.

395.    Consumers have not benefitted by the absence of collision industry repair competition.  To the contrary.  As shown above, the repair shops to which the Defendants encourage patronage quite often do extremely poor work, very dangerous work and a consumer is left is a worse position than whence begun.  Quality is not encouraged nor even necessary as the fixed prices/ punishment system created and perpetuated by the Defendants as a concerted group rewards the worst body shop at the same level as the very best.

396.    Certainly some body shops are successful.  But negative effects on competition are not weighed and measured by the effect on competitors, but on competition.

397.    In this case, the Defendants violations of state and federal law have effectively eradicated competition in the body shop industry.  The Defendants actions have had a wholly detrimental effect on the body shop industry and detrimental to the public.

## INTENTIONAL NATURE OF DEFENDANTS' WRONGFUL CONDUCT

398.    In 1963, a consent decree was entered in *United States vs. Association of Casualty and Surety Companies*, et al, Docket No. 3106, upon complaint filed in the Southern District of New York.  The allegations of that complaint included violations of Sections 1 and 3 of the

Sherman Act, also known as the Sherman Antitrust Act.  A copy of this Decree is attached hereto as Exhibit "5."

399.    Specific actions supporting those allegations included: (1) requiring repair rather than replacement of damaged parts; (2) replacing damaged parts with used rather than new parts; (3) obtaining discounts on new replacement parts; (4) establishing strict labor time allowances; (5) suppressing the hourly labor rate; (6) channeling auto repairs to those repair shops which would abide by the insurer estimates and boycotting those which refused.  The complaint further alleged a conspiracy and combination in unreasonable restraint of trade and commerce for these practices.

400.    The Consent Decree order provided the following relief: (1) enjoined the defendants from placing into effect any plan, program or practice which has the purpose or effect of (a) directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any independent or dealer franchised automotive repair shop with respect to the repair of damage to automobile vehicles; (2) exercising any control over the activities of any appraiser of damages to automotive vehicles; (3) fixing, establishing, maintaining or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automotive vehicles or for replacement parts or labor in connection therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

401.    The clear terms of the Decree apply to and are binding upon "each defendant and upon its officers, directors, agents, servants, employees, committees, successors and assigns, and

upon all other persons in active concert or participation with any defendant who shall have received actual notice of this Final Judgment by personal service or otherwise."

402.    Many of the named Defendants are members of the contemporary associations which are still bound by the Consent Decree's terms.

403.    1963 Defendant Association of Casualty and Surety Companies merged with the American Insurance Association ("AIA") in 1964 to form the "present-day AIA."

404.    As the successor organization upon completion of the merger in 1964, the terms and requirements of the 1963 Consent Decree are binding upon and enforceable against the AIA and its members, and all other persons in active concert or participation with the AIA, whether or not an actual member of the AIA.

405.    1963 Defendant American Mutual Insurance Alliance became the Alliance of American Insurers in 1977 when membership was opened to stock and other non-mutual insurance companies.  The Alliance of American Insurers subsequently merged with the National Association of Independent Insurers to form the present-day Property Casualty Insurers Association of America ("PCI").

406.    As the successor organization upon completion of all mergers to date, the terms and requirements of the 1963 Consent Decree are binding upon and enforceable against the PCI, its members, and all other persons in active concert or participation with the PCI whether or not an actual member of the AIA.

407.    As noted above, all but a few of the Defendants are known to be members of these organizations including Allstate, Liberty Mutual, GEICO, Progressive, Farmers (parent company of Defendants 21st Century, Bristol West, Foremost, Security National and Sentry) Southern

Farm Bureau (parent company of Defendants Florida Farm Bureau and Florida Farm Bureau

Casualty) among others.

408.    As such, it can only be said that Defendants were fully aware their actions, plans,

programs, and combinations and/or conspiracy to effectuate the same have been willful,

intentional and conducted with complete and reckless disregard for the rights of the Plaintiffs.

