A & E AUTO BODY, INC., *et al.*,                    **DISPOSITIVE MOTION**

     Plaintiffs,                    Case No. 6:14-CV-310-GAP-TBS
                               (MDL Case No. 6:14-md-2557-GAP-TBS)
v.

21ST CENTURY CENTENNIAL INSURANCE COMPANY, *et al.*,

     Defendants.
_____/

## CERTAIN DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

Certain Defendants ("Defendants") hereby move pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Plaintiffs' Second Amended Complaint ("SAC") with prejudice. The Defendants who have joined in this Motion are listed in **Exhibit A**, attached hereto.

## MEMORANDUM OF LAW

### I.    INTRODUCTION.

Plaintiffs' SAC fails to satisfy the controlling standards for pleading the Sherman Act and state law claims they seek to assert, fails to correct the legal deficiencies identified by this Court in its January 22, 2015 Order (Doc. 293), and in many instances repeats Plaintiffs' pattern of impermissible group pleading:

• In an effort to salvage their purported price-fixing claim, Plaintiffs have added allegations that the body labor and paints and materials rates paid by several Defendants to *only* 4 of the 20 Plaintiffs in certain towns or locations were the same as the rates paid by State Farm in 2013 and 2014. These few allegations show at most that there were parallel reimbursement rates among some insurers in transactions with a few of the Plaintiffs in a few places. Such unremarkable business conduct has repeatedly been held by this Court and other courts as inadequate as a matter of law to support an antitrust conspiracy claim.

• Plaintiffs' contention that there are "plus factors" that could impart factual support and

plausibility to their conscious parallelism theory is based on the same conclusory allegations rejected by the Court in its January 22 Order and by governing precedent. Plaintiffs have not alleged any factual scenario that could provide a basis for a plausible inference that the alleged parallel conduct implemented a preceding agreement or was inconsistent with any Defendant's independent self-interest in controlling costs.

• A few Plaintiffs have added a handful of allegations of purported steering conduct against a few Defendants to support their sweeping claim that all Defendants have engaged in an unlawful boycott. The SAC does not state a boycott claim for the same fundamental reason that the previous iterations fell short – vaguely asserted isolated examples of purported steering are not equivalent to a *concerted* refusal to deal. There are no factual allegations to support the claim that all Defendants conspired to refuse to deal with Plaintiff shops. Indeed, the allegations make clear that these Plaintiffs continue to do business with the Defendants.

• Plaintiffs have larded the SAC with apparent new claims that Defendants have conspired to fix the prices of replacement parts and to require shops to use aftermarket, salvaged, or recycled parts. Plaintiffs do not tie any of these allegations to any agreement by Defendants regarding reimbursement rates or otherwise; they fail even to allege parallel conduct, which fatally undermines their antitrust claims. These allegations also employ the same collective pleading technique the Court has twice rejected.

• Plaintiffs' third attempt to state a claim for tortious interference with business relations fails to remedy the deficiencies of their previous complaints. Plaintiffs continue to rely primarily on conclusory and generalized group pleading. As this Court has recognized, such collective pleading is insufficient to state a claim. The vast majority of Plaintiffs have failed to allege any tortious interference by any Defendant in any business relationship. To the extent a few Plaintiffs have added limited allegations regarding a few specific instances of purported tortious interference, those allegations fail to satisfy the essential requirement of "an actual and identifiable understanding or agreement" that an insured would return to a particular Plaintiff for future collision repairs, as is necessary to show a business relationship.

• Plaintiffs' attempt to plead a quantum meruit claim has not overcome the legal deficiencies noted by this Court twice before. As with their prior complaints, Plaintiffs' quantum meruit claim here fails "because the Plaintiffs have not conferred a benefit upon the Defendants." (Doc. 293 at 9.) Plaintiffs' quantum meruit claim also fails because Plaintiffs had no reasonable expectation of higher payments than they received from Defendants.

• Finally, many of the 39 Defendants who have now been named three times in Plaintiffs' complaints are identified as parties but barely mentioned, if they are mentioned at all, in the body of the SAC. Many other Defendants are connected to the lawsuit by a single cryptic allegation that their reimbursement rates were parallel to those of other Defendants. The SAC provided Plaintiffs with another opportunity to make specific factual allegations linking each Defendant to their claims. Instead, Plaintiffs have repeated their improper pattern of

generalized, conclusory group pleading.[1]

## II.    PLAINTIFFS' ANTITRUST CLAIMS (COUNTS ONE AND TWO) SHOULD BE DISMISSED.[2]

### A.    The SAC Fails to Allege an Antitrust Conspiracy.

The SAC merely describes in more detail the same implausible allegations that this Court already held insufficient to plead either a price-fixing conspiracy or a boycott under Section 1 of the Sherman Act, 15 U.S.C. § 1. A plaintiff alleging an antitrust conspiracy must adequately plead that the defendants "(1) entered into 'a contract, combination or conspiracy,' . . . (2) 'in restraint of trade or commerce,' and (3) that [the plaintiff] was damaged by the violation." *Moecker v. Honeywell Int'l*, 144 F. Supp. 2d 1291, 1300 (M.D. Fla. 2001) (citation omitted). Plaintiffs' Sherman Act claims still founder on the first requirement, as they have not alleged a plausible conspiracy of any kind among all or any of the Defendants.

Plaintiffs allege that Defendants imposed maximum price limitations for automobile repair services. (SAC ¶¶ 411, 414.) The "'crucial question,'" however, is "whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (citation omitted).[3] In its January 22, 2015 Order dismissing Plaintiffs' First Amended Complaint ("FAC"), this

---

[1] For the convenience of the Court, Defendants provide Exhibits B through G identifying Defendants that have not even been mentioned in the allegations concerning Plaintiffs' principal claims, and Plaintiffs that have failed to make any state law claims against Defendants.

[2] Defendants hereby adopt and incorporate the legal standards for a Rule 12(b)(6) motion set out in the Court's January 22, 2015 Order. (*See* Doc. 293 at 7-8.)

[3] *See also Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1205 (7th Cir. 1981) ("Section 1 of the Sherman Act does not preclude a party from unilaterally determining the parties with whom it will deal and the terms on which it will transact business.").

Court explained that "[a] showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, but it falls short of conclusively establishing agreement or itself constituting a Sherman Act offense. Because of this, stating a claim under § 1 of the Sherman Act requires 'a complaint with enough factual matter (taken as true) to suggest that an agreement was made.'" (Doc. 293 at 16 (citations omitted).)

