# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

A & E AUTO BODY, INC.,        ET AL.,                          PLAINTIFFS

VS.                                          CASE NO.: 6:14-CV-310
                                      MDL DOCKET: 6:14-MD-2557

21ST CENTURY CENTENNIAL INSURANCE
        CO., ET AL.                                    DEFENDANTS

_____

## OMNIBUS RESPONSE TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

_____

COME NOW, Plaintiffs in the above-captioned cause, and submit this, their Omnibus Response to Defendants' Motion to Dismiss the Second Amended Complaint and state to the Court the following:

## INTRODUCTION

Defendants make a number of arguments as to why the Second Amended Complaint ("SAC") must be dismissed on Rule 12(b)(6) grounds for failure to state a claim. The vast majority of those arguments are mere duplications of arguments previously made and previously addressed by the Court. The Second Amended Complaint complies in every respect with the Order entered by the Court on 22 January 2015 for both federal and state law claims and, as such, Defendants' arguments are without merit.

In addition, Defendants continue to urge this Court to commit reversible error by misrepresenting explicit and unambiguous binding authority contrary to their arguments as to the degree of factual content required under Rule 8 of the Federal Rules of Civil Procedure. In other instances, Defendants inchoately urge this Court to commit reversible error by employing a higher

pleading standard because this case involves claims of antitrust violations, also in direct conflict with clear and unambiguous binding authority to the contrary.

Finally, Defendants again urge this Court to dismiss the SAC on the ground that Plaintiffs have not proven their case, failed to adduce evidence via the complaint and otherwise advocate for dismissal on what amounts to summary judgment standard in the procedural infancy of this case. This is error.

Additional individual arguments and/or statements are discussed more fully below where appropriate.  Arguments made by all filing Defendants are addressed as such.  Where a single Defendant asserts a unique argument, the Defendant is specifically identified.

### SHERMAN ACT CAUSES OF ACTION

### I.      Plaintiffs' SAC complies in all respects with the previous order of this Court regarding Sherman Act price fixing claim

On 22 January, 2015, this Court entered an order setting out additional facts it deemed necessary for sufficient pleading.

### A.      "Group" Pleading

The Court expressed concern that Plaintiffs' assertion that each factual allegation applies to each Defendant in light of the fact that some Plaintiffs are not associated with any of Defendants' direct repair programs ("DRPs") and others have never been so associated.

Plaintiffs addressed this concern in the SAC by clarifying that association with a DRP is not the basis of the Complaint.  To use a metaphor, DRPs are not the crime, they are one of the weapons in Defendants' arsenal.  (See, e.g., SAC ¶ 130.)

This was further elucidated by setting out the Defendants' enforce DRP terms against Plaintiffs who do not (and have never) associated with DRPs, as well as enforced by Defendants who never had a DRP.  (See, e.g., SAC ¶¶ 137, 144-48).

This is particularly enlightening as Defendants continue to assert no evidence of an agreement.  Yet Defendants without DRPs nonetheless are aware of and seek to compel compliance with DRP terms created by other insurers, indicative of sharing information by and between the Defendants as well as intentional agreement to uniformly enforce DRP provisions against the Plaintiffs.

As Plaintiffs have clarified DRPs are not a decisive factor but merely a tool of the Defendants, Plaintiffs have fully responded to the Court's previously set out concerns.  Defendants continued arguments on this point appear to merely disagree with the Court's prior order, a position which they had every opportunity to explore via a motion to reconsider which was never filed.  Arguments inferring the Court simply got it wrong are without legal merit.

B.      Sherman Act Price Fixing Claim

In its prior order, the Court acknowledged three critical points: (1) a combination or conspiracy in violation of the Sherman Act need not be made via an express agreement, but also by tacit action; (See Doc. 293, pg. 16) and (2) that circumstantial evidence of a combination or conspiracy is sufficient to infer an agreement; (*Id.*) and  (3) that evidence of parallel conduct constitutes circumstantial evidence of a combination or conspiracy in violation of the Sherman Act. (*Id.*)

I.      Facts alleged supporting a plausible basis for inferring the existence of an agreement

The Court pointed out, and the Plaintiffs have never asserted otherwise, that facts going towards supportive indications of a combination or conspiracy are required when the bulk of the outward behavior of the defendants display parallel conduct.  These are the "plus factors" identified by the United State Supreme Court.

There is no definitive or finite list of "plus factors."  Rather there are suggested considerations.  As the Supreme Court discussed, a plus factor may include, "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," as well as "conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement," and "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 FN4 (U.S. 2007).

Circuit courts around the country have identified specific "plus factors," a court may consider in addition to the Supreme Court's broad definition of a "plus factor."  These include, but are not limited to:

(1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether the defendants have been uniform in their actions; (3) whether the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether the defendants have a common motive to conspire. *Re/Max Int'l, Inc. v. Realty One, Inc.,* 173 F.3d 995, 1009 (6th Cir. 1999).  See also, In re Publ'n Paper Antitrust

Litig., 690 F.3d 51, 62 (2d Cir. 2012), *Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, 1999 U.S. App. LEXIS 21487 (4th Cir. 1999) and *Wilcox v. First Interstate Bank, N.A.*, 815 F.2d 522, 526 (9th Cir.1987).

Plaintiffs are not required to establish the entire universe of plus factors.  Rather asserting facts of only one is sufficient, "since plus factors are, by definition, facts that tend to ensure that courts punish concerted action—an actual agreement—instead of the unilateral, independent conduct of competitors." *Mayor & Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013).

In response to the Court's order, the Plaintiffs set out facts supporting a multitude of "plus factors." These include, but are not limited to, the following:

- <u>Market Power</u>:        Collectively, the named Defendants hold over ninety percent (90%) of the private passenger insurance market within the State of Florida. (See Exhibit "1," to SAC.

- <u>Motive</u>:        The Defendants shared a motive to conspire, profit. As the profit in this case reaches the billions of dollars, the motive is substantial (Complaint, ¶¶ 377-384).

- <u>Opportunity to conspire</u>:        The Defendants have numerous opportunities to conspire through their membership in trade associations (which, in turn, regularly work together), involvement with purported benificent organizations (e.g., IIHS) and similar organizations (Complaint, ¶¶ 352-376).

