A & E AUTO BODY, INC., et al.,

        **Plaintiffs,**

**v.**                                   **Case No:  6:14-cv-310-Orl-31TBS**

21ST CENTURY CENTENNIAL
INSURANCE COMPANY, et. al,

        **Defendants.**

_____

## ORDER

This matter comes before the Court on the motions to dismiss (Doc. 302, 306-308) filed by various Defendants, the response in opposition (Doc. 313) filed by the Plaintiffs, and the replies (Doc. 319-322) filed by various Defendants.

### I.      Background

This is the first-filed action in an MDL case involving two dozen suits, consolidated for pretrial purposes, in which collision repair shops across the country have accused many of the automobile insurers in their states of conspiring to suppress the reimbursement rates for collision repairs in violation of Section I of the Sherman Antitrust Act and various state laws.  The instant suit, which involves Florida repair shops and insurers, was filed in this Court on February 24, 2014.  (Doc. 1).  The initial complaint was dismissed on June 11, 2014 on the grounds that it was a prohibited "shotgun" pleading, that it failed to properly set forth the basis for this Court's jurisdiction, that it failed to identify which parties had ongoing contracts with one another, and that all of the allegations of wrongdoing were attributed, collectively, to every Defendant, even where such collective attribution made no sense.  (Doc. 110 at 1-2).

An amended complaint (Doc. 167) (henceforth, the "First Amended Complaint") was filed on June 28, 2014. The First Amended Complaint contained two Sherman Act claims and five state law claims. On January 21, 2015, this Court dismissed one of the state law claims with prejudice and the remaining claims (state and federal) without prejudice. (Doc. 291). On February 11, 2015, the Plaintiffs filed their Second Amended Complaint (henceforth, "SAC"). (Doc. 296). In it, they assert four claims: price-fixing in violation of the Sherman Act (Count I); boycott in violation of the Sherman Act (Count II); tortious interference with business relations (Count III); and quantum meruit (Count IV). By way of the instant motions, the movants seek dismissal with prejudice of all four claims.

## II.     Legal Standards

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief" so as to give the defendant fair notice of what the claim is and the grounds upon which it rests, *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957), *overruled on other grounds*, *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A Rule 12(b)(6) motion to dismiss for failure to state a claim merely tests the sufficiency of the complaint; it does not decide the merits of the case. *Milbum v. United States*, 734 F.2d 762, 765 (11th Cir.1984). In ruling on a motion to dismiss, the Court must accept the factual allegations as true and construe the complaint in the light most favorable to the plaintiff. *SEC v. ESM Group, Inc.*, 835 F.2d 270, 272 (11th Cir.1988). The Court must also limit its consideration to the pleadings and any exhibits attached thereto. Fed. R. Civ. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993).

The plaintiff must provide enough factual allegations to raise a right to relief above the speculative level, *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1966, and to indicate the presence of the

required elements, *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1302 (11th Cir. 2007). Conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal. *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court explained that a complaint need not contain detailed factual allegations, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id*. 678, 129 S.Ct. at 1949 (internal citations and quotations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the plaintiff is entitled to relief.'" *Id.* at 679, 129 S.Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

## III. Analysis

The Plaintiffs in this matter are 20 Florida automobile repair shops; the Defendants are 39 insurers who write private passenger automobile coverage here. In their roughly 90-page Second Amended Complaint, the Plaintiffs contend that the Defendants have

> engaged in an ongoing, concerted and combined intentional course of action and conduct to improperly and illegally control and depress automobile damage repair costs to the detriment of the Plaintiffs and the substantial profit of the Defendants.

(Doc. 296 at 11). The Plaintiffs go on to assert that the Defendants have

> intentionally combined to utilize their aggregated market power to exert control over every aspect of the collision repair industry, including but not limited to price fixing of labor rates, price fixing of replacement parts, compulsory use of substandard or dangerous replacement parts, compulsory use of a parts procurement program which directly financially benefits State Farm Defendants and indirectly benefits the remaining Defendants, boycotting shops which refuse to comply with either fixed prices or use of

substandard or improper parts, and interfering with Plaintiffs'
current and prospective business relations by intentionally
misrepresenting and making knowingly false statements regarding
the quality, efficiency and ethical reputation of Plaintiffs'
businesses, exerted economic duress and coercion upon both the
Plaintiffs to capitulate and upon consumers, including direct threats
to consumers to refuse coverage or portions of available coverage if
consumers persist in their efforts to patronize Plaintiffs' businesses.