## CAUSES OF ACTION

### COUNT ONE: VIOLATIONS OF THE SHERMAN ACT - PRICE FIXING

409.    The United States economy rests upon open market systems in which vigorous

competition benefits individuals and businesses alike.  The federal government has long recognized

the necessity of public policies and a regulatory framework designed to foster and protect the free

market system from activities that restrict interstate commerce and/or marketplace competition. The

Sherman Act, passed in 1890 as U.S.C. §§ 1-7 and amended by the Clayton Act in 1914 (15 U.S.C.

§§ 12-27)  functions "not to protect businesses from the working of the market; [but] to protect the

public from the failure of the market.  The law directs itself not against conduct which is

competitive, even severely so, but against conduct which unfairly tends to destroy competition

itself." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993).

410.    The Sherman Act prohibits contracts, combinations or conspiracies in restraint of

trade. 15 U.S.C. §1. Such agreements are illegal if (1) their purpose or effect is to create an

unreasonable restraint of trade, or (2) they constitute a per se violation of the statute.

411.    Through parallel actions, and\or explicit agreement, the Defendants have formed and

engaged in a conspiracy or combination to impose maximum price limits upon the Plaintiffs for their

products and services.

412.     The United States Supreme Court has noted that agreements to fix maximum prices, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment. *Kiefer-Stewart Co. vs. Joseph E. Seagram and Sons, Inc.*, 340 U.S. 211 (1951).

413.     The Defendants and co–conspirators have engaged in combination and/or conspiracy in unreasonable restraint of trade and commerce in the automobile damage repair industry.

414.     The aforesaid combination and/or conspiracy has consisted of a continuing agreement in concert of action among the Defendants and co-conspirators to control and suppress automobile damage repair costs, automobile material repair costs through coercion and intimidation of these shops as shown by the "market rate" adopted by the Defendants as a group, though none are purported to have access to the survey conducted by only one of them; uniformity of prices fixed across vast geographic areas of the State of Florida though the "market rates" are purported to related to an undefined but specific geographic area;

415.     Evidence of this conspiracy or combination include, but is not limited to, uniformity of action in instances where Defendants should not have access to particular information; to wit, State Farm does not publish or make public its survey results, without mathematical value though it is, and the remaining Defendants do not conduct their own purported survey and yet reach the same "market rate" as State Farm.

416.     The Defendants all raise their "market rates" within days of State Farm raising their rates, although, again, these Defendants are not supposed to have access to State Farm's information.

417.     State Farm regularly and routine seeks to keep what it considers proprietary information, including internal training and assessment manuals, sealed from public view.

418.    The Defendants all utilize and admit the applicability of the body shop industry databases but regularly and routinely ignore the databases in the exact same fashion, i.e, calling the same procedures included operations when the databases say the opposite, denying the applicability of processes and procedures the databases states are necessary repairs, admitting the baseline application of the industry database but failing to conform to that minimum standard, numerous defendants telling different Plaintiffs each is the only one to perform or demand payment for the same set of processes, i.e., seat belt safety checks, detailing for delivery and denib and finesse.

419.    The aforesaid offenses have had, among others, the effect of eliminating competition within the automobile damage repair industry, elimination of some shops from a substantial segment of the automobile damage repair industry for refusing or attempting to refuse the Defendants' arbitrary price ceilings, harming consumer choice and public interests, subjecting repair shops to collective control and supervision of prices by the Defendants and co-conspirators.

420.    Neither the Plaintiffs, nor other members of the auto collision repair industry are able to engage in competitive business practices as the Defendants have effectively and explicitly determined what their business practices will be.

421.    The Defendants actions individually and certainly collectively have violated federal law and directly caused the Plaintiffs to incur substantial damages. Defendants are continuing and will continue said offenses unless the relief herein prayed for is granted.

## COUNT II

### VIOLATION OF THE SHERMAN ACT - BOYCOTT

422.    The Sherman Act makes every contract, combination, or conspiracy in unreasonable restraint of interstate commerce illegal.  26 Stat. 209, as amended, 15 U.S.C. §1.