To state a legally sufficient claim, the SAC must contain "'allegations plausibly suggesting (not merely consistent with) [a conspiracy or] agreement,'" *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1332-33 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 557), and must, but does not, offer "'enough factual matter (taken as true) to suggest that an agreement was made.'" (Doc. 293 at 17 (quoting *Twombly*, 550 U.S. at 556).) Allegations "that are 'consistent with conspiracy, but just as much in line with . . . rational and competitive business strategy' are insufficient." *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1308 (S.D. Fla. 2010) (quoting *Twombly*, 550 U.S. at 554). Plaintiffs bear "the burden to present allegations showing why it is more plausible that [defendants]—assuming they are rational actors acting in their economic self-interest—would enter into an illegal price-fixing agreement" when they could have reached the same result through "purely rational profit-maximizing behavior." *Jacobs*, 626 F.3d at 1342. "'[F]ormulaic recitations' of a conspiracy claim" are insufficient, and "'a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1294 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 557).

Like its predecessors, the SAC fails to meet the standards set by the Supreme Court and the Eleventh Circuit for pleading an antitrust conspiracy. The rate-fixing conspiracy al-

leged in the FAC was based entirely on Plaintiffs' general characterization of Defendants' conduct as conscious parallelism, without so much as a single factual allegation that there were parallel rate reimbursement levels set by any Defendant. In the SAC, Plaintiffs have added some episodic allegations that some Defendants were reimbursing 4 Plaintiffs at the same body labor or paint and labor rates in 2013. (*See, e.g.*, SAC ¶¶ 168-78). These allegations set forth instances of parallel conduct that in itself is insufficient to support a conspiracy claim. (*See* Doc. 293 at 16.)

The SAC is, like the FAC, devoid of the necessary factual content that could offer a cognizable basis for an inference that the parallel reimbursement rates result from a preceding agreement among the Defendants. Because conclusory recitations of the elements of the claim are not presumed true at the pleading stage, *Am. Dental Ass'n*, 605 F.3d at 1294, Plaintiffs' continued failure to set forth factual allegations plausibly establishing an antitrust conspiracy requires dismissal of their antitrust claims as a matter of law.

1. **The SAC Does Not Allege an Express Agreement to Fix Reimbursement Rates.**

Plaintiffs contend that each of the 39 Defendants engaged in a conspiracy to fix maximum labor or paint and material rates. (*See* SAC ¶¶ 409-421.) In dismissing the FAC's conspiracy claims, this Court stated that, "aside from conclusory allegations that it exists, the Plaintiffs offer no details at all in the . . . Complaint about the alleged agreement, such as how the Defendants entered into it, or when." (Doc. 293 at 17.) The SAC has not cured these defects. Plaintiffs still do not allege or even attempt to allege facts reflecting what any Defendant might have done or said to form an explicit or implied agreement, or when or how an agreement might have been formed. They still do not allege a single communication be-

tween or among any 2 or 5 or 10 Defendants, much less all 39.

Indeed, despite this Court's explanation that parallel conduct does not suffice to show the sort of concerted action required by Section 1 of the Sherman Act (*id.* at 16-17, 19 n.12), Plaintiffs continue to allege that this supposed conspiracy may be founded on nothing more than conscious parallelism. (*See* SAC ¶ 411 ("Through parallel actions, and/or explicit agreement, the Defendants have formed and engaged in a conspiracy or combination to impose maximum price limits upon the Plaintiffs for their products and services.").)[4] In addition, like its predecessors, the SAC relies on antitrust buzzwords such as "price fixing" (*id.* ¶ 72), and repeated allegations that Defendants engaged in "concerted" action (*id.* ¶ 71), or acted "in concert, combination and by agreement" (*id.* ¶ 188), but again fails to offer any details about the nature, formation, or operation of the alleged agreement.

### 2. Allegations of Conscious Parallelism Do Not Warrant an Inference of Conspiracy.

The SAC predicates its claim of conspiracy on alleged parallel conduct among Defendant insurers with respect to reimbursement for auto repair labor and paint and material charges. Specifically, the SAC alleges that Defendants pay shops at body labor rates that State Farm pays. (SAC ¶ 167.)[5] As examples, Plaintiffs now allege that in 2013 a number of Defendants each paid 4 of the 20 Plaintiffs $42 per hour for labor and $24 per hour for paint and materials. (*Id.* ¶¶ 168-78.) Plaintiffs do not allege when or in what circumstances these Defendants adopted the same prices. In one instance, the alleged rate paid for paint and ma-

---

[4] This Court previously singled out Plaintiffs' use of the phrase "*parallel actions*, and/or explicit agreement" in holding that "Plaintiffs themselves suggest that the Defendants might have been acting in response to perfectly lawful motivations." (Doc. 293 at 18, 19 n.12 (emphasis in original).)

[5] The SAC, unlike the FAC, does not allege that other Defendants made "explicit statements" that they will "conform to State Farm's unilaterally imposed payment structure." (Doc. 293 at 17.)

terials, $24, is actually the posted rate requested by the Plaintiff body shop. (*See* SAC ¶ 176 (Plaintiff Premier Paint and Body).)[6] Labor and paint and material rates are, according to Plaintiffs, two of the components of their pricing for repairs.

Plaintiffs ask the Court to infer that these few instances of alleged parallel rates were the result of an "agreement." (*See id.* ¶ 188.) Based on nothing more than rank speculation, they allege that the only possible explanation why some Defendants could pay the same rate that State Farm was paying body shops is that State Farm provided its rate to the other Defendants. (*Id.* ¶¶ 181, 183.) They do not, however, allege when, how, by what means or to whom State Farm made such communications.

Courts have uniformly declined to draw such unwarranted inferences of conspiracy from mere consciously parallel conduct. *See*, *e.g., Twombly*, 550 U.S. at 553-54 (holding insufficient allegations of conduct "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market"); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1298-99 (11th Cir. 2003) ("it is important to distinguish at the outset between collusive price fixing, i.e., a 'meeting of the minds,' to collusively control prices, which is prohibited under the Sherman and Clayton Acts, and 'conscious parallelism,' which is not").