- <u>Uniformity of action by Defendants</u>:

  (A)        The Defendants all pay the same labor rates, calling it the "prevailing rate," though this rate has no correlation to rates actually charged (Complaint, ¶¶ 151-183, 227-232).
  (B)        The Defendants refuse to pay for the same processes and procedures required to return a vehicle to pre-accident condition (Complaint, ¶¶ 205-221, 223-25)
  (C)        The Defendants utilize the same "reasons" for refusing to pay for those processes and procedures required to return a vehicle to pre-accident condition (*Id.*)

(D)     The Defendants raise the labor rate price ceiling in uniformity and immediately following a change by State Farm (Complaint, ¶ 182).

(E)     All of the Defendants utilize the estimating databases, all refuse to pay or permit the same repair processes and procedures in contradiction of the databases they use themselves, for the same purported reasons (e.g., claim that denib and finesse is an included operation when database documentation clearly states to the contrary) (Complaint, ¶¶ 196-205, 215-220).

•      <u>Actions that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties</u>:

(A)     The State Farm labor rate survey is created from manipulated information, sometimes created out of whole cloth, then "calculated" utilizing a formula which bears no indicia of mathematical/statistical legitimacy (Complaint, ¶¶ 154-163)

(B)     State Farm does not publish or make publicly available it's purported survey results, even going so far as seal such information in other litigation, calling it proprietary, confidential and/or trade secret information (Complaint, ¶¶ 165-67)

(C)     None of the Defendants except State Farm even allege they conduct a market survey to determine the purported "market rate," yet each Defendant pays the same rate, claiming it is the "market rate" and that "market rate" is the rate State Farm has created through its manipulated and unpublished "survey" results  (Complaint, ¶¶ 167-73, 181, 183).

(D)     Despite conducting no independent fact gathering or analysis of their own, the Defendants quickly conform to rate changes set by State Farm, including conforming within twenty-four hours.  (Complaint, ¶ 182).

(E)     The Defendants rely upon the exact same excuses for refusing to pay for necessary processes and procedures, though those reasons are demonstrably false (e.g., assertions that a particular plaintiff is "the only one" to perform a particular procedure or to bill for that procedure when numerous plaintiffs have performed and/or billed for those same procedures), the reasons are contradicted by the databases the Defendants themselves use (Complaint, ¶¶ 205-209, 223-24).

As set out in the SAC, the statistical likelihood of the Defendants each independently arriving at the same labor rates is likely astronomical, particularly where, as here, the rates bear no connection to real rates as publicly posted by the Plaintiffs and there is no variability across the entire state, again, in contradiction of rates publicly posted by the Plaintiffs.

The likelihood of the Defendants each independently arriving at the same labor rates when they conduct no information gathering of their own is likely astronomical, particularly where, as here, the rates bear no connection to real rates as publicly posted by the Plaintiffs and there is no variability across the entire state, again, in contradiction of rates publicly posted by the Plaintiffs.

The likelihood of the Defendants each independently arriving at the same labor rates as State Farm without State Farm's sharing of its unpublished, purportedly confidential survey results is likely astronomical, particularly where, as here the rates bear no connection to real rates as publicly posted by the Plaintiffs and where, as here, State Farm's methodology is fatally flawed and scientifically invalid.

The likelihood of the Defendants each independently deciding to alter rates in conformity with State Farm's "survey" results, including within twenty-four hours, without State Farm advising of such in advance of or simultaneous with that decision is likely astronomical, particularly where, as here, the rates bear no connection to real rates as publicly posted by the Plaintiffs and State Farm consistently alleges its survey information is confidential.

The likelihood of the Defendants each independently deciding not to pay/fully pay for the same processes and procedures is likely astronomical, particularly where, as here, the databases they each utilize contradicts their expressed rationales.

The likelihood of the Defendants each independently deciding to utilize the same excuses and rationales for refusing to pay/fully pay for the same processes and procedures is likely astronomical, particularly where, as here, the databases they each utilize contradicts their expressed rationales, and shops were told each was "the only one" seeking payment for those processes and procedures when numerous Plaintiffs had billed for the same processes and procedures.

- Defendants' actions, if taken independently, would be contrary to their economic self-interest:  If only a single Defendant took the position that underpaying for repairs, compelling use of substandard and/or dangerous replacement parts, failing and refusing to pay for repairs that will return a vehicle to pre-accident condition and similar actions, that Defendant would find itself losing customers for insurers who do pay for full and proper repairs utilizing safe and appropriate parts.  (Complaint, ¶¶ 385-388).

Contrary to arguments asserted in their most recent motions to dismiss, the Plaintiffs are not required to allege facts that tend to exclude possible non-collusory or independent action by the Defendants to move beyond a motion to dismiss.  The Eleventh Circuit has specifically recognized this, going so far as to note a district court which dismissed upon this, among other, ground was in error.  The district court had misinterpreted a prior Eleventh Circuit ruling.  *City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 571 (11th Cir. 1998).  See also, *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010)("Defendants first argue that a plaintiff seeking damages under Section 1 of the Sherman act must allege facts that "tend[] to exclude independent self-interested conduct as an explanation for defendants' parallel behavior."[ . . .]  **This is incorrect**." (internal citations omitted, emphasis added).[1]

This is consistent with the obligation of the Court to accept the allegations of the complaint as true and construe them in the light most favorable to the plaintiff.  *Mills v. Foremost Ins. Co.*, 511

---

[1]The entirety of the Second Circuit's ruling reads:  Defendants first argue that a plaintiff seeking damages under Section 1 of the Sherman act must allege facts that "tend[] to exclude independent self-interested conduct as an explanation for defendants' parallel behavior." Appellee's Br. 15-17. This is incorrect. Although the Twombly court acknowledged that for purposes of summary judgment a plaintiff must present evidence that tends to exclude the possibility of independent action, 550 U.S. at 554, and that the district court below had held that plaintiffs must allege additional facts that tended to exclude independent self-interested conduct, id. at 552, it specifically held that, HN11to survive a motion to dismiss, plaintiffs need only "enough factual matter (taken as true) to suggest that an agreement was made," id. at 556; see also 2 Areeda & Hovenkamp § 307d1 (3d ed. 2007) ("[T]he Supreme Court did not hold that the same standard applies to a complaint  [**25] and a discovery record . . . . The 'plausibly suggesting' threshold for a conspiracy complaint remains considerably less than the 'tends to rule out the possibility' standard for summary judgment.").