(Doc. 296 at 11).

At the outset, it should be noted that the Plaintiffs have failed to indicate which assertions in the Second Amended Complaint are intended to support which of their claims.   None of the four counts explicitly incorporate any of the factual assertions set forth in the pleading.   Instead, the Plaintiffs' 70 pages of "Facts" are simply followed by 17 pages of "Causes of Action," leaving it up to the reader to divine which allegations the Plaintiffs believe to be relevant to any particular claim.[1]   Normally, the Court would remedy this shortcoming by requiring the Plaintiffs to replead.   But given the enormous amount of time it has already taken to get to this point in the proceedings, the Court will instead rely on the Plaintiffs' papers and its own assessment of the document to resolve the instant motions.

## A.    Count I – Price Fixing in violation of the Sherman Act

In their first count, the Plaintiffs assert that the Defendants, "[t]hrough parallel actions, and/or explicit agreement … have formed and engaged in a conspiracy or combination to impose maximum price limits upon the Plaintiffs for their products and services."[2]   (SAC at 81).   In

---

[1]  Similarly problematic, the four claims are followed by a single prayer for relief – despite the fact that the relief available under the Sherman Act (Count I and II), such as treble damages, is markedly different than that relief available under Florida law for tortious interference (Count III) or quantum meruit (Count IV).

[2]  A sellers' price-fixing cartel is illegal *per se* under Section I of the Sherman Act, because its intent is to produce monopoly profits which cause a price increase at the consumer level.   The effect and illegality of a buyers' cartel, such as the one alleged in the instant case, is not as clear because the intent is to lower prices (which would presumably inure to the consumers' economic

general terms, the Plaintiffs allege that the Defendants hold more than 90 percent of the private passenger automobile liability insurance market in Florida and that they all pay automobile repair shops (on behalf of their insureds or claimants) the same hourly rates for repairs, painting and the like. Those rates, the Plaintiffs allege, are based on market surveys performed by Defendant State Farm Mutual Automobile Insurance Company (henceforth, "State Farm"). (SAC at 29). The Plaintiffs allege that State Farm manipulates or fakes the survey results, producing bogus "market rates" that are below the rates actually prevailing in the marketplace. (SAC at 29-32). State Farm insists that it is only willing to pay these bogus market rates, and the other Defendants insist on paying no more than State Farm pays. (SAC at 32).

In addition, the Plaintiffs allege that the Defendants have a list of repair procedures for which they all refuse to pay, even when that particular procedure is recommended by the industry's leading repair-estimating databases, (SAC at 38), and that the Defendants insist that the shops use cheaper (and lower-quality) parts to do repairs, (SAC at 19-20). Finally, the Plaintiffs contend that when repair shops balk at any of this, such as by trying to raise their hourly rates, they are subject to being boycotted by the Defendants. (SAC at 26).

Section 1 of the Sherman Act, 15 U.S.C. §1, prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." While § 1 could be interpreted to bar every agreement in restraint of trade, the Supreme Court has long recognized that Congress intended to outlaw only unreasonable restraints. *See*, *e.g.*, *Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332, 342-43, 102 S.Ct. 2466, 2472-73,

---

benefit). Thus, while buyers' cartels have been held to violate the Sherman Act – *see, e.g., Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219 (1948) – courts assess them more carefully than is the case with sellers' cartels. *See, e.g., Balmoral Cinema v. Allied Artists*, 885 Fed.2d 313 (6th Cir. 1989) (rule of reason analysis required as to buyers' agreement to split up distribution of films).