423.    While most Sherman Act claims are analyzed under the rule of reason standard, some actions pose such a habitual unacceptable risk of restraining trade they are unreasonable *per se*. *Vacation Break U.S.A., Inc. v. Mktg. Response Grp.*, 169 F.Supp. 2d 1325 (M.D. Fl. Tampa Div. (Mar. 26, 2001).

424.    The United States Supreme Court has repeatedly held that group boycotts are *per se* violations of the Sherman Act.  See, *e.g.*, *United States v. Gen. Motors Corp.*, 384 U.S. 127, 86 S. Ct. 1321, 16 L. Ed. 2d 415 (1966); *Radiant Burners v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S. Ct. 365, 5 L. Ed. 2d 358 (1961); *Klor's, Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 79 S. Ct. 705, 3 L. Ed. 2d 741 (1959); *Fashion Originators' Guild Assoc. v. FTC*, 312 U.S. 457, 61 S. Ct. 703, 85 L. Ed. 949 (1941)(boycott designed to coercively influence trade practices, rather than to fully eliminate boycott victims from the market held still *per se* illegal).

425.    Those decisions that have rejected the *per se* rule generally applied to boycott activity in favor of a rule of reason analysis have been limited to circumstances where the conduct complained of may reasonably be shown to fall outside the rationale of the *per se* rule; that is, where the conduct arguably furthered a public policy goal such as improving market efficiency or increasing healthy competition.  See, *e.g.*, *U.S.A. v. Realty Multi-List, Inc*., 629 F. 2d 1351 (5th cir. 1980).

426.    Defendants' common scheme herein acts to restrain trade and diminish competition and market functionality for Plaintiffs and consumers.  Whether viewed under a *per se* rule or a rule of reason analysis, Plaintiffs allege herein a restraint of trade in violation of the Sherman Act.

427.     "Boycott" has been defined within the antitrust law context as "pressuring a party with whom one has a dispute by withholding or enlisting others to withhold, patronage or services

from the target." *St. Paul Fire & Marine Ins. v. Barry*, 438 U.S. 531, 541 (1978). "It does not matter how the end is achieved, if one or more firms is deprived of suppliers or customers (or other essential trade relationships) by concerted action among other firms aimed at keeping the victim firms from competing, the arrangement is in purpose and effect a boycott. *Id.* at 543 (citing L. Sullivan, Handbook of the Law of Antitrust 231 (1977)).

428.    Each of the Defendants have actively participated in, and gained economic advantage from, a common scheme, agreement, or conspiracy designed to pressure, intimidate, and/or coerce each of the Plaintiffs into complying with the Defendants' price-fixing scheme.  This common scheme constitutes a continuing agreement, understanding, combination, and/or conspiracy to unreasonably restrain trade, so as to limit or exclude Plaintiffs' and customers' participation in the market.

429.    The common scheme involves multiple forms of illegal boycott activity including, *inter alia*, steering actual and potential customers away from Plaintiffs through knowing dissemination of false and misleading statements about Plaintiffs; manipulating delays and obstacles in approving, obtaining and paying for repairs obtained from Plaintiffs; threats that use of Plaintiffs' services will incur additional and greater out-of-pocket costs to customers; alteration and manipulation of the Defendants' referral and rating systems to limit or otherwise influence customer access to service providers.  Each of these forms of conduct individually constitutes an unreasonable restraint of trade and a *per se* violation of the Sherman Act §1.

430.    The enlistment of third parties in an agreement not to trade, as a means of compelling capitulation by the boycotted group, long has been viewed as conduct supporting a finding of unlawful boycott. *St. Paul Fire & Marine Ins. v. Barry*, 438 U.S. 531, 544-5 (1978).

431.    Defendants have enlisted, and continue to enlist third party consumers in need of auto repairs, as unwitting participants in their common scheme to coerce Plaintiffs . . .

432.    Defendants' ongoing conduct in furtherance of the common scheme to boycott, and thereby coerce, Plaintiffs has had substantial negative impact on the Plaintiffs' business practices and relationships, the ability of customers to freely obtain safe and full repairs, and the functionality of the relevant market.