Just as in *Twombly*, there are obvious explanations here of how and why insurers would wish to and could know the rates paid by their competitors. Many, perhaps all, De-

---

[6] Plaintiffs allege that all Defendants insisted on paying the "market rate," specified by each insurer as what State Farm pays (SAC ¶ 167), but Plaintiffs do not mention the prices paid to any Plaintiffs by 13 of the Defendants. (*See* Exhibit C; SAC ¶¶ 168-79.) Exhibit D is a list of the Defendants not alleged to have paid parallel paint and material rates.

fendants engage with Plaintiffs and other body shops in hundreds of transactions every day in the ordinary course of business. The rates body shops charged or were paid are an integral part of these transactions. Body shops doing business with State Farm across Florida, including Plaintiffs, all would possess State Farm's rates in the ordinary course of business, just as they would know the rates paid by other insurers with whom they do business. Moreover, Plaintiffs allege that most insurers have DRP agreements, which they concede to be unobjectionable in and of themselves (SAC ¶¶ 126, 130), and which purportedly require pricing concessions or most favored nations provisions (*id.* ¶ 131). Thus, the alleged fact that State Farm's rate was well-known among both body shops and the insurers with whom they regularly transact is unsurprising. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) ("Similar contract terms can reflect similar bargaining power and commercial goals (not to mention boilerplate); similar contract language can reflect the copying of documents that may not be secret; similar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy . . . "). Plaintiffs do not allege that the State Farm surveys by which State Farm set its rates were anything other than State Farm's unilateral conduct. They affirmatively allege that State Farm took measures to protect the confidentiality of its surveys, not that it used the survey to communicate with other Defendants about rates. In any event, the other Defendants did not need to know any of that information or to conduct their own surveys to know what State Farm actually paid body shops.

### 3. The SAC Completely Fails to Allege Any Facts to Support an Inference that Defendants Conspired to Fix Reimbursement Rates.

*Twombly* makes clear that, "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply

facts adequate to show illegality." 550 U.S. at 556-57. Rather, allegations of parallel conduct must be "placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557.

          **(a)**     **The Parallel Conduct Alleged in the SAC Cannot Itself Provide a Plausible Basis for an Inference of Conspiracy.**

None of the newly added allegations, separately or in context, raise a suggestion of a preceding agreement among Defendants to fix reimbursement rates. There is no factual context to suggest that Defendants agreed to adopt State Farm's price limitations. Indeed, Plaintiffs' core allegation is simply the self-defeating generalization that after State Farm, the alleged market leader, adopted a price structure for labor rates, the other Defendants at some point thereafter refused to pay more than State Farm. Following a price leader does not suffice to prove the existence of an agreement. *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 910 (6th Cir. 2009); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) ("merely charging, adopting or following the fees set by a Consortium is insufficient as a matter of law to constitute a violation of Section 1 of the Sherman Act"); *Quality Auto Body*, 660 F.2d at 1200 (antitrust conspiracy could not be inferred from defendants' "adherence to a 'common formula' for calculating damage estimates" for automobile repairs).

Plaintiffs have failed to plead facts that would render it plausible to infer a conspiracy in light of the competing and far more plausible inference that it was in the rational, independent business interest of State Farm to demand lower prices and of other insurers to refuse to permit a body shop to charge them more than the shop was charging State Farm. *See Twombly*, 550 U.S. at 554 (allegations that are "consistent with conspiracy, but just as much in line with . . . rational and competitive business strategy" do not suffice); *Am. Dental Ass'n*,

605 F.3d at 1295 (alleged parallel conduct that is not "inconsistent with the independent pursuit of [defendants'] own economic self-interest" "is equally indicative of rational independent action as it is concerted, illegitimate conduct" and cannot support a conspiracy claim).

In applying these principles to the FAC, this Court ruled that Plaintiffs' allegations of purported statements by insurers that they would pay no more than State Farm did not give rise to an inference of a prior agreement:

> It is not illegal for a party to decide it is unwilling to pay a higher hourly rate than its competitors have to pay, and the fact that a number of the Defendants made statements to that effect does not tip the scales toward illegality. . . . Without more, statements such as these suggest that the party is acting out of its own economic self-interest rather than because of an agreement to fix prices, as required to violate § 1. . . . Plaintiffs themselves suggest that the Defendants might have been acting in response to perfectly lawful motivations.

(Doc. 293 at 18.) That same rationale applies to Plaintiffs' new allegations as to Defendants' purported statements that they would pay no more than the market rate. (SAC ¶ 167.)

### (b) The SAC Does Not Allege Any Factual Plus Factor Context Supporting a Plausible Inference of Conspiracy

The SAC provides no details regarding the supposed agreement or any "specific time, place, or person involved in the alleged conspiracies." *See Twombly*, 550 U.S. at 565 n.10.[7] Plaintiffs do not offer any "plus factors" that might make it plausible to infer a conspiracy from the alleged parallel conduct. *See Williamson Oil Co.*, 346 F.3d at 1301 (discussing need for plus factors). Plaintiffs simply recycle, at somewhat more length, the conclusory allegations the Court previously rejected.

---

[7] Tellingly, the SAC does not even mention the conduct of many of the Defendant insurers and barely mentions the conduct of certain others. (*See* Exhibits B to D.)

*Opportunities to Conspire (SAC ¶¶ 352-76).* In support of their theory that 39 different insurers conspired to fix the prices they would agree to pay for auto repairs throughout Florida, Plaintiffs point to Defendants' membership in various trade associations and standard-setting organizations. (*See id.* ¶¶ 353-76.) Unspecified meetings of these associations, Plaintiffs speculate, could have served as opportunities for high-level executives and officers of Defendants to get together and form a conspiracy. (*See id.* ¶¶ 357, 363, 371, 376.)

But mere opportunities to conspire do not plausibly suggest an agreement, particularly where the defendants had an independent, rational reason to be at the alleged meeting place. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 349 (3d Cir. 2010) (affirming dismissal where "neither defendants' membership in the CIAB, nor their common adoption of the trade group's suggestions, plausibly suggest conspiracy"); *In re Travel Agent*, 583 F.3d at 911 ("[A] mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement because [defendants'] presence at such trade meetings is more likely explained by their lawful, free-market behavior.").