F.3d 1300, 1303 (11th Cir. Fla. 2008).  Accepting statements of defendants in motions to dismiss and construing those statements in the light most favorable to defendant would contradict well-established rules of analysis.

Further, the Defendants variously attack individual facts which constitute a plus factor and attempt to recast them as independent business decisions, as if the SAC will fall by removal of a piece.  This avails the Defendants nothing.  In addition to the Plaintiffs having no responsibility to exclude Defendants possible defenses in the Complaint (see *Harcros*, above), the argument encourages the Court to view individual facts in isolation.  This is contrary to nationally accepted practice.

Having provided facts which meet numerous plus factors, the Court's concerns have been fully addressed.  This alone, should be sufficient, particularly when reviewing the facts in their totality.

ii.     The Plaintiffs complied with the Court's direction to provide detailed facts of the pricing structure

In its order, the Court found the payment structure was inadequately described.  (Doc. No. 293, pg. 17).  In response, the SAC set out in substantial detail the various components of body shop costs and revenue.  (Complaint, ¶¶ 83-124).  The SAC further set out in substantial detail the manner and methods by which the Defendants control, cap and otherwise fix prices for those respective components.  (Complaint, ¶¶ 125-260).

Having satisfied the Court's requirement on this set of facts, the Defendants' motions to dismiss are without merit.

<u>iii.     The Defendants are not legally permitted to refuse to deal with Plaintiffs</u>

Yet again, the Defendants argue the SAC must be dismissed because their refusal to deal with Plaintiffs is well within their legal rights and does not suggest evidence of a conspiracy.  This argument tends to be more closely relevant to the boycotting claim than price fixing, but whichever Count it most closely relates to, it is erroneous and the continued pressing of it is misleading to the Court for several reasons.

First, the Defendants are <u>not</u> free to refuse to deal with the Plaintiffs, particularly with respect to third-party claimant repairs.  The choice of repair facility belongs to the consumer.  The obligation and duty to pay for those repairs is not elective for the Defendants; they are not free to choose to which vehicles they will repair unless the vehicle meets the statutory definition of a total loss.

Second, The Defendants here are not the sellers, they are the payers and only the payers.  Under other circumstances, a seller may refuse to sell at a particular price, and a buyer may shop around for a better deal.  The Defendants are neither buyers nor sellers; their only obligation and concomitant right is to pay for repairs.

Third, "refusal to deal" considerations are only applicable to monopoly claims under Section 2 of the Sherman Act.  The Plaintiffs have not asserted a monopoly claim.  See, e.g., *United States v. Colgate & Co.*, 250 U.S. 300 (U.S. 1919), and Note, Delegation of the United States to the Competition Committee, Directorate for Financial and Enterprise Affairs Competition Committee, ROUNDTABLE ON REFUSALS TO DEAL, 12 October 2007.

As Plaintiffs have not asserted a monopoly claim, the Defendants' arguments on right to refuse to deal are legally barred.  Factually, the Defendants have no right to refuse to deal with the

Plaintiffs, nor has any Defendant identified any authority legally permitting one industry to unilaterally fix the prices of an entirely separate industry.

> iv.   Plaintiffs have alleged facts regarding acceptance of repair databases in compliance with this Court's previous Order

The Court previously noted the Plaintiffs did not place the Defendants' refusal to adhere to the databases in context suggesting a preceding agreement.  "They do not, for example, allege that the Defendants formerly accepted the databases as authoritative but around the same time, stopped doing so.  In fact, the Plaintiffs do not allege that any of the Defendants strictly abided by the databases."

In response to this concern, the SAC sets out in detail that the databases are accepted by the Defendants, identified which databases the Defendants currently use or have used in the past (with a few exceptions as noted within the SAC), and identified specific public endorsements of the databases.  (Complaint, ¶¶ 191-205).

The SAC further set out facts showing the Defendants selectively ignore the databases, i.e., refusing to recognize the very same processes and procedures in contradiction of the databases, give identical reasons for these refusals in contradiction of known facts (e.g., each Plaintiff is "the only one").  Inasmuch as the Defendants themselves utilize the databases for preparing their own estimates, the databases contradict the express statements of the Defendants, and each Defendant expresses identical reasons for their decision that are directly contrary to those databases, the only reasonable inference for the complete uniformity of behavior by the Defendants is a preceding agreement.

**II.   Plaintiffs' SAC complies in all respects with the previous order of this Court regarding Sherman Act boycotting claim**

-11-

With respect to the federal boycotting claim, the Court expressed concern that the Amended Complaint did not allege facts relative to "any Defendant refus[ing] to allow any of its insureds to obtain a repair from such a shop, or refus[ing] to pay for repairs performed at such a shop."

The concern was directly addressed in the SAC. The SAC provided factual details setting out specific instances where a named Defendant prohibited a customer from using a Plaintiff's services, i.e., requiring that customer to patronize another shop. Examples of that included but were not limited to:

- GEICO telling Carissa Stone she was not allowed to have her vehicle repaired at Plaintiff Express Paint & Body. (Complaint, ¶¶ 270-74).
- Progressive telling Ruby Srinivasan she was not allowed to have her vehicle repaired at Plaintiff Gunder's Collision. (Complaint, ¶ 275.)
- State Farm telling Kathy Rivera she was not allowed to have her vehicle repaired at Plaintiff A&E. (Complaint, ¶ 277.)
- Farm Bureau telling Mary Davis she had to have her repairs performed at one of its "program shops," and not Plaintiff A&E. (Complaint, ¶ 278.)

These facts satisfy the requirements set out by the Court in its 22 January Order. As was noted in the SAC, these are examples, and do not constitute the entire universe of successful boycotting by the Defendants. The information necessary to fully establish the breadth of Defendants steering is within the control and possession of the Defendants' themselves (Complaint, ¶ 292).