73 L.Ed.2d 48 (1982) (citing *United States v. Joint Traffic Assn.*, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259 (1898)). Even where a restraint of trade is unreasonable, it is only prohibited if it was effected by a contract, combination or conspiracy. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775, 104 S.Ct. 2731, 2743, 81 L.Ed.2d 628 (1984). Because of this, the "crucial question" in § 1 cases is whether the challenged anticompetitive conduct "stems from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553, 127 S.Ct. at 1964 (alterations and citations omitted). A showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, but it falls short of conclusively establishing agreement or itself constituting a Sherman Act offense. *Id.* (citations omitted). Because of this, stating a claim under § 1 of the Sherman Act requires "a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965.

The alleged behavior of the Defendants – *i.e.*, paying the same rates, refusing to pay for the same list of procedures, requiring lower-quality parts – is not enough, on its own, to violate Section 1 of the Sherman Act. Evidence of conscious parallelism[3] alone does not permit an

---

[3]                    The Supreme Court has defined conscious parallelism as a "process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227, 113 S.Ct. 2578, 2590, 125 L.Ed.2d 168 (1993). In other words, conscious parallelism is the practice of interdependent pricing in an oligopolistic market by competitor firms that realize that attempts to cut prices usually reduce revenue without increasing any firm's market share, but that simple price leadership in such a market can readily increase all competitors' revenues.

*City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 570 (11th Cir. 1998)

inference of conspiracy unless the Plaintiff either (1) establishes that, assuming there is no conspiracy, each defendant engaging in the parallel action acted contrary to its economic self-interest or (2) offers other "plus factors" tending to establish that the defendants were not engaging merely in oligopolistic price maintenance or price leadership but rather in a collusive agreement to fix prices or otherwise restrain trade. *City of Tuscaloosa v. Harcros Chemicals, Inc*., 158 F.3d 548, 570-71 (11th Cir. 1998).

In *Twombly*, the Supreme Court noted a number of "plus factors," identified by commentators (and the parties in that case) that could support a plausible inference of such a collusive agreement, including: "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties;" conduct indicating "restricted freedom of action and sense of obligation that one generally associates with agreement;" or "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." *Twombly*, 550 U.S. at 556 n.4 (internal citations omitted).

Thus, in addition to setting out the Defendants' uniform conduct, the Plaintiffs must provide enough factual matter, taken as true, to show that the Defendants took steps that would otherwise have been against their economic self-interest or that tends to show collusion.

> The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief." A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a

meeting of the minds, an account of a defendant's commercial
efforts stays in neutral territory.

*Twombly*, 550 U.S. at 557.

## Acting against Self-Interest

In their response to the instant motion, the Plaintiffs argue that the allegations of the

Second Amended Complaint compel a conclusion that only the existence of a conspiracy can

explain the Defendants' actions:

> If only a single Defendant took the position [of] underpaying for
> repairs, compelling use of substandard and/or dangerous
> replacement parts, failing and refusing to pay for repairs that will
> return a vehicle to pre-accident condition, and similar actions, that
> Defendant would find itself losing customers [to] insurers who do
> pay for full and proper repairs utilizing safe and appropriate parts.

(Doc. 313 at 8). This argument fails for the obvious reason that paying as little as possible for

repairs is clearly in the self-interest of automobile insurers, as it improves their bottom lines. The

possible eventual loss of customers resulting from this practice is nothing more than speculation.[4]

*See Twombly*, 550 U.S. at 567-68 (rejecting argument that defendants' failure to compete in each

other's geographic areas was suggestive of conspiracy to restrain trade where plaintiff had no

support for allegation that such competition would have proven lucrative and reluctance to expand

beyond existing areas could be explained by legitimate concerns). *Compare Evergreen*

*Partnering Group, Inc. v. Pactiv Corp*., 720 F.3d 33 (1st Cir. 2013) (finding that plaintiff

successfully pled that defendants acted against their own interests in refusing to do business with

plaintiff, where successful pilot programs showed that participation in plaintiff's recycling

---

[4] Similarly, the Court notes that the Plaintiffs allege that they have been subjected to these
lowballing tactics by the Defendants for a number of years. Unless the Plaintiffs are admitting
that they have not been performing "full and proper repairs utilizing safe and appropriate parts"
during that period, it is also mere speculation that the Defendants' practices will have this effect.

enterprise would have been cost-neutral to defendants and would have increased sales to defendants' customers).