433.    The Defendants actions are violations of federal law and have directly caused the Plaintiffs to incur substantial damages.   Defendants are continuing and will continue the aforementioned offenses unless the relief requested herein is granted.

## COUNT THREE:   TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

434.    Tortious interference with business relations occurs when a defendant engages in some act with malicious intent to interfere and injure the business of another.

435.    The Defendants have repeatedly engaged in malicious actions and a course of conduct designed to interfere with and injure the Plaintiffs' business relations and prospective business relations. The Defendants have repeatedly steered and attempted to steer customers who have either initiated or verbalized the intent to initiate a business relationship/transaction with a Plaintiff from the Plaintiffs' respective businesses through their repeated campaign of misrepresentation of facts, failure to verify facts damaging or tending to cause damage to the Plaintiffs business reputations before conveying the same to members of the public, and, inter alia,  implications of poor quality work, poor quality efficiency, poor business ethics and practices, and unreliability.

436 .   The purpose of these actions was twofold: to punish the Plaintiffs who complained about or refused to submit to the various oppressive and unilateral price ceilings the Defendants were

enforcing upon them, and to direct potential customers of the Plaintiffs to other vendors who would comply with the maximum price ceilings unilaterally imposed by the Defendants.

437.    Malicious intent is shown through the absence of legitimate business purpose in Defendants actions.  Without or without the defamatory statements, the Defendants have habitually and in concert paid the amount each pre-determined it would pay for a particular repair.  Whether or not a patron visited a noncompliant plaintiff or a fully compliant network shop, the end result was a forgone conclusion and therefore the Defendants actions can only be attributed to malicious intent to harms the Plaintiffs.

438.    Malice is further shown by Defendants failure to notify consumers who have initiated or announced the intention of initiating a business relationship with a Plaintiff of known quality issues or repeated instances of poor repairs of which it has actual knowledge while continuing to notify consumers of false statements, actions which serve no public interest or legitimate business interest.

439.    Agreement to boycott is shown by the Defendants knowledge of changed circumstances, i.e., when a Plaintiff has left another Defendants' direct repair program followed by defamatory and misleading statements to drive customers away from the defecting Plaintiff.  As this information is not publicly shared, the unaffected Defendants should not have knowledge of the actions of one shop with which it is not itself even informally associated. But unaffected Defendants do have knowledge and do act upon that knowledge as a concerted group with malicious intent to harm particular plaintiffs.

440.    Agreement of purpose is also shown by the identical nature of the falsehoods and misrepresentations utilized by the various Defendants in their boycotting and steering of customers

from Plaintiffs' places of business.  The nearly identical nature of the wording leads to a reasonable conclusion that an agreement was reached as to the most effective statements to use to the greatest effect.

441.    The Plaintiffs have been damaged by the Defendants malicious and intentional actions without privilege and in violation of law. Plaintiffs are therefore entitled to compensation for these damages.

## COUNT FOUR : QUANTUM MERUIT

442.    Quantum meruit rests upon the equitable principle that a party is not allowed to enrich itself at the expense of another. More specifically, the law implies a promise to pay a reasonable amount for the labor and materials furnished, even absent a specific contract therefore.

443.    Plaintiffs have performed valuable services and expended material resources with the reasonable expectation of payment\compensation for those services and materials. This is their business. Performing said services and expending material resources benefitted Defendants and Defendant's insured/claimants for whom Defendants are required to provide payment for repairs.

444.    Defendants reserved the unilateral right to give permission for each Plaintiff to commence work until such time and place as they deemed appropriate.  Although ultimate authority for such orders lies solely with the consumer, the Defendants asserted they were entitled to certain rights and privileges in advance of work actually commencing to preserve their own rights.

445.    Having reserved those right and affirmative extended  permission and direction, the Plaintiffs were reasonably entitled to rely upon the belief an equitable contract had been formed and should be fully performed.

446.    It was and has always been foreseeable the Plaintiffs were not performing labor or providing services and materials without expectation of full payment. However, Defendants have simply taken the position that payment may not be made unless they choose to provide it, regardless of any other factor or consideration and having fully exercised the extent of their rights, they have further enriched themselves at the expense of Plaintiffs by failing to compensate for work performed and materials expended upon the receipt of the Defendants agreement work could commence.