Plaintiffs have not alleged facts that could have created an opportunity to conspire in the first place. They do not list or describe a single meeting of any of these associations, who attended, what contacts or communications occurred, or how any of these unspecified contacts or communications might be temporally or causally related to any of the purported parallel conduct that Plaintiffs allege. *See In re Travel Agent*, 583 F.3d at 910 (affirming dismissal where complaints did "not cite any specific meetings that involved both [defendants]"). Moreover, only 7 of the Defendants are members of the American Insurance Association (SAC ¶ 353), only 9 are members of the Property and Casualty Insurer Association of

America (*id.*), and only 8 are members of the Certified Automotive Parts Association ("CAPA"), which also includes body shop members, making its attractiveness as a conspiracy-planning location doubtful at best. Only 2 are members of the National Association of Mutual Insurance Companies ("NAMIC"). (*Id.* ¶¶ 353.) State Farm, which purportedly plays "a leading role" in the conspiracy (*id.* ¶ 82), belongs only to CAPA, NAMIC, and the Insurance Institute of Highway Safety ("IIHS"). (*Id.* ¶¶ 353, 361, 369-70.) There is not even a single association of which all Defendants are members, and several Defendants do not apparently belong to any of them.

*Common Motive to Conspire (SAC ¶¶ 377-84).* As before, the only motive Plaintiffs offer for the alleged price-fixing conspiracy is that it would be profitable for Defendants to pay less for repairs. (*See* SAC ¶ 377.) A profit motive is insufficient to articulate a common motive to conspire. *See White v. R.M. Packer Co.*, 635 F.3d 571, 582 (1st Cir. 2011) ("Taking as a given that all of the defendants had motive to conspire with one another to earn high profits, all such a motive shows is that the defendants could reasonably expect to earn higher profits by keeping prices at a supracompetitive level through parallel pricing practices.").

As this Court noted in dismissing the FAC, the fact that the parallel pricing conduct alleged by Plaintiffs is in the independent profit-maximizing self-interest of each Defendant insurer renders Plaintiffs' claim of conspiracy implausible. (*See* Doc. 293 at 18); *see also Jacobs*, 626 F.3d at 1342 ("Jacobs had the burden to present allegations showing why it is more plausible that TPX and its distributors—assuming they are rational actors acting in their economic self-interest—would enter into an illegal price-fixing agreement (with the attendant costs of defending against the resulting investigation) to reach the same result realized by

purely rational profit-maximizing behavior.").

*Action Against Self-Interest (SAC ¶¶ 385-88).* The SAC adds no coherent allegations that would show why, absent an agreement, it would be irrational for an insurer to ask body shops to lower their labor rates to the levels they charge a different insurer. Defendants set the amounts they will pay to reimburse for repairs regardless of which body shop their policyholders choose, and Plaintiffs concede that even when a shop wants to charge higher rates, Defendants simply refuse to reimburse for the higher charges. (*E.g.*, SAC ¶¶ 293-95.) Plaintiffs offer nothing to suggest that the ability or decision of a Defendant to refuse to pay higher prices than required by its insurance contract depended on the actions of other insurers.

Finally, Plaintiffs allege that, in mid-2014, GEICO and other unidentified insurers announced ***increases – not decreases – in the rates that they were willing to pay*** after State Farm increased its own, allegedly unpublished, market rates for labor and paint and materials. (*See id.* ¶¶ 182, 234.) According to Plaintiffs, this constitutes an unusual pricing movement that probably would not result from chance or independent responses to common stimuli. *See Twombly*, 550 U.S. at 556 n.4. However, it makes no sense, and is fundamentally inconsistent with the purported basis of this lawsuit, that insurers would allegedly agree to pay body shops *more* money. The body shops themselves knew about the increase and almost certainly would have been eager to tell GEICO and other insurers, who allegedly had refused to pay any more than State Farm, that State Farm had increased its market rate. The decisions of those insurers to pay more after State Farm had increased its market rate hardly indicates the presence of an agreement (and certainly did not prejudice Plaintiffs). *See In re Travel Agent*, 583 F.3d at 907 (refusing to infer conspiracy where defendants were not al-

13

leged to have received information about rate reductions before they were implemented). If anything, this example tends to show that pricing movements in the market are the result of independent rather than concerted action.

     **4.**     **Plaintiffs' New Allegations Regarding the Prices of Replacement Parts, the Types of Parts Used, and Reimbursement Policies for Various Repair Procedures Are Insufficient to Show Parallel Conduct, Much Less Support a Conspiracy Claim.**

Plaintiffs also have added or expanded a number of allegations concerning Defendants' payments for replacement parts (as distinguished from body labor or paint and materials rates), certain repair processes and procedures, and requirements for use of allegedly "substandard or dangerous" replacement parts. (SAC ¶¶ 72, 189.)[8] The SAC does not tie any of these allegations to any <u>agreement</u> by Defendants regarding parts reimbursement rates or policies concerning the types of replacement parts. To the contrary, these new allegations only underscore differences among the alleged reimbursement practices and parts replacement decisions of Defendants, rendering any alleged conspiracy or agreement implausible.

For instance, with respect to the type of replacement parts the shops are required to use, some Defendants write estimates specifying the use of "aftermarket" (non-OEM) parts. (*Id.* ¶ 102.) Some Defendants allegedly specify salvage parts. (*Id.*) Some Defendants are "exceptions." (*Id.*) With respect to parts procurement, some Defendants require parts to be ordered through the PartsTrader electronic marketplace. (*Id.* ¶ 103.) Other Defendants order the parts themselves and ship them to the body shop. (*Id.* ¶ 107.) Still others tell the body

_____

[8] The SAC is also replete with a catalog of other body shop grievances and accusations concerning matters having no apparent logical relationship to Plaintiffs' claims. Examples include DRP indemnity agreements (SAC ¶¶ 133, 259), "desk review" claims processes (*id.* ¶¶ 211-13), and disclosures of aftermarket parts (*id.* ¶¶ 250-54). These irrelevant allegations of various supposed practices by different insurers also are inconsistent with any notion of parallel conduct by Defendants.

shop which part to order from which vendor. (*Id.*) With respect to reimbursement practices, Plaintiffs allege that the Defendants base their estimates on different estimating software programs or independent appraisers. (*Id.* ¶¶ 196-201.) Defendants' decisions to reimburse for certain procedures also are based on different methods and appear to vary depending on the circumstances. (*See id.* ¶¶ 205, 207-08, 210-25.) Such pervasive variations hardly support even the SAC's general allegations of parallel conduct, much less give rise to a plausible inference of conspiracy or agreement. *See In re Elevator Antitrust Litig.*, 502 F.3d at 50-51 (affirming dismissal of claim that defendants conspired to fix the various terms of elevator repair parts and services for failure to show any parallel conduct in the first place).