A complaint is not susceptible to dismissal where the evidence to prove a claim is within the control and possession of a defendant, not even under the heightened pleading requirements of Rule 9, which this case is not. See, e.g., *Craftmatic Sec. Litigation v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989)(Courts "must be sensitive to the fact that application of Rule 9(b) prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud.")

-12-

The only other factual concern expressed by the Court was evidence suggesting an agreement to boycott by the Defendants. The SAC also addressed this concern. The Plaintiffs provided facts showing:

- The Defendants' targeted specific shops for punishment, i.e., when a Plaintiff disassociated from one Defendants' DRP, that Defendant as well as others specifically began steering customers away from that Plaintiff, even though the Defendants should not have known of the disassociation or had any reason to care. Plaintiffs provided facts showing, e.g., when Plaintiff Stewart Auto left State Farm and Progressive's DRPs, not only did they experience steering from those two insurers, but several other insurers began steering as well, including Defendants USAA and Farm Bureau (Complaint, ¶¶ 322-33, 336-37).

- Defendants intentional and group targeting for punishment, particularly of shops who left DRPs, is further indicated by the timing of the boycotting, e.g., within ninety days of leaving all DRPs, Plaintiff A&E began experiencing boycotting by not only the Defendants whose DRPs it left (GEICO, State Farm and Liberty Mutual) but also eSurance and Farm Bureau (Complaint, ¶¶ 336-337).

- The Defendants targeted specific shops for punishment for refusing to comply with Defendants' price fixing, i.e., Plaintiff Elite Euro Cars, which has never been associated with any DRP, has experienced group boycotting by, among others, USAA, State Farm, 21st Century, Farmers, Progressive and eSurance (an Allstate subsidiary), simply because it insisted on being paid for the work it performed. (Complaint, ¶¶ 334-35).

- Facts also asserted show the boycotting of Plaintiffs was intentional and malicious, with intent to harm–while the Defendants boycotting Plaintiffs through false and defamatory statements, intentional misrepresentations and misleading innuendo, for which there was no factual basis, the Defendants were intentionally withholding information of shops that perform unsafe, inadequate and/or incomplete repairs while requiring or attempting to compel consumers to take their vehicles to those same shops for repairs. Defendants had actual knowledge of these unsafe, inadequate and/or incomplete repairs but withheld this information from consumers, e.g., GEICO did not disclose known unsafe repairs to the vehicle of consumer Carissa Stone by two of its preferred shops to which its steers customers; State Farm did not disclose the incomplete and unsafe repairs performed by its preferred shop on the vehicle of consumer Kathy Rivera. (Complaint, ¶¶ 338-45).

- The Defendant insurers use the same "script" to boycott targeted Plaintiffs, i.e., that shop is not on our "list," that shop overcharges, complaints about that shop have been received, if you use that shop the repairs will take too long and the consumer will run out of rental car time, the insurer can't guarantee the quality of work done at Plaintiffs' shops, a consumer is required to take their vehicle to a preferred shop for an estimate, and so forth.  (Complaint, ¶¶ 261-66).

These facts show that Defendant insurers acted as a group to punish and harm specific targets, the Plaintiffs.  The facts show that Defendants began steering and boycotting specific targets for no discernable legitimate reason, but did so immediately following an event, such as disassociating from a particular DRP, of which the other Defendants should have no knowledge or concern.   The Defendants utilize the exact same script for boycotting Plaintiffs.  The Defendants knowingly withhold factual information showing the shops to which they are steering consumers perform bad repairs, while simultaneously publishing false, defamatory and misleading statements about the Plaintiffs.

These facts show uniformity plausibly suggesting a preceding agreement, as well as intent to harm the Plaintiffs' specifically.

Having provided the information the Court required in its Order, the Defendants' arguments of insufficiency are without merit.

**III.    The facts asserted in the SAC are more than sufficient to deny the Defendants' Motions to Dismiss**

In addition to meeting the requirements of the Court's previous Order, the facts asserted in the SAC are consistent with sufficiency found by district courts within and without the Eleventh Circuit.

In *In re Marine Hose Antitrust Litigation*, the district court found the following allegations sufficient to withstand a motion to dismiss:

> [A]s discussed in the Omnibus Order on Motions to Dismiss, Plaintiff has alleged sufficient facts of an overall antitrust conspiracy. Moreover, unlike the First Amended Complaint, the Second Amended Complaint contains additional facts alleged against Defendant Scaglia. Specifically, Defendant Scaglia is alleged to have worked in the oil and gas unit of Defendant ITR. According to the Second Amended Complaint, Defendant Scaglia joined in and was an active member of the conspiracy while at ITR. Furthermore, Defendant Scaglia is alleged top have "communicated regularly by e-mail with cartel coordinator Whittle regarding prices to be charged for Marine Hose, and the jobs that ITR had been 'awarded' by the cartel and to lobby for additional jobs." Defendant Scaglia is further alleged to have continued to actively participate in and engage in conduct in furtherance of the conspiracy to fix the price of Marine Hose and to regularly communicate with Whittle, complaining for example, that Manuli was not being awarded sufficient work by the cartel.

*In re Marine Hose Antitrust Litig.*, 2009 U.S. Dist. LEXIS 133199, 10-11 (S.D. Fla. May 21, 2009)(citations to record omitted). These were the only facts alleged against this particular defendant and the court found them sufficient.

Also in that same case, the court found the following factual allegations sufficient to withstand dismissal:

> Specifically, according to the Second Amended Complaint, Defendant "Northcutt engaged in conduct in furtherance of the conspiracy, by inter alia, soliciting and coordinating bids through Whittle, receiving and following cartel bid instructions, quoting cartel-set prices for Marine Hose customers, and having regular discussions with Defendants Furness and Gillespie regarding Manuli's participation in the cartel." Plaintiff further alleges that Northcutt attended at least one cartel meeting in Japan in 2002.

*Id.* at *13 (citations to record omitted).