## Plus Factors

The Plaintiffs assert that the Second Amended Complaint contains the following (purported) plus factors:

**Market Power**:   The first such factor asserted by the Plaintiffs is that the Defendants "hold over ninety percent of the private passenger insurance market within the state of Florida." (Doc. 313 at 5).   However, the Plaintiffs offer no explanation as to how possession of this amount of market share constitutes a "plus factor".    The fact that a group of alleged price-fixers possess power in a particular market does not, standing alone, make it more likely that the members of that group have entered into an agreement to fix prices.   While such an agreement would likely be pointless if the participants lacked the muscle to enforce it, the mere (collective) possession of market share is not suggestive of collusion.

**Motive**:   Next, the Plaintiffs contend that the Defendants "shared a motive to conspire: profit," arguing that, as asserted in the Second Amended Complaint, the profit in the Florida automobile insurance industry "reaches billions of dollars."   (Doc. 313 at 5).   The Defendants' desire to make a profit cannot constitute a "plus factor," because conscious parallelism is itself a profit-maximizing behavior.   *See Jacobs v. Tempur-Pedic Int'l, Inc*., 626 F.3d 1327, 1342 (11th Cir. 2010) ("Jacobs had the burden to present allegations showing why it is more plausible that TPX and its distributors . . . would enter into an illegal price-fixing agreement . . . to reach the same result realized by purely rational profit-maximizing behavior.").

**Opportunity to Conspire**:    The Plaintiffs describe three insurance-related organizations of which some Defendants are members and contend that this provides the Defendants with

"numerous opportunities to conspire". (Doc. 313 at 5). The Plaintiffs' characterization overstates the Defendants' participation in these organizations; based on the allegations of the Second Amended Complaint, a number of the Defendants are not members of any of the organizations. Even if all of the Defendants had been members of one such organization, it would not aid the Plaintiffs' efforts to state a claim, because participation in trade organizations "provides no indication of conspiracy." *American Dental Association v. Cigna Corp.*, 605 F.3d 1283, 1295 (11th Cir. 2010).

**Uniformity of Action:** The Plaintiffs next point to their allegations that all of the Defendants pay the same labor rates for repairs, that the rates are not an accurate reflection of the rates prevailing in the market, and that they all refuse to pay for the same list of recommended procedures. (Doc. 313 at 6). The Plaintiffs contend that the odds against the Defendants all independently deciding to do these things are astronomical, thereby suggesting that they are the result of collusion. (Doc. 313 at 6). But the Plaintiffs do not allege that State Farm or any of the other Defendants try to keep their reimbursement rates or other details secret, or that they have any incentive for doing so. Given that this information would be possessed by every automobile repair shop in the state, it seems unlikely the Defendants could keep it secret even if they wished to do so. In the absence of plausible allegations that this information is not readily discoverable, this is merely parallel behavior, not indicative of collusion.

To the same end, the Plaintiffs attempt to rely on their allegations that the Defendants, when refusing to pay for certain recommended procedures, uniformly utilize the same explanations. (Doc. 313 at 5-6). For example, the Plaintiffs have alleged that the Defendants refuse to pay separately for a painting-related procedure known as "denib and finesse," claiming that it is included as part of the paint job, even though industry repair databases identify it as a

separate procedure.   (SAC at 40).   But the Plaintiffs fail to offer any explanation as to how this indicates collusion on the part of the Defendants, and no such rationale is apparent to the Court. Even if one assumes that the Defendants have agreed to refuse to pay for certain procedures, it defies logic that they would also agree to use the same bogus excuses to justify their refusal.

As set forth above, the Plaintiffs have again failed to state a claim for price fixing in violation of Section I of the Sherman Act.

### B.    Count II – Boycott

In Count II, the Plaintiffs argue that the Defendants have engaged in a group boycott to coerce the Plaintiffs into going along with the price-fixing scheme alleged in Count I.   (SAC at 85).   Specifically, the Plaintiffs allege in this count that the Defendants have steered actual and potential customers away by disseminating false statements about the quality, timeliness, and/or price of the work done by the Plaintiff shops.   (SAC at 85).