447    Plaintiffs are equitably entitled to receive payment for the materials and services rendered.

## **PRAYER FOR RELIEF**

448.    As a result of the Defendants' actions, Plaintiffs have been substantially harmed and will continue to suffer unless the relief requested herein is granted.  The Plaintiffs therefore pray for the following relief:

A.    Compensatory damages for all non-payment and underpayment for work completed on behalf of the Defendants' insureds and claimants as determined by a jury.

B.    Compensation for the lost revenue through artificial suppression of labor rates as determined by a jury.

C.    Damages sufficient to compensate Plaintiffs for lost business opportunities as determined by a jury.

D.    Treble damages, reasonable attorneys' fees and costs  for violations of the Sherman Act, as required under 15 U.S.C. § 15.

E.    Injunctive relief prohibiting the Defendants from further engaging in any of the following:

(1)    Placing into effect any plan, program or practice which has the purpose or effect of:

      (a)     directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any Plaintiff automotive repair shop with respect to the repair of damage to automobiles.

      (b)     fixing, establishing or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automobiles or for replacement parts or labor in connection therewith whether by coercion, boycott or intimidation, or by the use of flat rate or parts manuals or otherwise.

(2)     Placing into effect any plan, program or practice which explicitly requires or has the purpose or effect of requiring Plaintiffs to participate in any parts procurement program.

(3)     Providing untruthful and/or unverified information to customers or third persons regarding the quality, cost, efficiency or reputation of any Plaintiff ("steering").

(4)     Prohibiting Defendant State Farm from altering or amending any Plaintiff response to its market labor rate "survey" without the express written permission of the affected Plaintiff.

F.     Punitive and/or exemplary damages sufficient to punish Defendants for their intentional acts and deter each Defendant and similar entities from pursuing this improper conduct in the future.

G.     Pre- and post-judgment interest.

H.     Any additional relief the Court deems just and appropriate.

## CONCLUSION

While this matter has many aspects and trade terms, the essence of our claim is simply this:

In the American marketplace there are two types of body shops.  There are shops who strive to serve the customer, the owner of the car, and there are those shops who believe the insurance company is their customer.  The defendants have successfully created a "market" system that rewards

the body shops that will cut corners so they can increase profits and punishes body shops who are unwilling to compromise the quality or safety of the American consumers repair.

The whole intent of anti trust actions was and is to increase competition for the sole benefit of the American consumer.  Defendants' actions have violated the letter and the spirit of the law. Instead of providing the best quality repairs for the lowest cost they have fixed the costs to their utmost benefit and forced the market into a race to the bottom in terms of quality to the customer.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demands a judgment against all Defendants in an amount sufficient to fully compensate Plaintiffs for damages incurred as a result of Defendants' conduct with appropriate pre- and post-judgment interest, equitable relief as set forth above, punitive damages, attorneys' fees, expenses, costs and any other relief the Court deems the Plaintiffs entitled.

Respectfully submitted, this the 10th day of February, 2015.


**A & E AUTO BODY, INC., et al.**


/s/ *Allison P. Fry*

JOHN ARTHUR EAVES, JR.

ALLISON P. FRY,

John Arthur Eaves,
Attorneys at Law
101 N. State Street
Jackson, MS 39201
Telephone:     601.355.7961
Facsimile:     601.355.0530
JohnJr@eaveslaw.com
Allison@eaveslaw.com
Will@eaveslaw.com

Attorneys for the Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing *Plaintiffs' Second Amended Complaint* was filed electronically on the 10th day of February, 2015..  This filing will be served upon all ECF-registered counsel by operation of the Court's electronic filing system.  Parties and counsel may access this filing through the Court's system.

*s/ Allison P. Fry*
Allison P. Fry

JOHN ARTHUR EAVES, JR.,
ATTORNEYS AT LAW
101 N. State Street Jackson, MS 39201
601.355.7961 Tel
601.355.0530