Plaintiffs, on their third try, have still failed to "nudge" their antitrust conspiracy claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Plaintiffs' suggestion that their allegations entitle them to discovery that will enable them to repair the deficiencies in their claim (SAC ¶ 188) is wholly unwarranted. In the absence of "allegations that reach the level suggesting conspiracy" and of any "'"reasonably founded hope that the [discovery] process will reveal relevant evidence"' to support a § 1 claim," allowing this case to proceed to enormously expensive antitrust discovery would contravene the dictates of *Twombly*. *Twombly*, 550 U.S. at 559-60 (citation omitted).[9] Indeed, given Plaintiffs' "'repeated failure to cure deficiencies by amendments previously allowed,'" *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (citation omitted), Plaintiffs' antitrust conspiracy claims should be dismissed with prejudice as a matter of law.

---

[9] *See Dowdy & Dowdy P'ship v. Arbitron Inc.*, 2010 WL 3942755, at *3 (S.D. Miss. Oct. 6, 2010) (dismissing antitrust claims; complaint did not "offer a single fact to suggest that the defendants ever agreed to restrain trade, communicated regarding the restraint of trade, or shared a common intent to restrain trade" and did "not reveal when, where, or how the conspiracy was supposedly formed").

### B.     The SAC's Boycott Allegations Are Insufficient as a Matter of Law.

Count Two should be dismissed for the independent reason that Defendants' alleged conduct does not constitute a group boycott as a matter of law.  A group boycott under the antitrust laws requires proof of a *concerted refusal* to deal.  *See Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1568 (11th Cir. 1991) (a "group boycott" "describes a situation where two or more parties have agreed that each of them will '*refus[e]* to deal with a particular customer or customers'" (emphasis added; citation omitted)); *see also Quality Auto Body*, 660 F.2d at 1206.  Here, there is no legally cognizable allegation of concerted action.  (*See* Doc. 293 at 21 ("The Plaintiffs offer even less 'evidence' of an agreement to boycott than they did of an agreement to fix prices.").)

The conduct that Plaintiffs allege in apparent support of their boycott claim includes a smattering of allegations that a few Defendants attempted to steer policyholders to non-Plaintiff shops or told certain of their policyholders not to take their cars to certain shops.  As Defendants pointed out in their motions to dismiss the FAC, steering is not equivalent to a refusal to deal and, accordingly, cannot support a boycott claim.  Moreover, review of the allegations concerning these alleged episodes shows that they do not constitute even parallel, much less coordinated, conduct.  The SAC offers no facts to support the claim that 39 insurers agreed to refuse to deal with Plaintiffs in hundreds or thousands of transactions, much less any detail about when, how, or with whom agreements were or could have been made.[10]

---

[10] *See also Quality Auto Body*, 660 F.2d at 1206 (even if two insurers agreed to refuse to pay more than competitive price for automobile repairs, that agreement did not constitute a boycott); *Custom Auto Body, Inc. v. Aetna Cas. & Sur. Co.*, 1983 WL 1873, at *19 (D.R.I. Aug. 3, 1983) (body shop "at all times has been free to compete for the business of the defendant and its insureds by offering lower prices or higher quality services"); *Nationwide Mut. Ins. Co. v. Auto. Serv. Councils of Del.,*

Allegations concerning the purported impact of the alleged misconduct – for example, that Stewart Auto's volume of business with State Farm declined from $665,000 to $490,000 (SAC ¶ 318) – contradict the notion that even individual Defendants refused to deal with Plaintiffs. Moreover, the allegations concerning Stewart clearly suggest why Stewart's volume of business declined: Stewart left State Farm's DRP program and was no longer a "preferred provider." (SAC ¶¶ 317-18).

The boycott claim is also defective because the SAC does not provide factual allegations that explain the impact of the purported boycott on *competition*. "'[T]he purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market.'" *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1069 (11th Cir. 2004) (quoting *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 458 (1993)). Thus, "an antitrust plaintiff must show harm to competition in general, rather than merely damage to an individual competitor." *Id.* Here, the SAC fails to make a single allegation about how the purported steering detracted from competition among auto repair providers or in any other market.[11] Because Plaintiffs' allegations do not support a plausible boycott claim, Count Two should be dismissed with prejudice.

---

*Inc.*, 1981 WL 2053, at *2-4 (D. Del. Apr. 10, 1981) (discouraging insureds from using body shops "by telling them that their prices were too high, and by notifying the owners that Nationwide would not guarantee full reimbursement" did not constitute refusal to deal: there was "no suggestion of an outright refusal of Nationwide to deal with any repair shop," rather Nationwide had "simply refused to accede to what it considers to be defendants' excessive prices"). Plaintiffs cannot cure the deficiencies of their boycott claim by invoking the term "coercion." (SAC ¶ 428.) None of the alleged conduct comes close to coercion. *See Nationwide Mut.*, 1981 WL 2053, at *3 ("driving a hard bargain . . . hardly constitutes a form of 'coercion' cognizable under the antitrust laws").

[11] To the extent that Plaintiffs allege that the purported boycott is illegal under the rule of reason, Plaintiffs also fail to allege essential elements of a rule of reason claim. *Jacobs*, 626 F.3d at 1336.

## III. PLAINTIFFS' CLAIM FOR TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS (COUNT THREE) SHOULD BE DISMISSED.

Plaintiffs' third attempt to state a claim for tortious interference with business relations also fails as a matter of law. The elements of such a claim are: "(1) the existence of a business relationship that affords the plaintiff existing or prospective legal rights; (2) the defendant's knowledge of the business relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff." *Med. Sav. Ins. Co. v. HCA, Inc.*, 2005 WL 1528666, at *9 (M.D. Fla. June 24, 2005), *aff'd*, 186 F. App'x 919 (11th Cir. 2006). Such a claim "generally requires 'a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered.'" *Id.* (quoting *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994)); *see also* Doc. 293 at 14. Interference with a business relationship with "identifiable customers" must be alleged. *Ferguson Transp., Inc. v. N. Am. Van Lines, Inc.*, 687 So. 2d 821, 821 (Fla. 1996) (per curiam).

Plaintiffs' attempt in the SAC to allege a claim for tortious interference with business relations fails to remedy the deficiencies of their previous complaints. As with their original Complaint and FAC, Plaintiffs still rely primarily on impermissible group pleading, which is insufficient to state a claim under Florida law and Supreme Court precedent. Moreover, to the extent Plaintiffs have added limited allegations regarding a small number of specific instances of purported tortious interference involving specific identified customers, those allegations do not meet the essential requirements for pleading a claim for tortious interference.