And:

> Specifically, ITR and its predecessors Pirelli Itala and Pirelli Treg are alleged to have been "active members of the conspiracy to fix, raise maintain and stabilize the price of Marine Hose in the United States through the Class period, including but not limited to those periods when it was owned by Pirelli, S.p.A. and Parker Hannifin. Plaintiff further alleges that "co-conspirator Romano Pisciotti ran ITR's Marine Hose business" and that Pisciotti attended cartel meetings and agreed with Defendants to

-15-

. . . fix prices for Marine Hose and to allocate among themselves the Marine Hose market."

*Id.* at *14-15 (citations to record omitted).

Florida District Courts have also found the following more than sufficient factual allegations to withstand a motion to dismiss:

> Plaintiff argues that Defendant pleads no relevant facts to state a cause of action of a violation of Section 1 of the Sherman Act. The Court disagrees. Count II alleges that Plaintiff acquired title to a competitor's patent (McNaughton Inc.) in order to restrain commerce in the relevant market, by requiring other competitors, like Defendant, to take a license from Plaintiff at an exorbitant royalty. Defendant also alleges that Plaintiff has acquired more than 10 patents covering plural chamber drinking cups, known as bombers or shooters, in order to obtain licenses from competitors at exorbitant rates. At this stage, this is sufficient to state a claim.

*Hurricane Shooters, LLC v. EMI Yoshi, Inc.*, 2010 U.S. Dist. LEXIS 127411 (M.D. Fla. Dec. 2, 2010).

> Plaintiffs' group-boycott allegations include the following: Over multiple encounters, representatives from Health First, including Defendants Senne and Means, expressly informed Plaintiffs that inclusion in HF Health Plans' provider network was conditioned upon exclusively referring patients to Health First's subsidiaries. The representatives further emphasized that physicians who were included in HF Health Plans' provider network were "not" to refer patients to excluded practice groups or their members. Members of excluded practice groups would be admitted into HF Health Plans' provider network and would be eligible for referrals from Health First's subsidiaries only if they left the excluded group and joined one that was more "friendly" or "loyal" to Health First—that is, "one in which the physicians had entered into exclusivity arrangements." Health First's representatives specifically named MIMA as an example of an independent but "friendly" practice group. When Plaintiffs refused to enter into exclusive referral arrangements, HF Health Plans excluded them from its provider network and, shortly thereafter, MIMA and other independent in-network providers stopped referring patients to them.
>
> Plaintiffs insist, and the Court agrees, that their meetings with Health First's representatives, coupled with their subsequent exclusion from HF Health Plans' provider network and "blacklisting" by its in-network providers, plainly provide

-16-

"context that raises a suggestion of a preceding agreement" to boycott physicians who refuse to enter into exclusive referral arrangements with Health First. *Twombly*, 550 U.S. at 557. That context provides enough "heft" to plausibly allege a conspiracy and not merely parallel action. See id. Defendants' motion to dismiss for failure to plausibly allege a conspiracy is therefore due to be denied.

*Omni Healthcare, Inc. v. Health First, Inc.*, 2015 U.S. Dist. LEXIS 7284, *45-47 (M.D. Fla. Jan. 21, 2015).

The quantity and specificity provided in Plaintiffs' SAC not only meets the necessary standard already in place in this Court, but far exceeds it, as a brief comparison between the allegations of the SAC and other complaints found more than sufficient establishes.

This Court's holdings as such are consistent with other courts. The Seventh Circuit affirmed the district court's denial of a motion to dismiss because the complaint alleged facts showing a mixture of parallel behaviors, details of industry structure, and industry practices, that facilitate collusion. The complaint further alleged the defendants belonged to trade associations which allowed them the opportunity to meet and conspire, alleged defendants raised prices when costs were falling, enacted a uniform pricing structure that simultaneously raised rates. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627-28 (7th Cir. 2010).

Bearing in mind the present case involves price suppression rather than price inflation, all of those same facts are alleged in the SAC–uniformity of prices imposed on the Plaintiffs, membership in trade associations and other organizations offering numerous opportunities to conspire, uniform changes in price ceilings, continued price suppression even in the face of documentation submitted by Plaintiffs their actual costs were rising (see, e.g., SAC discussion on paint and materials compensation) and numerous Defendants posted record high profits.

In *Starr v. Sony BMG Music Entertainment*, the court found highly persuasive facts alleging that defendants held over 80% of the market share. "[E]mpirical studies considering many industries have suggested that noncompetitive pricing [that may be the result of price coordination] is likely to appear when the four leading firms account for some 50 to 80 percent of the market." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 324 (2d Cir. 2010)(citing 7 Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law § 1431a (2d ed. 2003). In the present cause, the Defendants control over 90% of the market.

Also of note from *Starr* is the fact the court considered pending government investigation a highly relevant factor in assessing a probable conspiracy. *Id.* at 323. Although not referenced in the SAC, Plaintiffs' submit the Court may take note of another action in this MDL, *State of Louisiana v. State Farm, et al*, 6:14-cv-6017, wherein the state attorney general has not merely investigated the price fixing spearhead, State Farm, but has sued the State Farm entities for actions which duplicate and overlap those set forth in the SAC.

In summary, the Plaintiffs have supplied all facts requested of them by the Court. The facts alleged are far and away sufficiently ample to withstand Defendants' motions to dismiss, as shown by a simple comparison between the contents of the SAC and other cases where motions to dismiss were denied. The Defendants' motions are without merit.

## IV. The Plaintiffs are not required to set out facts establishing the specific time, place or person(s) involved in the combination or conspiracy

Defendants, particularly GEICO, have repeatedly urged that the Plaintiffs' complaints must be dismissed for failing to detail the specific time, place or persons involved in initiating the

conspiracy, agreeing to the conspiracy and so forth.  This Court has already declined to accept the

invitation of GEICO and other Defendants to improperly require such details.

Despite this, the argument continues to be urged, in both current motions and motions to

dismiss filed in the several companion cases collected within MDL 2557.  This argument is contrary

to applicable law.

> Defendants next argue that *Twombly* requires that a plaintiff identify the
> specific time, place, or person related to each conspiracy allegation. This is also
> incorrect. The *Twombly* court noted, in dicta, that had the claim of agreement in that
> case not rested on the parallel conduct described in the complaint, "we doubt that the
> . . . references to an agreement among the [Baby Bells] would have given the notice
> required by Rule 8 . . . [because] the pleadings mentioned no specific time, place, or
> person involved in the alleged conspiracies." 550 at 565 n.10. In this case, as in
> *Twombly*, the claim of agreement rests on the parallel conduct described in the
> complaint. Therefore, plaintiffs were not required to mention a specific time, place
> or person involved in each conspiracy allegation.