The generic concept of "boycott" refers to a method of pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target.   *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978). In the antitrust context, group boycotts, or concerted refusals to deal, may run afoul of Section 1 of the Sherman Act.   *See, e.g., Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 625 (1953) *and see F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 422 (1990) (finding that boycott by criminal defense lawyers, who refused to represent indigent clients until government increased compensation for doing so, constituted "a classic restraint of trade within the meaning of Section 1 of the Sherman Act").

The boycott claim in the First Amended Complaint was dismissed because the Plaintiffs failed to include well-pleaded facts setting forth a concerted refusal to deal.   (Doc. 291 at 21).   Instead, the First Amended Complaint contained only conclusory allegations that the Defendants had steered their insureds away from Plaintiff shops that sought to charge higher prices.   (Doc. 291 at 21).   In their

response to the instant motions, the Plaintiffs assert that they have remedied this issue by providing "factual details setting out specific instances where a named Defendant prohibited a customer from using a Plaintiff's services, *i.e.*, requiring that customer to patronize another shop."  (Doc. 313 at 12).

The Defendants point to a section of the Second Amended Complaint, titled "Steering," that includes a number of examples of insureds being told by one of the Defendants that they could not or should not patronize one of the Plaintiffs' shops, generally because their insurance policy did not permit it or because the Plaintiff shop was likely to do a bad job.  (SAC at 50-56). For example, the Plaintiffs include the following allegations regarding an insured named Ruby Srinivasan:

> In 2014, consumer Ruby Srinivasan told Progressive[5] she was taking her vehicle to Plaintiff [Gunder's Auto Center, Inc.] for repairs.  Progressive told Ms. Srinivasan Gunder's was "not on our program" and she had only two choices for repairs, Cannon Buick or a shop in another town.  Ms. Srinivasan was unaware she could refuse these choices and took her vehicle to Cannon.  The repairs performed by Cannon Buick were substandard and left the vehicle unsafe to drive.  Ms. Srinivasan took her vehicle to Gunder's for post-repair inspection and Progressive's adjuster agreed Cannon's repairs were substandard and ended up declaring the vehicle a total loss.

(SAC at 54).  The Second Amended Complaint includes four similar incidents involving customers of four other Defendants.[6]  (SAC at 52-56).

Despite the inclusion of these additional allegations, the Second Amended Complaint also fails to state a boycott claim.  Even accepting the allegations as true, they in no way suggest that

---

[5] It is not clear whether this is a reference to Defendant Progressive American Insurance Company or Defendant Progressive Select Insurance Company.

[6] The Second Amended Complaint also includes a number of incidents where a Defendant attempted but failed to steer one of its customers away from one of the Plaintiff shops.  (SAC at 51-52, 56-59).

the Defendants have engaged in a *concerted* refusal to deal. Each of the incidents involves a single Defendant discouraging one of its insureds from dealing with a single Plaintiff (or misleading the insured into refusing to do so); there are no allegations that at the time any of these steering incidents occurred, the other Defendants (or any of them) were also preventing their insureds from utilizing that particular Plaintiff's services. Just as important, the Plaintiffs never allege that any of these incidents had anything to do with price-fixing, as they do not allege that, at the time the steering occurred, the shop at issue was demanding higher rates or otherwise challenging the price-fixing scheme.

### C. Tortious Interference

In Count III, the Plaintiffs attempt to assert a claim for tortious interference with business relations. Under Florida law, the elements of tortious interference with a business relationship are: (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship. *Tamiami Trail Tours, Inc. v. Cotton*, 463 So.2d 1126, 1127 (Fla. 1985).

Tortious interference may be justified where the interfering defendant is not a stranger to the business relationship with which it is interfering. *Ernie Haire Ford, Inc. v. Ford Motor Co*., 260 F.3d 1285, 1294 (11th Cir. 2001). Under Florida law, a defendant is not a stranger to a business relationship, and thus cannot be held liable for tortious interference, when it has "a supervisory interest in how the relationship is conducted or a potential financial interest in how a contract is performed." *Palm Beach County Health Care Dist. v. Prof'l Med. Educ., Inc*., 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009). The Defendants in this case were not strangers to any business relationships between their insureds and auto repair shops, as the Defendants would be

paying for the repairs to be performed.   However, the privilege to interfere is not absolute, and it is not applicable where the plaintiffs allege that the interference was accomplished by improper means, such as misrepresentations and intimidation.   *See, e.g., Morsani v. Major League Baseball*, 663 So.2d 653 (Fla. 2d DCA 1995) (finding privilege to interfere not applicable where plaintiffs had "alleged the use of threats, intimidation, and conspiratorial conduct").   *See also* Florida Standard Jury Instruction (Civil) 408.6. (stating that one who uses physical violence, misrepresentations, illegal conduct or threats of illegal conduct has no privilege to use such methods, and interference using such methods is improper).