### A. Plaintiffs Continue to Rely on Impermissible Group Pleading.

Plaintiffs continue by and large to rely impermissibly on generalized statements that

do not disclose which Defendant is alleged to have done what in tortiously interfering with which Plaintiff's purported business relations with which specific customer(s). (*See, e.g.*, SAC ¶¶ 261-265, 267-69, 293-301, 303-310, 312-336, 434-441.) As this Court has recognized, such generalized collective allegations do not state a claim for tortious interference against any Defendant.[12] (*See* Doc. 293 at 14 (dismissing FAC; stating that "[s]o far as the Amended Complaint discloses, the insureds to whom the Defendants made misrepresentations never had any contact with the repair shop that was being disparaged, much less an 'actual and identifiable understanding or agreement'"); *see also* Doc. 110 ¶ 4.)

For the great majority of the 39 Defendants, no specific instance of purported steering or tortious interference is alleged in the SAC. The few specific allegations of tortious interference, which are discussed in Point III.B below, "would not entitle any other plaintiff to a judgment" against any other Defendant. (*See* Doc. 110 ¶ 4 (dismissing original Complaint).) Accordingly, as matter of law, Plaintiffs' tortious interference claims should be dismissed with prejudice as to the Defendants against whom no specific instance of tortious interference is alleged.[13] (*See id.*) In addition, the claims of the 17 Plaintiffs who have provided no allegations whatsoever of any particular instance of tortious interference against any Defendant should be dismissed with prejudice.[14] (*See id.*)

---

[12] Moreover, the SAC includes numerous allegations about specific Defendants that do not relate to specific customers and specific transactions as to which Plaintiffs claim tortious interference. (*See, e.g.*, SAC ¶¶ 266, 302, 313-15.) Such allegations do not support the required element of an existing business relationship and do not state a claim for tortious interference.

[13] A list of these Defendants is provided as Exhibit E hereto.

[14] A list of these Plaintiffs is provided as Exhibit F hereto. In addition, even the handful of Plaintiffs that have attempted (unsuccessfully) to allege business relationships with identified insureds of specific Defendants (*see* Point III.B) have not thereby provided support for a claim against any other

**B. Plaintiffs' Additional Allegations Do Not State a Claim for Any Purported Specific Instance of Tortious Interference.**

In the SAC, Plaintiffs have added a limited number of allegations of tortious interference regarding 13 identified insureds or claimants. (*See* SAC ¶¶ 270-291.) None of these new allegations state a viable claim for tortious interference. As a threshold matter, as Plaintiffs concede, the allegations regarding 8 of the 13 identified customers show only "failed steering instances" (*id.* ¶ 293), where the insureds "refused" to take their cars to other repair shops. (*Id.* ¶¶ 281-92.) These allegations on their face do not support claims of tortious interference because there is no actual interference with a customer relationship and there are no damages. *See Med. Sav. Ins. Co.*, 2005 WL 1528666, at *9.

The five purported instances of tortious interference included in the SAC where specific, identified insureds or claimants (Carissa Stone, Ruby Srinivasan, Kathy Rivera, Michelle Niece, and Mary Davis) are alleged to have been "steered" to another shop also are deficient as a matter of law. Plaintiffs' allegations regarding these purported instances of tortious interference (SAC ¶¶ 270-280) do not satisfy the element of "the existence of a business relationship that affords the [particular body shop Plaintiff] existing or prospective legal rights." *See Med. Sav. Ins. Co.*, 2005 WL 1528666, at *9. Although a "'protected business relationship need not be evidenced by an enforceable contract,'" there must be allegations of "'an actual and identifiable understanding or agreement.'" *Duty Free Americas, Inc. v. Estee Lauder Cos.*, 946 F. Supp. 2d 1321, 1338 (S.D. Fla. 2013) (citation omitted); *see also* Doc. 293 at 14. "[A]bsent an identifiable agreement between a past customer and a plaintiff that

---

Defendant, and their claims against such other Defendants should also be dismissed with prejudice. *See* Exhibit G hereto.

the past customer would do business with the plaintiff again, a plaintiff's past relationship with a past customer cannot be the basis for the existence of a business relationship." *Duty Free America*, 946 F. Supp. 2d at 1338 (citing *Ethan Allen*, 647 So. 2d at 815). "[E]xisting business relationships that merely had the possibility of continuing" cannot support a claim of tortious interference. *Maxi-Taxi of Fla., Inc. v. Lee Cnty. Port Auth.*, 2008 WL 1925088, at *14 (M.D. Fla. April 29, 2008), *aff'd*, 301 F. App'x 881 (11th Cir. 2008); *see also Med. Sav. Ins. Co.*, 2005 WL 1528666, at *9 (insurer's "hope that some of its past insureds may choose to renew their policy" was insufficient; insurer "d[id] not allege any agreement with its existing insureds that they would renew their policies at the end of the current term.").

Here, as Plaintiffs' allegations demonstrate, none of the five identified insureds whose purported business relationship with a Plaintiff was allegedly disrupted had "an actual or identifiable understanding or agreement." (Doc. 293 at 14.) Plaintiffs do not allege that Ms. Stone (a GEICO insured) had any pre-existing relationship or contact with Plaintiff Express Paint and Body, much less an "actual, identifiable agreement." (*See* SAC ¶¶ 270-75.) Rather, she had simply "received several positive reviews of [Express]." (*Id.* ¶ 270.) Thus, any purported interference was not interference with a cognizable existing business relationship. *Med. Sav. Ins. Co.*, 2005 WL 1528666, at *9. Likewise, Plaintiffs allege no existing business relationship whatsoever between Progressive insured Ruby Srinivasan and Gunder's (SAC ¶ 275), or between Farm Bureau insured Mary Davis and A & E (*id.* ¶ 278). As to State Farm insured Kathy Rivera, Plaintiffs allege only that she was a "former customer of Plaintiff A & E," which is insufficient to support an actual, identifiable understanding or agreement or to create a protected business relationship. *See Duty Free Americas*, 946 F.

Supp. 2d at 1338 (requiring "an identifiable agreement . . . that the past customer would do business with the plaintiff again"); *Ethan Allen*, 647 So. 2d at 815.