*Starr*, 592 F.3d at 325 (emphasis added).

This argument is contradicted by authority and is therefore without merit.

## V.      Plaintiffs are not required to allege an express agreement

As with the immediately preceding argument, this argument has been repeatedly pressed in

prior motions to dismiss and the Court has declined to impose this requirement.

Plaintiffs are not required to present evidence of an express agreement in their Complaint.

Plaintiffs are not even required to provide evidence of an express agreement to survive summary

judgment and proceed to jury trial.

"It is elementary that an unlawful conspiracy may be and often is formed without

simultaneous action or agreement on the part of the conspirators." *Interstate Circuit, Inc. v. United

States*, 306 U.S. 208, 227 (1939).  See also *United States v. Paramount Pictures, Inc.*, 334 So. 2d

131, 143 (1948)("It is not necessary to find an express agreement in order to find a conspiracy. It is enough that a concert of action is contemplated and that the defendants conformed to the arrangement.") See also, *William Inglis & Sons Baking Co. v. Itt Cont'l Baking Co.*, 668 F.2d 1014, 1055-56 (9th Cir. 1982), *Volasco Products Co. v. Lloyd A. Fry Roofing Co.,* 308 F.2d 383, 389 (6th Cir. 1962), *Ball v. Paramount Pictures, Inc*., 169 F.2d 317, 320 (3RD Cir. 1948) *Ross v. American Express Co.*, 2014 U.S. Dist. LEXIS 50550, *70-71 (S.D.N.Y. 2014)

As these cases demonstrate, it is generally accepted and understood across the national judiciary that only rarely will there be direct evidence of an express agreement.  Logic dictates this as conspirators are generally anxious to conceal their crimes and any direct evidence of unlawful agreements are solely within the possession or control of the guilty parties or they were not foolish enough to write down their illegal agreement.

Authority, both binding and persuasive, makes it extremely clear Plaintiffs are not required to plead, or even prove at trial, the existence of an express agreement amongst the conspirators.

**VI.     Plaintiffs are not required to set out specific facts connecting each and every
          Defendant with each and every element of each and every claim**

This, too, is an argument repeatedly pressed by a number of Defendants in prior motions and which the Court has not accepted.

Plaintiffs are required to set out sufficient factual matter to plausibly suggest a conspiracy. The Plaintiffs are <u>not</u> required to set out specific, detailed facts as the Defendants argue.  The United States Supreme Court has made this point quite clear.

 "[W]e hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement

does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Bell Atlantic Corp. v. Twombly*, 550 U.S.544, 556 (2007).

The Court further stated, quite clearly, that detailed factual allegations are <u>not</u> required under Rule 8 to defeat a Rule 12(b)(6) motion to dismiss.  *Id*. at 555.  This was apparently of sufficient importance the Court reiterated this holding with equal clarity just two years later:  "As the Court held in *Twombly*, the pleading standard Rule 8 announces <u>does not require "detailed factual allegations</u>," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added).

Several Defendants allege they are mentioned only a few times by name in the SAC and therefore should be dismissed.  None of the Defendants making this argument cite any authority for this proposition and presumably, the Defendants fail to meet their burden under the Federal Rules of Civil Procedure.

Beyond this, however, as noted above, the vast bulk of evidence proving the violations of federal law is within the possession and control of the Defendants.  The SAC alleges more than sufficient facts, taken as a whole, to establish a reasonable probability of agreement in violation of the Sherman Act.  That Plaintiffs presently know more details about some Defendants' illegal acts than others, does not excuse the acts of those who have been more successful at hiding their misdeeds.

## <u>STATE LAW CAUSES OF ACTION</u>

### VII.    Tortious Interference with Business Relations

"'An action for intentional interference with a business relationship or *expectancy* will lie if the parties' understanding would have been completed if the defendant had not interfered.'" *Ethan Allen, Inc., v. Georgetown Manor*, 647 So.2d 812, 815 (Fla. 1994) (citing *Charles Wallace Co. v. Alternative Copier Concepts, Inc.*, 583 So.2d 396, 397 (Fla. 2d DCA 1991)).  (Emphasis added.)

There must exist an "identifiable understanding… which in all probability would have been completed if the defendant had not interfered." *Ethan Allen, Inc.*, 647 So.2d at 815.  "'[T]he alleged business relationship must afford the plaintiff existing or prospective legal or contractual rights.'" *Id.* at 814.  "An action for intentional interference is appropriate even though it is predicated on an unenforceable agreement, if the jury finds that an understanding between the parties would have been completed had the defendant not interfered." *Id.*

Plaintiffs' Second Amended Complaint clearly satisfies this element of Tortious Interference with Business Relations as expounded upon under Florida law in the paragraph above, particularly in the light of the specific factual allegations set forth in paragraphs 269 –through- 279.  Contrary to the misleading indications and/or suggestions by certain of the Defendants in their Motions to Dismiss, these paragraphs obviously and explicitly set forth and sufficiently allege factual examples of the identifiable understandings that prospective identifiable customers possessed with regard to each of the prospective business relationships that would have been completed with the respective Plaintiff shops (and would have otherwise resulted in each Plaintiff shop with existing, as opposed to being left with prospective, contractual rights with regard to each such respective customer (*see Ethan Allen, Inc.*, 647 So.2d at 814)) but for the interference of the respective Defendants.[1]  (*See* e.g.,

---

[1] As revealed in the allegations of the Second Amended Complaint, under these circumstances and with retail/service oriented businesses such as the Plaintiff shops, a legally recognized prospective customer decides, of course, and then relays his/her intent, to complete an understanding with the particular Plaintiff shop.  The fact that a specific identifiable understanding actually exists is further substantiated due to the fact that under the retail/service oriented business –to- customer scenario, the business (here, the Plaintiff

customer/insured "told GEICO she was taking her car to Plaintiff Express Paint and Body for repairs" (¶ 270); customer/insured "told Progressive she was taking her vehicle to Plaintiff Gunder's Collision for repairs" (¶ 275); customer/first-party claimant "took her vehicle to Plaintiff Ideal Auto[2] for repairs" (¶ 276); etc.)  (It is important to note that Defendants have not cited one (1) case for their argument to the contrary that included a similar factual scenario to this case where specific examples of actual customers, understandings, and prospective business relations were identified and where the Court ruled, nonetheless, that such is not sufficient for purposes of a viable action for Tortious Interference with Business Relations;  all of the cases cited by Defendants where the Court ruled that there failed to exist any identifiable customers, understandings, and prospective business relations, involved factual scenarios where *not one (1)* identifiable customer, understanding, or prospective business relation existed and/or was alleged as part of that case.)