　　　To establish that tortious interference occurred, the Plaintiffs rely on the same incidents they cited as demonstrating that the Defendants were engaging in a boycott – *i.e.*, the five incidents set forth in the "Steering" section of the Second Amended Complaint, in which a Defendant made misrepresentations to one of its insureds or a claimant and convinced that person to not utilize a particular Plaintiff's services.   (SAC at 52-56).   However, those incidents are not sufficient to state a claim for tortious interference with a business relationship.

　　　Under Florida law, a protected business relationship need not be evidenced by an enforceable contract.   *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812 (Fla. 1994). However, the alleged business relationship must afford the plaintiff existing or prospective legal or contractual rights.   *Id.*   As a general rule,

> an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered.

*Id.* at 815.

　　　As set forth in the Second Amended Complaint, none of the five relationships are alleged to have progressed to the point where the repair shop possessed legal or contractual rights.   In

four of the five incidents, there was not even an "actual or identifiable understanding or agreement" because the affected Plaintiff was unaware at the time the steering occurred that the insured wanted to utilize its services.   For example, the Plaintiffs allege that

> Consumer Carissa Stone notified her insurer, GEICO, of an accident in February, 2014, and told GEICO she was taking her car to [Plaintiff Express Paint & Body, Inc. ("Express")] for repairs. Miss Stone specifically selected Express because she received several positive reviews of Express's work.   Upon being notified of the chosen body shop, GEICO told Miss Stone she was not allowed to take her car to Express because it wasn't one of GEICO's preferred shops.   Miss Stone was given a list of four other shops, all GEICO preferred shops, to which she was allowed to take her car.

(SAC at 52).   There is no allegation that Express even knew Stone existed before she was convinced to take her car to one of GEICO's preferred repair shops. The same holds true for three of the four other steering incidents set forth in the Second Amended Complaint.   There are no allegations that consumers Ruby Srinivasan, Kathy Rivera, or Mary Davis had any contact whatsoever with any of the Plaintiffs before their insurers (Defendants Progressive, State Farm, and Florida Farm Bureau General Insurance Company, respectively) steered them away from one of the Plaintiff shops to one of the insurers' preferred shops.   (SAC at 54-55).

The sole exception involves an insured named Michelle Niece.   (Niece's insurer is identified in the Second Amended Complaint only as "Allstate," despite there being two Allstate entities in this case: Defendant Allstate Fire and Casualty Insurance Company and Defendant Allstate Insurance Company.)   Niece took her vehicle to Ideal Auto – a d/b/a of Plaintiff North Bay Auto Service, Inc. – for an estimate before contacting her insurer.   (SAC at 54).   Niece was informed (presumably by Ideal Auto) that the repairs to her vehicle would take approximately three weeks.   (SAC at 54).   When she contacted Allstate, she was informed that if she took her vehicle to one of Allstate's preferred shops, the repairs would only take nine days and Allstate would provide her with a free loaner car.   (SAC at 54).   According to the allegations of the

Second Amended Complaint, Niece – whose policy did not provide rental car coverage – took her car to an Allstate preferred shop because she "could not afford a rental and needed a vehicle for work".   (SAC at 54).   Though the repairs took nearly a month, rather than the promised nine days (SAC at 54), there is no allegation that Allstate failed to provide a replacement vehicle.