Plaintiffs' allegations with regard to Allstate insured Michelle Niece (*see* SAC ¶ 276) also fail to state a claim for tortious interference. As an initial matter, the allegations describe a purported tortious interference by Allstate in a business relation between Ms. Niece and "Ideal Auto." Ideal Auto has not been named as a Plaintiff in the SAC or in Plaintiffs' previous complaints, and these allegations are therefore a nullity. Moreover, even if Ideal were a Plaintiff in this case, Plaintiffs' allegations regarding Ms. Niece would be insufficient to support a tortious interference claim. Plaintiffs merely allege that Ideal Auto "had performed work for Ms. Niece on prior occasions to her complete satisfaction." (*Id.*) As with their other alleged instances of tortious interference, Plaintiffs do not allege any "actual or identifiable understanding or agreement" that Ms. Niece would "do business with [Ideal] again." *Duty Free Americas*, 946 F. Supp. 2d at 1338; *see Ethan Allen*, 647 So. 2d at 815.

Plaintiffs attempt to avoid by dismissal by asserting they need discovery, contending that, "[b]ecause of the nature of such things, the vast majority of evidence of successful steering lies solely within the control and custody of the Defendants themselves." (SAC ¶ 292.) However, Plaintiffs themselves are the only ones who have facts as to whether or not they have a protectable business relation with a customer. Without the necessary element of a business relationship, allegations of "steering" do not support a claim for tortious interference. *See Duty Free Americas*, 946 F. Supp. 2d at 1338. Moreover, contrary to Plaintiffs' contentions, it is not "part of the nature of such things" for insureds and other customers of collision repair shops to have "actual and identifiable agreements" that they will return in the

event that they have another collision. Indeed, as a matter of common sense, whether an insured or customer will have another collision in the future is itself purely speculative, rendering a shop's hope of a continuing relationship inherently uncertain – in contrast to businesses in which repeat business is normal and anticipated. *Cf. International Sales & Serv., Inc. v. Austral Insulated Prods., Inc.*, 262 F.3d 1152, 1157-58 (11th Cir. 2002) (assuming business relationship; customer had ordered goods from plaintiff "an average of about one order every nine business days" for three years). Discovery will not provide Plaintiffs with evidence of the necessary "actual and identifiable agreements" that past customers would return.

Plaintiffs' tortious interference claim also fails to the extent that Plaintiffs improperly base that claim on the same purportedly anti-competitive conduct alleged in their failed boycott and price-fixing claims. (*See, e.g.*, SAC, Count III (Tortious Interference) ¶ 439 (alleging Defendants' purported "[a]greement to boycott" as part of Plaintiffs' tortious interference claim).)[15] Where, as here, a tortious interference claim is "grounded on precisely the same 'anticompetitive' behavior alleged in the failed antitrust claim, it cannot as a matter of law constitute tortious interference with a business relationship." *Metzler v. Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1364 (S.D. Fla. 1998) (citing cases). Accordingly, Plaintiffs' attempt to use their antitrust allegations to satisfy the requirement of "improper means" (Doc. 293 at 12-14) fails as a matter of law to show an *unjustified* interference with a business relationship. For all these reasons, Plaintiffs' tortious interference claim should be dismissed with prejudice.

---

[15] *See also, e.g.*, SAC ¶ 437 ("With or without the defamatory statements, the Defendants have habitually and in concert paid the amount each pre-determined it would pay for a particular repair."); *id.* ¶ 440 ("[a]greement of purpose" is "shown by the identical nature of the falsehoods . . . utilized by the various Defendants in their boycotting and steering of customers").

## IV. PLAINTIFFS' CLAIM FOR QUANTUM MERUIT (COUNT FOUR) SHOULD BE DISMISSED.

Plaintiffs' third attempt to plead a quantum meruit claim is just as legally insufficient as the quantum meruit claims asserted in Plaintiffs' original Complaint and FAC, which were both dismissed by this Court. As with the FAC, Plaintiffs' quantum meruit claim here fails "because the Plaintiffs have not conferred a benefit upon the Defendants." (Doc. 293 at 9.) Under the guise of group pleading, the SAC (like the FAC) alleges that the repairs Plaintiffs performed "benefitted Defendants and Defendant's [sic] insured/claimants for whom Defendants are required to provide payment for repairs."[16] (SAC ¶ 443; *see also* FAC ¶ 135.) However, like the FAC, the SAC "provides no support for this assertion." (Doc. 293 at 9.) As the Court aptly stated, the repairs of insureds' vehicles at issue "obviously provided a benefit to the owners of the vehicles. But so far as the . . . Complaint discloses, the only effect of such a repair on the insurance company is the incurring of an obligation to pay for it." (*Id.*) As the Court recognized, that is hardly a benefit to the insurers. (*Id.*) Moreover, even to the extent that an obligation to pay could be construed as a "benefit," it is "certainly not something that has been conferred . . . by the repair shop." (*Id.* at 10.)

Plaintiffs' quantum meruit claim fails for the further reason that Plaintiffs had no reasonable expectation of higher payments than they received from Defendants. *See Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1195 (11th Cir. 2009) (quantum meruit in Florida

---

[16] Plaintiffs' reliance on impermissible group pleading flatly contravenes the Court's Orders directing Plaintiffs to provide "individualized allegations" to support their state law claims such as quantum meruit. (*See* Doc. 110 ¶ 4; Doc. 293 at 6 & n.8.) In their SAC, Plaintiffs entirely fail to provide the individual supporting factual allegations that would be required to show that the elements of their quantum meruit claim are met with respect to any of the individual repair transactions at issue. Plaintiffs' continued failure to plead with the required specificity warrants dismissal of their quantum meruit claim for this reason alone.

"'requires that plaintiffs demonstrate an expectation of compensation'" (citation omitted)); *Absolute Marine Towing & Salvage v. S/V Iniki*, 2010 WL 2652466, at *2 (M.D. Fla. June 22, 2010) (Presnell, J.) (similar). According to the SAC, Defendants made clear to autobody shops the amounts they would pay for repairs. (*See, e.g.*, SAC ¶¶ 105, 114, 133-34, 138, 140, 145, 151, 229.) Indeed, Plaintiffs' allegations show that the same or similar DRP agreements and pricing practices have existed for many years and are well known to body shops. (*See, e.g.*, *id.* ¶¶ 125-34, 138, 145, 184-85, 189, 398-401.) There can be no plausible claim that, when Plaintiffs took on repairs, they expected higher payments than they received.