   If under such circumstances and clear allegations the Defendants' contrary arguments were adopted, then it logically follows as a matter of course that retail/service oriented businesses akin to the auto body repair shop industry (e.g., shoe stores, restaurants, hardware stores, athletic equipment stores, doctor offices, etc.), practically speaking, could never successfully bring a tortious interference with business relations case to protect their interests against similar wrongful conduct involving prospective customers, that damages and/or destroys their businesses.

---

shops) are already and always offering their services/products to that particular customer as a matter of course, as part of and *in addition to* the community at large (which "community at large", in contrast with the aforementioned legally recognized prospective customer, as a whole and otherwise, have not yet made such a decision or made it known to any person or entity, so that no such identifiable understanding yet exists).  (This, of course, is different than other business type scenarios where an identifiable understanding necessitates both parties specifically deciding and revealing at some identifiable point in time, and not all the time, their respective intents to enter into a business relation with one another  (e.g., prospective partnership agreements:  in most such circumstances, neither party is offering to partner at all times with just anyone from the community at large).
[2] Ideal Auto is the "d/b/a" for Plaintiff North Bay Auto Service, Inc.

Admittedly, as otherwise suggested in paragraph 292 of the Second Amended Complaint, it is comparatively more difficult under such circumstances involving the "steering" of customers in the retail/service oriented industry, to gather and specifically identify all the specific instances of such "steering" prior to being allowed to engage in discovery in a case.  This is so in many numerous instances prior to being allowed to engage in discovery, because even though as in this case (1) the understanding on the part of the prospective customer and (2) the prospective business relationship itself, actually do exist in reality for evidentiary purposes (and in the case *sub judice,* such understandings and prospective business relationships have actually been directly relayed to the respective Defendants by the customer/insured), nonetheless, the only way such specific identifiable instances of wrongful and successful "steering" are brought to the direct attention of the respective Plaintiffs is if, by chance, the successfully "steered" customer happens to come back to their shop for whatever reason and then happens to relay information of the wrongful conduct to them for whatever reason.

However, Plaintiffs, via the Second Amended Complaint, have been able to sufficiently plead and provide examples of identifiable customers and understandings under Florida law.  Contrary to the arguments of certain of the Defendants, though, given that such evidence allowing for specific identification have been obtained only by chance thus far, it is more than highly probable that many further specific identifiable instances of Defendants' wrongful conduct will be uncovered through the only other mechanism left for Plaintiff shops to make such specific discovery:  discovery itself in this case.[3] (That so much can be offered as evidence, as revealed by the examples set forth in the

---

[3] Contrary to certain of the Defendants' proposition to the contrary, the auto body repair industry is, in fact, a business "in which repeat business is normal and anticipated";  faithful customers, who are otherwise not successfully and wrongfully "steered", are abundant.

Second Amended Complaint, at this point even prior to discovery, further substantiates the great depth of egregious and pervasive wrong-doing on the part of the Defendants.)

For example, in the majority of the instances of wrongful "steering", only representatives of the Defendants currently possess the knowledge, documentation, and ultimate testimony substantiating the <u>specific and identifiable</u> instances of when, where, and who they attempted to wrongfully "steer", who they successfully and wrongfully "steered", from which auto body repair shops they wrongfully "steered" each particular customer/insured, and to which auto body repair shop each such customer/insured was wrongfully "steered".  It is a reasonable conclusion and clear from, *inter alia*, the specific examples set forth in the Second Amended Complaint that as egregious and pervasive as such examples already demonstrate, that this is just the "tip of the mammoth iceberg" of further <u>specific</u> identifiable instances that only discovery as part of this case will further bring to <u>specific</u> light.

"A pleading that states a claim for relief must contain:… a short and plain statement of the claim showing that the pleader is entitled to relief…"  Fed.R.Civ.P., Rule 8(a)(2).  As referenced above, the Plaintiffs' Second Amended Complaint obviously and explicitly sets forth and sufficiently alleges factual examples of the identifiable understandings that prospective identifiable customers possessed with regard to each of the prospective business relationships that would have been completed with the respective Plaintiff shops but for the interference of the respective Defendants. *See Ethan Allen, Inc.*, 647 So.2d at 814,815.

Moreover, as otherwise referenced in Plaintiff's Omnibus Response to Defendants' Motions to Dismiss Amended Complaint, Addressing the Florida Law Portions Only [Dkt. 284],  it is the known allegation of the Plaintiffs that *each and every* Defendant in fact engaged in *each and every*

-25-

wrongful conduct alleged against *each and every* Plaintiff, and such should be taken, *inter alia*, as a revelation as to the depth and magnitude of the injustice that is being engaged in, furthered, and perpetuated by the automobile insurance industry, a/k/a the Defendants, against Plaintiff shops and their industry.  The factual examples provided and alleged in the Second Amended Complaint reasonably and sufficiently substantiate such for purposes of the initial pleading stage. Providing further extensive examples of such will only be an unnecessary exercise in redundancy, particularly here and as part of the initial pleading stage.

In its 22 January 2015 Order, the Court directed the Plaintiffs set out facts that show the Defendants' tortious interference was not with the community at large.  Plaintiffs have done. Plaintiffs have asserted an identifiable class of consumers with whom the Defendants tortiously interfered–consumers who identified (or had even already initiated business with) the Plaintiffs as the body shop they had chosen to perform repairs (Complaint, ¶ ¶263, 280).