Given that Niece had already taken her vehicle to Ideal Auto and gotten an estimate, it could be inferred that there was an understanding or agreement between the two that would have been completed had Allstate not interfered.   *See Ethan* Allen, 647 So. 2d at 815 (defining requirements for existence of a "business relationship").   According to the Plaintiffs, however, it was the provision of the loaner – rather than the promised length of the repair – that swayed Niece to take her car from Ideal Auto to Allstate's preferred repair shop.   (SAC at 54).   Allstate was not a stranger to the relationship between its insured and the repair shop, and therefore it was privileged to interfere in that relationship unless the interference was accomplished by "improper means," such as misrepresentations and intimidation.   A truthful promise to provide a replacement vehicle cannot constitute improper means.   Accordingly, Niece's insurer cannot be held liable for tortious interference on these facts.

Even if one of the five alleged steering incidents had itself been sufficient to state a claim for tortious interference, dismissal with prejudice would nonetheless be warranted as to Count III. Each of those five incidents purportedly set out a scenario in which one Defendant tortiously interfered with the relationship between one of its insureds and one Plaintiff.   However, what has been pled in Count III is a claim that *all* of the Defendants collectively interfered with business relationships involving *all* of the Plaintiffs:

> The Defendants have repeatedly engaged in malicious actions and a
> course of conduct designed to interfere with and injure the
> Plaintiffs' business relations and prospective business relations. The
> Defendants have repeatedly steered and attempted to steer customers

> who have either initiated or verbalized the intent to initiate a
> business relationship/transaction with a Plaintiff from the Plaintiffs'
> respective businesses through their repeated campaign of
> misrepresentation of facts, failure to verify facts damaging or
> tending to cause damage to the Plaintiffs business reputations before
> conveying the same to members of the public, and, inter alia,
> implications of poor quality work, poor quality efficiency, poor
> business ethics and practices, and unreliability.

(SAC at 86). Despite making these assertions, Plaintiffs have not pled any facts showing that more than a single Defendant was involved in any of the alleged incidents of steering or that more than a single Plaintiff suffered a loss of business as a result of any such incident.[7] Despite three efforts, totaling nearly 200 pages, the Plaintiffs have not even come close to alleging facts that might support the claim outlined in Count III.[8]

### D. Quantum Meruit

In Count IV, the Plaintiffs collectively assert a claim for quantum meruit against all of the Defendants. Under Florida law, "quantum meruit" is a legal doctrine which, in the absence of an express agreement, imposes legal liability on a contract that the law implies from facts where one receives goods or services from another under circumstances where, in the normal course of common affairs, a reasonable person receiving such benefit would ordinarily expect to pay for it. *See, e.g., Osteen v. Morris*, 481 So.2d 1287, 1289 (Fla. 5th DCA 1986). This fiction was adopted to provide a remedy where one party was unjustly enriched – where that party received a benefit under circumstances that made it unjust to retain it without giving compensation. *Hull &*

---

[7] And, as noted *supra*, there are no allegations that any of the Plaintiffs whose prospective customers were steered elsewhere had been engaged in any conduct (such as demanding higher labor rates) that might have provoked retaliation from any Defendant.

[8] In addition, the Court notes that the failure to include any allegations of tortious interference regarding 34 of the 39 Defendants is a separate basis for dismissal with prejudice of Count III as to those 34.

*Company, Inc. v. Thomas*, 834 So.2d 904, 906-07 (4th DCA 2003) (citing *Commerce Partnership 8098 Ltd. Partnership v. Equity Contracting Co.*, 695 So.2d 383, 386 (Fla. 4th DCA 1997)).   The elements of an action for quantum meruit are that (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred; and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it.   *Id.*

The Plaintiffs asserted this same claim in the First Amended Complaint.   In doing so, they argued that the repairs they performed on vehicles owned by (or damaged by) the Defendants' customers "benefitted Defendants and Defendants' insureds/claimants for whom Defendants are required to provide payment for repairs".   (Doc. 167 at 43).   That quantum meruit claim was dismissed because, at least as set forth in the First Amended Complaint, the repairs did not confer a benefit on the insurers.   Rather, the only thing the insurers obtained as a consequence of those repairs was an obligation to pay for them.   (Doc. 291 at 9).