As Magistrate Judge Smith has ruled in recommending dismissal of the nearly identical quantum meruit claims asserted in the Mississippi and Indiana actions, "Defendants' repeated and persistent refusal to pay the amounts demanded by Plaintiffs makes unreasonable any expectation on the part of Plaintiffs that Defendants would abruptly begin paying the amounts Plaintiffs believe their services are worth." (*Capitol Body Shop*, No. 6:14-cv-06000, Doc. 82 at 10, *adopted*, Doc. 83; *accord Indiana Autobody Ass'n*, No. 6:14-cv-06001, Doc. 145 at 7-8.) Moreover, given that Plaintiffs had no reasonable expectation of higher payments, there is no inequity in rejecting their quantum meruit claim. *Cf. Tooltrend, Inc. v. CMT Utensili, SRL*, 198 F.3d 802, 806-07 (11th Cir. 1999) (expectation of compensation "relevant to the question of whether it would be unjust to retain a benefit").

## V. CONCLUSION

After three tries, it is apparent that any further amendment of Plaintiffs' Complaint would be futile. Accordingly, the Court should dismiss all of Plaintiffs' claims against Defendants with prejudice. *See Corsello*, 428 F.3d at 1014.

Dated:  March 4, 2015

Respectfully submitted,

*/s/ Johanna W. Clark*
Johanna W. Clark
CARLTON FIELDS JORDEN BURT, P.A.
450 S. Orange Ave., Suite 500
Orlando, Florida 32801
Telephone: (407) 849-0300
Facsimile: (407) 648-9099
Email: jclark@cfjblaw.com

Michael L. McCluggage
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Telephone: (312) 660-7600
Facsimile: (312) 692-1718
E-mail: mmcluggage@eimerstahl.com

Michael P. Kenny
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: 404-881-7000
Facsimile: 404-881-7777
Email: mike.kenny@alston.com

*Attorneys for Defendant State Farm Mutual*
*Automobile Insurance Company*

*/s/ Richard L. Fenton*
Richard L. Fenton (admitted *pro hac vice*)
Mark L. Hanover (admitted *pro hac vice*)
Dentons US LLP
233 S Wacker Dr, Suite 7800
Chicago, IL 60606
Tel: (312) 876-8000
Fax: (312) 876-7934
Email: richard.fenton@dentons.com
Email: mark.hanover@dentons.com

Bonnie Lau
Dentons US LLP
525 Market Street, 26th Floor
San Francisco, CA 94105-2708
Telephone: (415) 882-5000
Facsimile: (415) 882-0300
bonnie.lau@dentons.com

Lori J. Caldwell (Florida Bar No. 026874)
Rumberger, Kirk & Caldwell, PA
300 S Orange Ave, Suite 1400
PO Box 1873
Orlando, FL 32802-1873
Tel: (407) 839-4511
Fax: (407) 835-2011
Email: lcaldwell@rumberger.com

*Attorneys for Defendants*
*Allstate Fire and Casualty Insurance*
*Company, Allstate Insurance Company,*
*Encompass Indemnity Company, and*
*Esurance Property & Casualty Insurance*
*Company a/k/a Esurance Insurance*
*Company*

*/s/ David L. Yohai*

David L. Yohai (admitted *pro hac vice*)
John P. Mastando III (admitted *pro hac vice*)
Eric Hochstadt (admitted *pro hac vice*)
WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: 212-805-3000
Facsimile: 212-805-3007
Email: david.yohai@weil.com
Email: john.mastando@weil.com
Email: eric.hochstadt@weil.com

*Counsel for Defendants 21st Century
Centennial Insurance Company, 21st
Century Indemnity Insurance Company,
Bristol West Insurance Company, Foremost
Insurance Company Grand Rapids,
Michigan, and Security National Insurance
Company*

*/s/ Timothy J. Rooney*

Timothy J. Rooney (admitted pro hac vice)
Norman K. Beck (admitted pro hac vice)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
trooney@winston.com
nbeck@winston.com

Laura Besvinick
HOGAN LOVELLS US LLP
600 Brickell Avenue
Suite 2700
Miami, FL 33131
Telephone: (305) 459-6500
Facsimile: (305) 459-6550
Fla. Bar No. 391158
laura.besvinick@hoganlovells.com

*Counsel for Defendant
The Travelers Indemnity Company*

/s/ *Michael R. Pennington*
Michael R. Pennington
Bradley Arant Boult Cummings llp
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
205.521.8391
205.488.6391
mpennington@babc.com

*Counsel for Infinity Insurance Company, Inc. and First Acceptance Insurance Company, Inc.*

/s/ *Maria Elena Abate*
Maria Elena Abate
Fla. Bar No. 770418
COLODNY FASS, P.A.
One Financial Plaza, 23rd Floor
100 Southeast 3rd Avenue
Fort Lauderdale, Florida 33394
Telephone:(954) 492-4010
Facsimile: (954) 492-1144
mabate@colodnyfass.com

*Counsel for Florida Farm Bureau Casualty Insurance Company and Florida Farm Bureau General Insurance Company*

/s/ Hal K. Litchford
Hal K. Litchford (272485)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
SunTrust Center
200 South Orange Avenue
Post Office Box 1549
Orlando, Florida  32802
Telephone:  (407) 422-6600
Facsimile:  (407) 841-0325
Email*:  *hlitchford@bakerdonelson.com*

  -and-

Amelia W. Koch *(Admitted Pro Hac Vice)*
Steven F. Griffith, Jr. *(Admitted Pro Hac Vice)*
BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana  70170
Telephone:  (504) 566-5200
Facsimile:  (504) 636-4000
Email:  akoch@bakerdonelson.com
Email:  sgriffith@bakerdonelson.com

*Counsel for Defendants United Services*
*Automobile Association and USAA Casualty*
*Insurance Company*

/s/ Jeffrey S. Cashdan
Jeffrey S. Cashdan, admitted pro hac vice
Christine A. Hopkinson, admitted pro hac vice
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Facsimile: (404) 472-5139
jcashdan@kslaw.com
chopkinson@kslaw.com

/s/ Michael R. Nelson
Michael R. Nelson, admitted pro hac vice
Kymberly Kochis, admitted pro hac vice
Francis X. Nolan, admitted pro hac vice
NELSON BROWN & CO.
17 State Street, 29th Floor
New York, New York 10004
Telephone: (212) 233-0130
Facsimile: (212) 233-0172
mnelson@nelsonbrownco.com
kkochis@nelsonbrownco.com
fnolan@nelsonbrownco.com

*Counsel for Defendants*
*Progressive American Insurance Company*
*and Progressive Select Insurance Company*