The SAC also set out several examples of this interference, both successful and unsuccessful. (Complaint, ¶¶ 266-291).

Thus, Plaintiffs have sufficiently pled a cause of action for Tortious Interference with Business Relations as part of the Second Amended Complaint.  Plaintiffs have provided the facts and information the Court stated it required.  Defendants' Motions to Dismiss are without merit with regard to same.

## VIII.   Quantum Meruit

The thrust of the Defendants Motions to Dismiss Plaintiffs' cause of action in Quantum Meruit, is that Plaintiffs did not confer a benefit on the Defendant insurers.  However, this is incorrect and not consistent with the totality of the underlying allegations.

        To that extent, it is indisputable that the Defendant insurers are paid monies in the form of premiums by their respective insureds; their respective insureds pay said monies to the Defendant insureds in exchange for Defendant insureds agreeing, *inter alia* and in general, to repair –OR- pay for the repair of the respective insureds' damaged vehicles; the Defendant insureds are then contractually obligated to repair –OR- pay for the repair of their respective insureds' vehicles; the Plaintiff shops are the entities that repair the vehicles for the insureds of Defendants; thus, and clearly, Plaintiff shops benefit Defendants by providing them with the needed opportunity to fulfill, and not otherwise be in breach of, Defendants' respective contractual obligation to have their respective insureds' vehicles repaired (and without this benefit of the Plaintiff shops, this contractual obligation cannot be fulfilled by the Defendants and Defendants would not be paid the premiums they are paid by their respective insureds; the Defendants *need* the Plaintiffs); the Defendants obviously possess knowledge of this benefit and have accepted and retained the benefit of the repairs that are conferred to each of them via their respective relationships, contracts and paid premiums with and from their insureds.  (*See Aceto Corp. v. TherapeuticsMD, Inc., et al.*, 953 F.Supp.2d 1269, 1288-1289 (S.D. Fla. July 16, 2013) (Where the Court allowed an unjust enrichment claim to stand where the benefit was conferred through a 3rd party or intermediary; "direct contact, or privity, is not the equivalent of conferring a direct benefit".)  (Citations omitted.))

        As is clearly set forth in the above paragraph, Plaintiff shops confer(red) a benefit on the Defendant insurers and do/did so before the Defendants pay/paid for repairs to their respective insureds' vehicles.  Thus and otherwise, the Second Amended Complaint sufficiently alleges, as part of an action in Quantum Meruit, that Plaintiffs possess a reasonable expectation of being paid by the

Defendant insurance companies for repair work they perform. *See W.R. Townsend Contracting, Inc., v. Jensen Civil Constr., Inc.*, 728 So.2d 297, 305 (Fla. 1st DCA 1999).

The only other argument made by the Defendants for dismissal of the Quantum Meruit claim appears to be, in summary, the following: that since Plaintiffs have known at different times the limitations of payment for repairs that are/were self-imposed by the Defendants upon the Plaintiffs before Plaintiffs did repairs, that therefore the Plaintiffs have no legal right to any greater or full payment or compensation for their work. This argument, however, is disingenuous and borders on the ridiculous: other than the wrongful "steering" engaged in by the Defendants, the fact that the Defendants have refused to rightfully pay and/or compensate Plaintiffs over many, many years and in such an egregious and extensive manner IS, "when the rubber hits the road", the very essence of this case.

That is the ultimate question posed and which is before this Court: under the applicable law, did the Defendants commit a wrong by, *inter alia*, failing and refusing to pay more than what they are/were willing to pay Plaintiffs for the repair work the Plaintiffs provide(d) and which full and greater pay the Plaintiffs reasonably expect(ed) pursuant to, *inter alia*, the law? (Of course, the Plaintiffs are confident under these circumstances that the answer is a resounding, "YES".) To effectively argue that since we told you we were going to "wrong you" and you knew we "wronged you", therefore you cannot seek justice for the wrongs committed --- that, either you take what we are willing to give you so you can make at least SOME money to stay in business or don't repair the vehicle for your customer at all, is, at a minimum, unwarrantedly and inexplicably audacious. Such argument on the part of the Defendants, of course, has no merit.

-28-

All of Defendants arguments fail to comport with the totality of the allegations asserted in the Second Amended Complaint with regard to Quantum Meruit, and the Defendants' Motions to Dismiss are without merit.

## CONCLUSION

In assessing a complaint pursuant to a motion to dismiss, "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. Mo. 2009).  See also, *McHale v. Water's Edge Ass'n, Inc.*, 2014 U.S. Dist. LEXIS 182258, 5-6 (S.D. Fla. 2014)("The Court does not view each fact in isolation; but rather considers the complaint  in its entirety. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)").

"The issue in considering such a motion is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of the claim. See *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989)." *Ursery v. Fed. DEA,* 2014 U.S. Dist. LEXIS 3925 (E.D. Mo. 2014).

In the present case, the Plaintiffs have provided the facts the Court has already determined are necessary and sufficient.  Having met this burden, the motions to dismiss are merely recycled themes the Court has declined to accept.  Taken as a whole, the facts set out by the Plaintiffs meet not only the Court's previous order but also exceed the necessary factual requirements for complaints in comparison to both those decided in this district but across the country.

The Defendants' arguments are without merit and the Motions to Dismiss should be denied.

Respectfully submitted, this the 25th day of March, 2015.


**A & E AUTO BODY, INC., et al**


**BY:**   /s/ Allison P. Fry
John Arthur Eaves, Jr.
Allison P. Fry
William R. Sevier

*Attorneys for the Plaintiffs*

John Arthur Eaves,
Attorneys at Law
101 N. State Street
Jackson, MS 39201
Telephone:    601.355.7961
Facsimile:      601.355.0530
allisonfry@bellsouth.net


<u>**CERTIFICATE OF SERVICE**</u>


The undersigned hereby certifies that a copy of the foregoing Motion for Extension of Time was filed electronically on 25th day of March, 2015.  This filing will be served upon all ECF-registered counsel by operation of the Court's electronic filing system.  Parties and counsel may access this filing through the Court's system.


*/s/ Allison P. Fry*

Allison P. Fry

-30-