Beyond the problem with the way this claim has been pled,[9] the quantum meruit claim fails for at least two reasons.   In their response to the instant motions, the Plaintiffs assert that the repairs they performed provided a benefit to the Defendants because the Defendants, pursuant to their policies with their insureds, were obligated to either (1) pay for the repairs or (2) repair the vehicles themselves.   (Doc. 313 at 27).   The Court assumes, *arguendo,* that a Defendant that was obligated to perform a repair would obtain a benefit if the repair was performed by one of the

_____

[9] As was the case with the tortious interference claim asserted in Count III, the Plaintiffs in Count IV have asserted a single quantum meruit claim against all of the Defendants, as though all of the Plaintiffs collectively did something (or some things) that conferred a benefit on the Defendants as a group.   In actuality, what they describe is a series of unrelated interactions in which a single Defendant has (allegedly) been unjustly enriched at the expense of a single Plaintiff.

Plaintiffs instead. However, the Plaintiff has not alleged that any Defendant is ever obligated to perform repairs. To the contrary, at the outset of the "Facts" section, after stating that the Plaintiffs provide repair services to the Defendants' policyholders and claimants, the Plaintiffs assert that "[e]ach Defendant is individually responsible *for payment* for those repairs for their respective policyholders and claimants." (Doc. 296 at 10) (emphasis added). Similarly, within Count IV itself, the Plaintiffs allege that the repairs they performed "benefitted Defendants and Defendants' insureds/claimants for whom Defendants *are required to provide payment for repairs*." (Doc. 296 at 88) (emphasis added). The Plaintiffs have not directed the Court's attention to any allegation within the Second Amended Complaint that the Defendants are themselves obligated to perform repairs, and the Court's research has not uncovered any. Accordingly, the Court again finds that the Plaintiffs have failed to properly allege that they conferred a benefit on any of the Defendants.

Moreover, even accepting their allegations as true, the Plaintiffs have not shown that it would be inequitable to permit the Defendants to retain any benefit(s) that might have been conferred on them. Although the Plaintiffs have kept the details of the transactions between themselves and the insureds/claimants somewhat murky, the inescapable inference to be drawn from the Second Amended Complaint is that, before doing any of the repairs at issue in this case, the Plaintiffs knew how much the Defendants proposed to pay. The Second Amended Complaint is replete with allegations that the Defendants all pay the same hourly rates, use the same estimating databases, refuse to pay for the same associated procedures, and have been doing so for years. In their response to the instant motion, the Plaintiffs admit that they were not at all surprised by the amount they were paid for any particular repair: They scornfully translate the Defendants' argument on this point as being that "since *we told you* we were going to 'wrong you'

and you knew we 'wronged you,' therefore you cannot seek justice for the wrongs committed" (Doc. 313 at 28) (emphasis added).[10]

"The basis for a quantum meruit award is essentially an equitable one. One person should not benefit from the work efforts of another under circumstances where the person doing the work has the reasonable expectation of being paid by the person benefitted, and the person benefitted has a reasonable expectation of paying for the work." *Hallowes v. Bedard*, 877 So.2d 953, 957 (Fla. 5th DCA 2004). With foreknowledge of the amounts the Defendants were willing to pay, the Plaintiffs could not have had a reasonable expectation of receiving more. For all of the reasons set forth above, Count IV will also be dismissed.

## IV. Conclusion

This is the Plaintiffs' third arduous attempt to state a claim. The problems identified in response to their initial complaint – shotgun pleading, vagueness, and implausibility – have persisted in their subsequent efforts. Based upon a review of the pleadings in this and the other 20-odd cases – almost all of which share the same shortcomings – the Court finds that giving the Plaintiffs another opportunity to state a claim would be an exercise in futility. Despite becoming

---

[10] The commercial arrangement here is a three-party agreement in which the auto repair shop agrees to perform certain repairs to the customer's car in consideration of payment by the insurance company. If the insurer breaches that agreement by paying less than the agreed amount or by refusing to pay for agreed-upon procedures or parts, a breach of contract claim may be available. But this scenario does not implicate the equitable remedy of unjust enrichment.

much wordier, the Plaintiffs' pleadings have not come remotely close to satisfying the minimum pleading requirements as to any of the claims asserted. Accordingly, all four claims will be dismissed with prejudice.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on September 23, 2015.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party